# EXHIBIT 1

**Award**
**NASD Dispute Resolution**

In the Matter of the Arbitration Between:
Robert J. Knight, Claimant v. Merrill Lynch, Pierce, Fenner & Smith Incorporated, Patricia Gail Williams and George Scott Ralston, Respondents

Case Number: 06-03430                    Hearing Site: San Francisco, California

Nature of the Dispute: Associated Person vs. Member and Associated Persons

## REPRESENTATION OF PARTIES

For Claimant:                            Timothy A. Canning, Esq.
                                         Attorney A Law
                                         Novato, California

For Respondents:                         Patricia Bailey Tsipras, Esq.
                                         Rubin, Fortunato & Harbison P.C.
                                         Paoli, Pennsylvania

## CASE INFORMATION

Statement of Claim filed: July 20, 2006

First Amended Statement of Claim filed: March 23, 2007

Claimant's Opposition to Respondents' Motion to Dismiss filed: December 18, 2006

Claimant's Uniform Submission Agreement signed: July 6, 2006

Joint Statement of Answer of Respondents Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Patricia Gail Williams and George Scott Ralston filed: October 2, 2006

Respondents' Motion to Dismiss filed: October 25, 2006

Respondents' Reply in Support of Their Motion to Dismiss filed: December 29, 2006

Respondents' Supplemental Brief in Support of Their Motion to Dismiss filed: March 23, 2007

NASD Dispute Resolution
Arbitration No. 06-03430
Award  Page 2 of 6

Respondents' Answer and Affirmative Defenses to Claimant's Amended Statement of Claim filed:  April 2, 2007

Respondent Merrill Lynch's Uniform Submission Agreement signed:  August 12, 2006

Respondent Patricia Gail Williams' Uniform Submission Agreement signed:  September 28, 2006

Respondent George Scott Ralston's Uniform Submission Agreement signed: September 14, 2006

## CASE SUMMARY

Claimant alleged wrongful termination with respect to his employment with Merrill Lynch.  Claimant also alleged discharge in breach of implied contract, breach of the covenant of good faith and fair dealing, tortious discharge in violation of public policy, defamation and trade libel, intentional infliction of emotional distress and intentional interference with prospective economic advantage.

Respondents denied Claimant's allegations of wrongdoing and denied any liability to Claimant.  Respondents also asserted affirmative defenses.

## RELIEF REQUESTED

Claimant requested the following relief:
1. As to all Respondents, for compensatory damages, including lost wages and benefits, $800,000.00 in specific forfeited benefits and $1,700,000.00 for lost wages to date, or that amount proven at hearing;
2. As to all Respondents, $7,500,000.00 or that amount Claimant would have reasonably earned over the remainder of his career, based upon his partnership, and the present value of over $500,000,000.00 in client assets under management at the time of his termination;
3. As to all Respondents, for emotional distress, an amount this Panel deems appropriate, according to proof;
4. As to punitive damages, an amount this Panel deems appropriate;
5. Reimbursement of the reasonable costs associated with the prosecution of this matter, including expert witness fees, attorney fees, and arbitration fees in the arbitrators' discretion; and
6. Such other and further relief that the arbitrators consider proper.

Respondents requested that Claimant's claims be denied in their entirety and that Respondents be awarded all other relief that the Panel deems reasonable and appropriate under the circumstances presented in this proceeding.

## OTHER ISSUES CONSIDERED AND DECIDED

On January 15, 2007, the Panel permitted Claimant to amend his claim to assert discharge in breach of a written contract.

The Panel agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, and positions of the parties relative to Respondents' Motion to Dismiss, the Panel decided in full and final resolution of the issues submitted for determination as follows:

1.     Respondents' Motion to Dismiss, with prejudice, the claims filed by Claimant Robert J. Knight in his initial Statement of Claim and in his Amended Statement of Claim is Granted. Accordingly, all claims by Claimant, including the claim for punitive damages, are dismissed.

NASD Code of Arbitration Procedure Rule 10304 expressly contemplates the applicability of California Statutes of Limitation. Claimant filed his initial claim with NASD Dispute Resolution within four years of his termination, but more than three years after his termination. Mr. Knight claims Wrongful Termination, Violation of Public Policy, Defamation and Trade Libel, Intentional Infliction of Emotional Distress, and Intentional Interference with Prospective Economic Advantage. With the exception of a claim founded on a written contract, all of Mr. Knight's claims are time-barred.

California Code of Procedure Section 337 provides that an action upon any contract, obligation or liability founded upon an instrument in writing must be filed within four years. None of the writings submitted by Claimant in support of his claim expressly provides for a cause of action for breach of his employment agreement. Mr. Knight's claim rests on implicit provisions of his employment agreement and other documents; implicit agreements are not written agreements and therefore are not within the scope of CCP 337.

2.     Each party shall bear its own costs, including attorney's fees.

3.     All other relief requested and not expressly granted is denied.

NASD Dispute Resolution
Arbitration No. 06-03430
Award   Page 4 of 6

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees
NASD Dispute Resolution received or will collect the non-refundable filing fees for each claim as follows:

| | |
|---|---|
| Initial claim filing fee | ≈ $600.00 |

### Member Fees
Member fees are assessed to each member firm that is either a party in the matter or an employer of a respondent associated person at the time of the events that gave rise to the dispute, claim, or controversy.   Accordingly, Merrill Lynch is a party and the following fees are assessed:

| | |
|---|---|
| Member Surcharge | = $3,350.00 |
| Pre-Hearing Process Fee | = $  750.00 |
| Hearing Process Fee | = $5,500.00 |
| Total Member Fees | = $9,600.00 |

### Forum Fees and Assessments
The Panel assessed forum fees for each session conducted or each decision rendered on a discovery-related motion on the papers.  A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| (3) Pre-hearing conference sessions with the Panel @ $1,200.00/session | | | = $3,600.00 |
| Pre-hearing conferences: | December 4, 2006 | 1 session | |
| | January 15, 2007 | 1 session | |
| | May 10, 2007 | 1 session | |
| **Total Forum Fees** | | | = **$3,600.00** |

The Panel assessed the $3,600.00 in forum fees to Respondent Merrill Lynch.

NASD Dispute Resolution
Arbitration No. 06-03430
Award   Page 5 of 6

## Fee Summary

1.  Claimant Robert J. Knight is charged with the following fees and costs:
    Initial Filing Fee pursuant to Armendariz v. Foundation
    Health Psychcare Services, Inc. 24 Cal.4[th] 83            = $        200.00
    Less Payments                                               = $(   3,700.00)
    **Refund Due Claimant**                                     = $(   3,500.00)

2.  Respondent Merrill Lynch is charged with the following fees and costs:
    Balance due for Claimant's Filing Fee pursuant to
    Armendariz v. Foundation Health Psychcare
    Services, Inc. 24 Cal.4[th] 83                              = $        400.00
    Member Fees                                                 = $     9,600.00
    Forum Fees                                                  = $     3,600.00
    Total Fees                                                  = $    13,600.00
    Less Payments                                               = $(   9,600.00)
    **Balance Due NASD Dispute Resolution**                     = $     4,000.00

All balances are payable to NASD Dispute Resolution and are payable upon the receipt
of the Award pursuant to Rule 10330(g) of the Code.

NASD Dispute Resolution
Arbitration No. 06-03430
Award   Page 6 of 6

## ARBITRATION PANEL

Thomas D. Reese          -      Public Arbitrator, Presiding Chair
Michael Garcia           -      Public Arbitrator
Linda H. Perry-Cabrera   -      Non-Public Arbitrator

**Concurring Arbitrators' Signatures**

_Thomas D Reese_                    5/17/07
Thomas D. Reese                     Signature Date
Chair, Public Arbitrator

Michael Garcia                      Signature Date
Public Arbitrator

Linda H. Perry-Cabrera              Signature Date
Non-Public Arbitrator

                                    05/18/07
                                    Date of Service

NASD Dispute Resolution
Arbitration No. 06-03430
Award Page 6 of 6

## ARBITRATION PANEL

| Thomas D. Reese | - | Public Arbitrator, Presiding Chair |
| Michael Garcia | - | Public Arbitrator |
| Linda H. Perry-Cabrera | - | Non-Public Arbitrator |

### Concurring Arbitrators' Signatures

_____
Thomas D. Reese
Chair, Public Arbitrator

_____
Signature Date

_____
Michael Garcia
Public Arbitrator

_____
Signature Date

_____
Linda H. Perry-Cabrera
Non-Public Arbitrator

_____
Signature Date

_____
05/18/07
Date of Service

NASD Dispute Resolution
Arbitration No. 06-03430
Award   Page 6 of 6

## ARBITRATION PANEL

Thomas D. Reese          -     Public Arbitrator, Presiding Chair
Michael Garcia           -     Public Arbitrator
Linda H. Perry-Cabrera   -     Non-Public Arbitrator

### Concurring Arbitrators' Signatures

_____
Thomas D. Reese                              _____
Chair, Public Arbitrator                     Signature Date


_____
Michael Garcia                               _____
Public Arbitrator                            Signature Date

_Linda H. Perry-Cabrera_                     5/17/07
_____                      _____
Linda H. Perry-Cabrera                       Signature Date
Non-Public Arbitrator

                                             5/18/07
                                             _____
                                             Date of Service



# Proof of Service

State of California, County of Los Angeles

I am employed in the county of Los Angeles. I declare that I am over the age of eighteen (18) and not a party to this action. My business address is:

**NASD Dispute Resolution**
**300 South Grand Avenue, Suite 900**
**Los Angeles, California 90071**

On May 18, 2007, I served the following documents described as:

**Award, Cover Letters, and Invoice Statement for Arbitration Case No.** )6-03430 on the interested parties in this action by placing the true copies thereof enclosed in the sealed envelopes as follows:

Timothy A. Canning, Esq., Attorney At Law, Two Commercial Blvd., Su te 203, Novato, CA 94949; Fax number: 415-382-9421

Patricia Bailey Tsipras, Esq., Rubin, Fortunato & Harbison P.C., 10 South Leopard Road, MCS Building, Suite 202, Paoli, PA 19301; Fax number: 610-854-4301

☒ I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

☐ By Personal Service, I caused such envelope to be delivered b / hand to the individuals at the addressee(s) listed.

☐ By overnight courier, I caused the above-referenced documer ts to be delivered to an overnight courier service (Federal Express), for delivery to the above addressees.

☒ By facsimile machine, I caused the above-referenced documer ts to be transmitted to the above-named persons at the numbers abov ?.

☒ (STATE) I declare under penalty of perjure under the laws of :he State of California that the above is true and correct.

☐ (FEDERAL) I declare that I am employed in the office of a me nber of the bar on this court at whose direction the service was made.

Executed this May 18, 2007, at Los Angeles, California.

*Rosemenie Famos*
Rosemenie Famos

# EXHIBIT 2

# TIMOTHY A. CANNING
## ATTORNEY AT LAW

Two Commercial Blvd., Suite 203
Novato, California 94949

Telephone: (415) 382-7899
Facsimile: (415) 382-9421
E-Mail: tc@tclaws.com
Website: www.tclaws.com

July 20, 2006

George Friedman
Director of Arbitration
NASDR
One Liberty Plaza, 27th Floor
165 Broadway
New York, New York 10006

Re:    Robert Knight v. Merrill Lynch, Pierce  Fenner & Smith Inc.,
       Patricia Williams and Scott Ralston

Dear Mr. Friedman:

This firm represents **Robert Knight ("Claimant")**, formerly an "Associated Person" who at all times relevant to the matters alleged herein resided in San Jose, California. This letter is to assert the claims of Mr. Knight with respect to his employment at and wrongful termination by an NASD member firm, in or about July 26, 2002. Respondents are **Merrill Lynch, Pierce Fenner & Smith** (CRD 7691), the firm which claimant worked at for approximately 10 years, and **Patricia Williams**, claimant's branch manager and direct supervisor, and **Scott Ralston**, Ms. Williams' supervisor and District Director (collectively, **"Respondents"**).

Claimant and Respondent Williams were domiciled in the San Jose, California, branch office of Merrill Lynch. Claimant specifically reserves the right to amend this claim and name other individuals as respondents, whose identities are as yet unknown. Claimant requests that this matter be set for hearing in San Francisco, California in accordance with NASD policy.

## Claim Summary

1)    Robert Knight was in every sense of the word an exemplary employee, if not an exemplary individual. A graduate of the United States Naval Academy in Annapolis, Md., he obtained a Master's of Science degree from the Naval Post Graduate School in Monterey, CA and served his country as a naval officer and naval pilot for twenty four years before he retired in 1992. While teaching at Moffet Air Force base he was encouraged by one of his students to apply for a job at Merrill Lynch. Since he always had an interest in the securities markets he did just that.

2)    Merrill Lynch hired claimant in 1992, and through 1996 claimant became a successful financial advisor. By 1996 claimant was encouraged to go into management.

3)  Claimant became a producing manager in Cupertino, California, which was a satellite office of the San Jose, California branch office of Merrill Lynch. After approximately two years as a branch manager he was encouraged by his then immediate supervisor, Jim Hayes, to become a full time partner, of arguably the most successful broker in the region, Joe Thomas, a multi million dollar producer. At the time Thomas had been a producer for about 30 years and was nearing retirement age.

4)  Claimant went into that arrangement with the full understanding that upon Thomas retirement, at some reasonable time in the future, he would acquire Thomas' entire book. Although difficult to place a precise value upon that book, particularly in light of the fact that Thomas has not yet retired, based upon current market prices paid for experienced producers by firms such as Merrill Lynch, a book generating over $5 million in gross commissions, a value of $7.5 million, or 150% of annual gross, would be in the ball park.

5)  Upon partnering with Thomas, Claimant and Thomas merged their respective books of clients and began operating under one joint production number. Claimant gave up managing an office of 20 brokers, along with future potentially lucrative management assignments, in exchange for the ultimate acquisition of Thomas' book of clients upon his partner's eventual retirement. Based upon discussions which took place at that time, between Thomas and Claimant, said retirement was expected to occur over three to five years, or roughly 2003.

6)  The partnership was successful. Claimant brought in many new accounts and he and Thomas got along well. Claimant earned approximately $300,000 in 2001, his last full year of compensation with Merrill Lynch as he was terminated for cause in or about July 26, 2002. The percentage of the joint production which claimant received represented roughly 20% of their combined overall production of approximately $4 million. Although each were partners, claimant was not an equal partner. Equality however was never an issue, since each understood that upon Thomas' retirement, his book of business would go to claimant.

7)  Claimant was terminated "for cause" on July 26, 2002. The "termination for cause" as identified on Claimant's U-5 states "*Mr. Knight was terminated on July 26, 2002, after it was determined that he failed to timely and fully inform management of allegations made by an individual who was not a firm client relating to wrong doing by a firm client*". Claimant today alleges that he did nothing wrong, that nothing he did went against firm policy. His termination was wrongful.

8)  Merrill Lynch defines its corporate culture by five principles. These principles were always adhered to by claimant in all his dealings with or on behalf of Merrill Lynch. Nothing in claimant's personnel file; a file distinguished by innumerable awards honoring and distinguishing claimant during his tenure at Merrill Lynch, will indicate otherwise. These five principles are: *1) client focus; 2) respect for the individual; 3) teamwork; 4) responsible citizenship; and 5) integrity*. Claimant strictly adhered to all five principles, but unfortunately for claimant, the sense of integrity, discipline and an honor code, which he operated under while at Merrill Lynch can not be said for those responsible for claimant's wrongful termination. Claimant's wrongful termination involves a cast of many amidst a backdrop of

3

corporate liability avoidance. The details are far too numerous to fully address in this statement of claim but the essential facts follow.

9)    On April 3, 2002, claimant received an unsolicited telephone call from an individual, someone that was not a client of Merrill Lynch. They wanted to discuss the account of a Dr. Joel Siegel. The caller indicated that the branch office involved was the Cupertino office that claimant had been the manager of 5 years previously. Although no longer the manager, claimant occasionally received calls concerning that office. The individual identified herself as an assistant of Dr. Siegel.

10)    Dr. Siegel's assistant indicated she would be sending a letter, and claimant advised her that he could not discuss with her any circumstances concerning the owner of the account without that individual's permission. (pursuant to Merrill Lynch policy *"information or records concerning the business of the firm and/or its clients may not be released except to persons legally entitled to receive them"* ML Compliance Outline, dated August 1997). The individual that owned the account was Steve Fertitta. (Fertitta was a local businessman who ran in insurance agency in Santa Clara County.) Mr. Fertitta was not a customer of claimant's, but of another broker in the branch office, Charles Tyler. Claimant asked to speak with Dr. Siegel, but he was unavailable and also informed the caller he was no longer the branch manager.

11)    Claimant reported the call to Ms. Ellen Trainer, who was the Administrative Manager's assistant, of the Cupertino office, at the time. Claimant also notified Marilyn Taylor, who was the compliance manager. Ms. Trainer then advised claimant that Chuck Tyler was the broker of record, whom claimant then notified in person. Since claimant was no longer the branch manager, and since he had notified the branch vis a vis Ms. Trainer, and Ms. Taylor, as well as the broker, claimant correctly believed there was nothing more required of him.

12)    Further, claimant was sent a confirming e-mail from Chuck Tyler, advising him *"don't worry about today's call. The only relationship we have with that guy is that we have been sending him $900 per month from Steve Fertitta's IRA. He has us mixed up with another firm"*. (pursuant to an email dated April 3, 2002) This email, like all correspondence received or sent at any Merrill Lynch office was reviewed by someone at Merrill Lynch, both in the Cupertino and San Jose office locations. Those individuals would have reported to either the branch manager of Cupertino or the San Jose branch office manager (Patricia Williams).

13)    On or about May 19, 2002 a letter from Dr. Siegel was delivered to the Merrill Lynch office in San Jose, by overnight courier. This correspondence, like all correspondence received or sent out at any Merrill Lynch branch office was reviewed by someone prior to dissemination to claimant. (The two individuals most likely assigned that task would have been either the administrative manager or the operations manager). That individual(s) would have reported to respondent Patricia Williams. The letter essentially alleged that there may have been co-mingling of funds or assets taking place between Steve Fertitta's account and Dr. Siegel's account (Dr. Siegel was not a client of Merrill Lynch).

14)    Claimant read the letter and immediately went to Patricia Williams' office to discuss it with her. Ms. Williams was not in her office, and her office was locked. Claimant then gave the letter to David Kuipers (acting administrative manager) who told him

4

he would make sure Ms. Williams knew of the letter). This took place within a few minutes after claimant received and read the letter.

15) Approximately two days later Ms. Williams allegedly discovered the letter lying on her chair. Ms. Williams was angry and told claimant that *"this was unacceptable"*. Claimant advised Ms. Williams he did not know how it got onto her chair, and she advised claimant that she did not know how it got on her chair either. Approximately two weeks later, a Ms. Laine Benning, (associate administrative manager) admitted that she put the letter in Ms. Williams' chair without any comments or notes.

16) Ms. Williams may have been justified to be upset in the manner the letter was brought to her attention, but her anger was misdirected at claimant. All incoming correspondence must have been reviewed, time stamped and logged in by someone other than claimant. Even if claimant were to have treated this letter with less importance than it deserved, which claimant will strongly deny having done, the potential of loss or exposure to Merrill Lynch was not changed. Importantly, because the letter raised the specter of an embezzlement, even if a Merrill Lynch employee were to have been found to be the embezzler, any corresponding loss would have been covered by insurance. Therefore, Merrill Lynch stood to lose no money should the facts alleged in Siegal's letter be determined to be true, and a Merrill employee, at fault.

17) Merrill Lynch investigated the letter and the circumstances it represented. Claimant traveled to New York City, at the request of the firm, and was interrogated at length by Merrill Lynch's legal department, even though the interrogators failed to identify themselves as attorneys, or that claimant was himself the subject of an investigation. Claimant was under the intentionally misguided impression, given to him by Pat Williams, his branch manager, he was there only to assist Merrill Lynch.

18) Claimant returned to San Jose and discovered that he was about to be terminated for cause. This, in spite of reassurance by Patricia Williams that he had nothing to worry about. *"Just be truthful, you did nothing wrong"*, was precisely what Pat Williams advised claimant.

19) On Friday, July 26, 2002, claimant met with Pat Williams, whereupon she read to claimant the following: *"Among other things, you failed to timely inform branch management of significant and potential serious complaints brought by Dr. Siegel's bookkeeper alleging mismanagement and impropriety in connection with assets he believed were in a Merrill Lynch account. Particularly in light of your prior management experience, you should have been aware that such a complaint was serious and required management attention in a timely fashion."*

20) Claimant was informed, and therefore believes that Scott Ralston was the Merrill Lynch executive who actually made the decision to terminate him. Claimant specifically asked to speak with Mr. Ralston, but was refused the opportunity. Mr. Ralston never asked claimant what had occurred. Whatever facts he thought he had, Mr. Ralston never got the story from the claimant's mouth.

5

21)     Claimant alleges he did nothing wrong. He **did** notify branch management, in the person of Ellen Trainer and Marilyn Meyers and Chuck Tyler, when he received the first telephone call. He did pass on the complaint letter, as soon as it arrived. Ms. Taylor made it clear she would take any appropriate action once the letter arrived.

22)     Even assuming for the sake of argument, claimant did something wrong, the appropriate action to take, worse case, was a letter of reprimand. In effect, instead of a traffic citation, claimant was given a death sentence, carried out immediately upon its issuance.

23)     Based upon information and belief, Pat Williams, Scott Ralston or their designees, were the individuals responsible for approving any number of unorthodox distributions (and/or deposits) from Fertitta's account(s) and deposited to the accounts of other individuals, some of who were other Merrill Lynch customers. Claimant alleges that his termination was likely an intentional attempt to deflect potential responsibility and liability away from respondents' Williams and Ralston, whose approval for many of these unorthodox distributions was required. At the time, Merrill Lynch compliance personnel most likely believed that these two individuals had exposed Merrill Lynch to the possibility of substantial loss and embarrassment, based upon their negligent supervision over these customer accounts and branch office personnel.

24)     The unorthodox distributions that occurred in these accounts, namely the transference of monies, to and from unrelated accounts within a branch office, would normally have generated heightened scrutiny. But claimant was only a producer, and no longer a branch manager. He did not supervise these accounts. He did not approve the distributions.

25)     Merrill chose to terminate Mr. Knight for failing to notify the firm of the complaint by a non-customer, in a timely fashion, rather than Ms. Williams, the director of a branch office complex generating over $50,000,000 in annual revenue or Mr. Ralston, the District Director, both of whom had direct supervisor responsibilities over the accounts in question, the broker in question, and the other branch office personnel who were directly responsible to monitor branch office activity and supervise branch office personnel.

26)     Based upon numerous regulatory findings against Merrill Lynch over the past five years, over far more serious wrongdoing than *an alleged failure to promptly notify the firm of a non-customer complaint*, wherein no Merrill Lynch employee was terminated or even fined by the company for their wrongdoing, claimant alleges that the action taken against him by Merrill Lynch, in essence destroying his career, over something in which he personally did nothing wrong makes absolutely no sense. Furthermore, this type of conduct flies directly in the face of the contract which all employees of brokerage firms have with their employer; namely, that as an NASD member each member is required, by contract to exercise *"good faith and fair dealing"* among and between its members. That is the cement that binds the securities industry together.

27)     Since his termination, Claimant has been unable to obtain employment in the securities industry based upon the derogatory statements made by respondents on claimant's U-5. He has lost his clientele, his partnership and his ability to earn a

substantial livelihood. Instead, claimant became a full time teacher, sustaining an approximate 75% decline in income.

28) Although claimant may never know for certain what was really on Respondent's agenda, one thing is for certain. Claimant held in impeccable record as a producer and as a branch manager. At all times he conducted himself in accordance with Merrill Lynch's in house rules, as well as the rules governing the conduct of registered representatives. He was an exemplary employee that was wrongfully discharged.

29) Claimant's termination was both arbitrary and capricious. Perhaps it was done to insulate Merrill Lynch from any possible regulatory or legal retaliatory action based upon the fraud committed against Dr. Siegel, or other actual customers of Merrill Lynch, by Fertitta, or perhaps he was fired to protect someone else's reputation, almost certainly Ms. Williams and Mr. Ralston's. But, his termination and the subsequent desecration of his reputation and ability to earn a livelihood within the securities industry was something that Merrill Lynch knew would happen and for reasons unknown, wanted to see happen to this long time, loyal employee.

30) Further, claimant alleges that Merrill Lynch may have, at is has done in other regulatory investigations with which claimants representatives are in fact familiar, intentionally withheld relevant information, in this instance   concerning the Fertitta matter from investigators, in order  to further insulate itself from possible culpability and individual responsibility in the ensuing criminal investigation.  As in similar matters to this, the devil is frequently found in the details.

31) Claimant alleges wrongful termination, defamation, denial of severance and other benefits, and other consequential and foreseeable damages in the amount of $20 million or more.

Causes of Action

Claimant alleges that Respondents actions have violated the most fundamental rules governing the conduct of industry members. Namely, that NASD members will be guided by principles of good faith and fair dealing with one another.

Based upon Respondents' conduct Claimant asserts claims against these Respondents for: discharge in breach of implied contract, including breach of the covenant of good faith and fair dealing; tortious discharge in violation of public policy; defamation and trade libel; intentional infliction of emotional distress; and intentional interference with prospective economic advantage.

As a result of the employment relationship which existed between Robert Knight and Merrill Lynch, the expressed and implied promises made in connection with that relationship, and the acts, conduct, and communications resulting in these implied promises, Merrill Lynch promised to act in good faith toward and deal fairly with Knight.  This requires, among other things that:

a)    Each party in the relationship must act with good faith toward the other concerning all matters related to the employment;

b)    Each party in the relationship must act with fairness toward the other concerning all matters related to the employment;

c)    Neither party would take any action to unfairly prevent the other from obtaining the benefits of the employment relationship;

d)    Merrill Lynch would treat employees similarly who are similarly situated;

e)    Merrill Lynch would comply with its own representations, rules, policies and procedures in dealing with Claimant;

f)    Merrill Lynch would not terminate, or otherwise cause the constructive discharge of Claimant without a fair and honest cause, regulated by good faith on Merrill's part;

g)    Merrill would not terminate Claimant in an unfair, arbitrary or capricious manner;

h)    Merrill would give Claimant's interests as much consideration as it gave its own interests; and

i)    Merrill would maintain appropriate supervisory standards to govern the conduct of its employees with respect to its clients.

**Merrill Lynch's discharge of Claimant was wrongful, in bad faith, and unfair.**

Claimant further alleges that Merrill Lynch breached the covenant of good faith and fair dealing when it:

a)    Refused to abide by its own policies and by the standard of the industry when dealing with Claimant. A broker's book of clients is the only true and viable measure of a broker's success. The broker's book is his business and is considered, by the securities industry, a valuable asset of the broker's, and one that may be transferred from brokerage firm to brokerage firm. Merrill Lynch illegally and unethically interfered with claimant's contractual relationship with his clients. A relationship that would be earning claimant close to $2 million annually today, based upon his former partners' retirement.

b)    Unfairly prevented Claimant from obtaining the benefits of his 10 year employment relationship by confiscating substantial financial benefits acquired by claimant;

c)    Discharged Claimant's employment for pre-textual reasons, in order to deflect personal liability for others' defalcations against claimant, and in the process,  permit others to convert Claimant's accounts to themselves;

d)    Caused Claimant's termination for false reasons and in a manner that    was inconsistent with Merrill Lynch's stated policies and procedures.

Merrill Lynch's breach of the covenant of good faith and fair dealing was the proximate cause of Claimant's injury and damages. Claimant had a partnership arrangement in which he earned over $400,000 in 2000 and $300,000 in 2001, a poor year for the entire industry. Prior to his termination, based on Merrill Lynch's records, claimant was on track to earn  $332,062 in 2002,  $377,129 in 2003, $418,951 in 2004, $479,988 in 2005 and $533,311 in 2006.  In total $2,141,441 from 02 through 06. Instead, claimant has earned less than $400,000 or roughly $1,700,000 less over the past 4 years.

§

Claimant had a valid and existing employment contract with Merrill Lynch which included among other items, an agreement to abide by industry rules and standards, which means to abide by *"high standards of commercial honor"*. (NASD Manual, Restated Certificate of Incorporation, Objects or Purposes ). Claimant had substantial accumulated benefits between FCAAP, Wealth Builder, Investment Certificate Plan, and other Merrill Lynch plans specifically designed to provide incentive and discourage its producers from joining a competitive firm. Based upon information and belief and subject to proof at hearing these benefits have an approximate value of $800,000 (partially based on the current price of Merrill Lynch common stock).

Williams and Ralston knew of Claimant's contract with Merrill Lynch. They knew what constituted high standards of commercial honor, and what did not. Patricia Williams was Claimant's branch manager whose job responsibilities included the supervision of brokers and the supervision of other employees, including compliance personnel. Scott Ralston was the individual who terminated claimant, without just cause, and without even speaking with claimant, to determine for himself, if termination was justified and appropriate.

Both Williams and Ralston knew that the termination of claimant would potentially destroy his career, along with his multi-million dollar partnership arrangement with Joe Thomas. They also knew that it would cause claimant tremendous emotional pain. Claimant was being potentially set up as the fall guy, should a regulatory or legal proceeding be initiated against Merrill Lynch because of the criminal acts of one of their clients, Steve Fertitta, and that was apparently okay with both Williams and Ralston, who should have been scrutinized for their roles in the transactions that actually related to the victims' loss of money.

Both Williams and Ralston knew that a regulatory investigation could result in disciplinary actions not only against themselves, but others that failed to properly execute their duties and responsibilities.

Respondents knew that they could not terminate Claimant for cause because he had done nothing wrong, so instead they concocted a pretext for his termination, namely, *"after it was determined that he failed to timely and fully inform management of allegations made by an individual who was not a firm client relating to wrong doing by a firm client"* .

This is a cause which does not even exist, neither in the rules promulgated at the NASD or at the NYSE. If claimant knew what was going on but failed to report it, that would be a different story, but that was never alleged, nor did such a thing ever cross anyone's mind at Merrill Lynch, because of claimant's honesty. In reality, Claimant's termination is a textbook example of "wrongful termination".

Respondents' intentional acts have directly and proximately caused Claimant substantial damages. The loss of income over the last four years of approximating $1.7 million and the forfeiture of accumulated benefits of approximately $800,000 are only a small part of the damages. The permanent loss of his clientele, the destruction of his partnership, and the loss of a substantial mid six figure income for the remainder of his working life, at least another 15 years, plus his eventual retirement benefits, will likely exceed $10,000,000.

Respondents can be expected and will argue vehemently that Claimant was an "at will" employee and thus could be terminated at any time, for any reason or for no reason at all. But claimant was not terminated "without reason". This is not a matter of an "at will" employee let go because of some company restructuring or because he was not performing. Claimant was

terminated for cause. It was a cause that was trumped up by Williams, Ralston and likely others at Merrill Lynch.

Claimant, pure and simple, was set up for one reason. In the event Merrill Lynch were to be named as a defendant, in any civil or criminal action related to the embezzlement of funds by Steve Fertitta, claimant would be made out as the scapegoat.

Under California law a termination can be wrongful where the termination violates the covenant of good faith and fair dealing, which can exist in an employment contract, regardless of whether the contract is express or implied, written or oral. *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654. One term of the implied contract is that claimant would not be terminated except for good cause. "Good cause" has been judicially defined as "a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power." *Pugh v. See's Candies Inc.* (*"Pugh I"*) (1981) 116 Cal.App.3d 311, 330. If the panel determines that respondents' reasons for terminating claimant were "trivial, capricious, or pre-textual," then the termination was not made for a fair and honest cause or reason. *Pugh v. See's Candies, Inc.* (*"Pugh II"*) (1988) 203 Cal.App.3d 743, 769.

The evidence to be presented here will show that respondents did not have good cause to terminate claimant. Indeed, once Claimant shows that there was an express or implied employment contract, and that his performance was adequate, the burden falls on respondents to show that they conducted a reasonable investigation and reached an honest belief that that was good cause for terminating claimant. See Binder v. Aetna (1999) 75 Cal.App.4th 832 and see also Cotran v. Rollins Hudig Hall International, Inc. (1998) 17 Cal.4th 93, 108.

Claimant was involved in a long-standing business relationship as a stockbroker and financial planner with virtually all his clients. Many of his clients trusted and depended upon him for all their financial advice. Claimant had over $100 million in customer assets under his control and over $500 million between himself and Joe Thomas.

Respondents knew that if Claimant left their employ he would find it difficult to impossible to find suitable employment based upon what was placed on his U-5. It is common knowledge that a successful transition from one firm to another requires careful planning. This was something Respondents clearly did not wish to make available to claimant. This was something claimant was never given an opportunity to do. Respondents did not want to just terminate claimant's employment with Merrill Lynch, they wanted to terminate claimant's involvement in the securities industry.

Respondents knew that claimant, even if he located similar employment, would likely lose a substantial portion of his clientele based upon the urgency with which they removed him from his office. Based upon the mere possibility that Claimant would fight back, they hastened his departure by denying him access to his office, confiscating his clients, his computer, denying him access to important client information, and telling his clients that he retired from the securities industry.

This left Claimant without the ability to earn a living until he located suitable employment, a task that proved impossible, compounded by the explanation given to prospective employers who inquired as to why he "*failed to timely and fully inform management of allegations made by an individual who was not a firm client relating to wrong doing by a firm client*". Which, of course, is precisely what respondents wanted to happen. Make no mistake, respondents had no intention of giving claimant any opportunity to successfully reestablish

himself in the securities business. Certainly no notion of good faith and fair dealing can be found in respondent's conduct toward this ten year loyal employee.

The elements of a cause of action for interference with prospective economic advantage are:
(1) an economic relationship between the plaintiff and a third party containing the probability of future economic benefit;
(2) knowledge by the defendant of the existence of the relationship;
(3) intentional acts by the defendant to disrupt the relationship;
(4) actual disruption of the relationship and
(5) proximately caused actual damage.

Negligent acts by a defendant may also be the basis for a cause of action for interference with prospective economic advantage. *J'Aire Corp v. Gregory* (1979) 24 Cal.3d 799, 805.

The elements of defamation are:
(1) a false and defamatory statement
(2) published (ie, repeated to someone other than claimant) by respondent
(3) refers to the claimant
(4) intentionally made with malice or ill will.

See generally, California Civil Code section 46; *Robomatic v. Vetco Offshore* (1990) 225 Cal.App.3d 270 and *Davaris v. Cubaleski* (1993) 12 Cal.App.4th 1583.

Claimant will show that Respondents made derogatory statements about claimant, to bolster Respondents' ability to retain Claimant's customers as their own and dissuade those customers from following Claimant to a new firm, and to dissuade other firms from hiring claimant, for the sole purpose of destroying claimant's career.


Damages

Why should brokers deal with their customers ethically and responsibly when their own employers treat them unethically, immorally and dishonestly? Honesty in the brokerage business is intended to start at the top of the organization and work its way down.

If Robert Knight, who had an unblemished 10 year career with Merrill Lynch (not to mention his previous career as a Naval Aviator) can be treated like this, what hope is there for all the other brokers that follow in his footsteps and try to responsibly and ethically treat their clients and their employer? It may sometimes appear unfair that management, after investing in their brokers, have to deal with brokers that may join competing firms, often times with large up front cash bonuses. But, it is part of the business, and it is definitely a two way street. But, here is an example of a loyal employee, that gave ten years of his life to Merrill Lynch, and they turned against him, for the primary purpose of making him a scapegoat.

Broker dealers cannot observe "*high principals of commercial honor* " between or among its members only when it suits them. And, if they treat a loyal employee like this, it does not take much to imagine how they treat their clients.

Respondents interfered with the long-standing employment relationship between Merrill Lynch and Claimant. They then interfered with the business relationship(s) between Claimant, his partnership, and his clients. It has resulted in damages to Claimant approximating $20 million, now and for the future, the precise amount which will be proven at hearing. Claimant should recover, in addition to actual damages, punitive and exemplary damages in an amount sufficient to deter Merrill Lynch from engaging in similar misconduct in the future against other unlikely victims (namely its employees).

There are few things in life worse than to lose one's career, one's ability to earn a living, one's reputation, and subsequent self respect. Claimant requests that each arbitrator put themselves in claimant's shoes and ask themselves, what does Merrill Lynch need to do to right this wrong?

Claimant requests that the arbitrators selected to hear this matter award him the following:

1) As to all Respondents, for compensatory damages, including lost wages and benefits, $800,000 in specific forfeited benefits and $1,700,000 for lost wages to date, or that amount proven at hearing.

2) As to all Respondents $7,.5 million or that amount claimant would have reasonably earned over the remainder of his career, based upon his partnership, and the present value of over $500,000,000 in client assets under management at the time of his termination.

3) As to all Respondents, for emotional distress, an amount this panel deems appropriate, according to proof.

4) As to Punitive damages, an amount this panel deems appropriate to make an example of and punish Respondents.

5) Reimbursement of the reasonable costs associated with the prosecution of this matter, including expert witness fees, attorney fees, and arbitration fees in the arbitrators' discretion.

6) Such other and further relief that the arbitrators consider proper.

Enclosed is an original and six copies of Statement of Claim, a signed Uniform Submission Agreement, together with checks totaling $3,700 in payment of the NASD's $2,500 filing fee and $1,200 hearing session deposit. Claimant requests that the hearing in this matter be held in San Francisco at the earliest possible date.

Respectfully submitted,

Richard Sacks
Securities Arbitration Consultant

Timothy A. Canning
Attorney for Claimant
California State Bar #148336

# EXHIBIT 3

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

```
-------------------------------------------------------x
```
| | |
|---|---|
| **In the Matter of the Arbitration** <br>     **Between** | : |
| | : |
| **ROBERT KNIGHT,** | :     **NASD No. 06-03430** |
| | : |
|                 **Claimant,** | : |
| | : |
|   -against- | : |
| | :     **RESPONDENTS' ANSWER** |
| **MERRILL LYNCH, PIERCE, FENNER &** | :     **AND AFFIRMATIVE** |
| **SMITH INCORPORATED,** | :     **DEFENSES TO CLAIMANT'S** |
| **PATRICIA WILLIAMS, and** | :     **STATEMENT OF CLAIM** |
| **GEORGE SCOTT RALSTON,** | : |
| | : |
|             **Respondents.** | : |

```
-------------------------------------------------------x
```

Pursuant to Rule 10314(b) of the National Association of Securities Dealers Code of

Arbitration Procedure, Respondents Merrill Lynch, Pierce, Fenner & Smith Incorporated

("Merrill Lynch"), Patricia Williams ("Williams"), and George Scott Ralston ("Ralston")

(collectively "Respondents") hereby answer the Statement of Claim filed by Claimant Robert

Knight ("Knight"). Respondents expressly deny any allegations not specifically admitted in this

*Answer*.

## I.   FACTUAL BACKGROUND

In September 1992, Merrill Lynch hired Knight as a Financial Advisor in its San

Jose, California branch office. As a Merrill Lynch Financial Advisor, Knight served as a fully

licensed retail broker, who provided investment advice and recommendations to Merrill Lynch

customers. In July 1996, Knight became the Resident Manager of the Cupertino, California

office. As a Resident Manager, Knight was responsible for sales supervision, compliance, and

implementation of Merrill Lynch policy. In September 1998, Knight rejoined the San Jose office

as a Financial Advisor. In January 2002, Williams became the Director of the San Jose office

and reported to Ralston, the Managing Director of the Golden Gate District, of which the San

Jose office was a part. At all times, Knight was an at-will employee. Therefore, he was free to

resign his employment with or without notice, and Merrill Lynch was free to terminate his

employment for any reason or for no reason at all.

### A.    Employees Are Required to Report Complaints.

Both securities industry and Merrill Lynch rules require employees to report complaints.

Specifically, Merrill Lynch's Compliance Outline for Private Client Financial Advisors

("Compliance Outline") provides as follows:

> Industry rules require that disagreements with clients, or written or
> oral complaints alleging unethical or illegal conduct or sales
> practices violations are reported **promptly**. You must immediately
> report all such complaints to the MD/Director/RM for review and
> resolution. Tardiness in reporting complaints may cause otherwise
> innocuous complaints to escalate unnecessarily.

See Compliance Outline, January 2002, at 19 attached hereto as Exhibit A (emphasis in original).

The Compliance Outline further provides:

> To protect the Firm and its clients, you have an obligation to
> discuss concerns about possible unethical conduct with your
> Manager. If this is not feasible, you can bring concerns to senior
> management without reprisal by calling…or write to….All
> contacts will be treated with confidence to the extent allowed by
> law. You should report: theft, embezzlement, or other
> misappropriation of Firm or client assets…

See Exhibit A at 2.

### B.    Knight Failed to Timely and Fully Inform Management of Complaints.

On or about April 3, 2002, Knight received a telephone call from Jackie Parraz, who

described herself as an assistant or bookkeeper for Dr. Joel Siegel. Ms. Parraz believed that

Knight still was the manager of Merrill Lynch's Cupertino, California office. She informed

Knight that she located his name on a piece of correspondence that Knight had sent in August

2

1998 (when Knight indeed was the Resident Manager in Cupertino) to First Trust Corporation, where Dr. Siegel had an account, accepting, on behalf of Merrill Lynch, a wire transfer from a First Trust account to an unrelated Merrill Lynch IRRA account in the name of Steven Fertitta ("Fertitta").[1]  Despite knowing that Ms. Parraz wished to speak (indeed, believed she was speaking) to a manager, Knight continued with the call instead of immediately transferring it to a manager. Ms. Parraz informed Knight that Dr. Siegel believed his retirement funds had been misappropriated. She asked Knight for his contact information and told him that she would be following up her oral complaint with a letter further detailing Dr. Siegel's allegations.

Instead of immediately informing management of the oral complaint, Knight – who left management in September 1998 – began conducting his own investigation.  He spoke with Ellen Traina, the assistant to the Administrative Manager, to determine who serviced the account of Dr. Siegel.  Ms. Traina tracked Dr. Siegel's relationship to the primary account of Fertitta. Charles Tyler ("Tyler"), another Financial Advisor in the office, serviced Fertitta's account.

Knight then proceeded to discuss Dr. Siegel's complaint directly with Tyler.  Together, Knight and Tyler contacted Fertitta about the telephone call that Knight received from Ms. Parraz.  Later that day, Tyler sent an email to Knight stating, "Don't worry about today's call. The only relationship we have with that guy is that we have been SENDING him $900 per month from Steve Fertitta's IRA.  He had us mixed up with another firm." See email dated April 3, 2002 from Tyler to Knight attached hereto as Exhibit B.  Knight never brought Tyler's email to management's attention.

---

[1]  Fertitta was a Merrill Lynch customer and CEO of an employee benefits company in Roseville, California.  He was arrested on November 20, 2003 on three counts of felony grand theft and three counts of selling securities without a license.  The charges related to his misconduct against Dr. Siegel and two other investors.  In February 2005, Fertitta plead guilty to three counts of felony grand theft.

At some point after receiving the call from Ms. Parraz, Knight spoke to Marilyn Taylor Meyer (hereinafter "Ms. Meyer") an Administrative Manager in the San Jose office. Knight asked Ms. Meyer only whether the name "Fertitta" meant anything to her and mentioned that he received an inquiry about the account. Knight failed to offer any specifics about the call.

On or about May 19, 2002, Knight received Dr. Siegel's written complaint. In it, Dr. Siegel alleged, among other things, that Fertitta, to whom Dr. Siegel had given a substantial amount of money to invest, either had co-mingled his account with others or is embezzling. See letter from Dr. Siegel to Knight attached hereto as Exhibit C. Again, rather than immediately presenting the complaint to management, Knight made copies of Dr. Siegel's letter, one of which he gave to Tyler.

When management finally became aware of Dr. Siegel's written complaint, they, along with members of Merrill Lynch's Office of General Counsel, commenced a two-month investigation into Dr. Siegel's allegations. At the conclusion of its investigation, Merrill Lynch determined that the facts and circumstances warranted termination of employment for Knight and Tyler. On July 26, 2002, Merrill Lynch terminated Knight and Tyler and, pursuant to its regulatory obligations, Merrill Lynch prepared Knight's Uniform Termination Notice for Securities Industry Registration ("Form U-5") reflecting the reason for his termination.

On August 23, 2002, Merrill Lynch filed Knight's Form U-5, which truthfully and accurately stated: "Mr. Knight was terminated on July 26, 2002, after it was determined that he failed to timely and fully inform management of allegations made by an individual who was not a Firm client related to wrongdoing by a Firm client."

Four years later, Knight filed this statement of claim against Merrill Lynch, Williams, and Ralston. Knight's claims are baseless and untimely.

4

WHEREFORE, Respondents request that Knight's claims be denied in their entirety and that Respondents be awarded all other relief that the Arbitration Panel deems reasonable and appropriate under the circumstances presented in this proceeding.

## II.    AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Knight fails to set forth any facts upon which relief can be granted, including satisfaction of any of the predicate acts necessary to state a basic claim or any requisite duty on the part of the Respondents; failure to state a statutory basis for a claim; and failure to establish recoverable damages.

### SECOND AFFIRMATIVE DEFENSE

The claims are barred in whole or in part because Knight has sustained no legally recognized injury arising from the conduct alleged.

### THIRD AFFIRMATIVE DEFENSE

Some or all of the claims lack evidentiary support and/or are frivolous or unwarranted by existing law.

### FOURTH AFFIRMATIVE DEFENSE

Knight's claims are barred because he was an at-will employee of Merrill Lynch.

### FIFTH AFFIRMATIVE DEFENSE

Knight's tortious discharge claim must fail because he failed to plead a violation of a fundamental public policy supported by constitutional or statutory provisions.

### SIXTH AFFIRMATIVE DEFENSE

Respondents' actions with respect to Knight were taken in good faith and for proper and lawful business reasons.

## SEVENTH AFFIRMATIVE DEFENSE

Merrill Lynch's actions with respect to Knight were taken in good faith and without fraudulent motives, fraudulent intent, malice, or reckless disregard of his rights.

## EIGHTH AFFIRMATIVE DEFENSE

Knight's claim for breach of the covenant of good faith and fair dealing fails because he has not plead the breach of an explicit contract provision.

## NINTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, because he failed to plead any facts supporting a claim of defamation.

## TENTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, because any alleged defamatory statements are true.

## ELEVENTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, because the alleged defamatory statements constitute nonactionable opinion.

## TWELFTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, by the doctrines of absolute privilege and qualified privilege.

## THIRTEENTH AFFIRMATIVE DEFENSE

By execution of a Form U4, Knight consented to Merrill Lynch's publication of information concerning his employment, both within Merrill Lynch and also to others, including the NASD and the CRD.

## FOURTEENTH AFFIRMATIVE DEFENSE

Knight's trade libel claim fails because he has not plead any disparagement to the quality of his property.

## FIFTEENTH AFFIRMATIVE DEFENSE

Knight's trade libel claim fails because he has not plead special damages.

## SIXTEENTH AFFIRMATIVE DEFENSE

Knight's intentional infliction of emotional distress claim fails because he has not alleged any outrageous or extreme conduct that exceeds all bounds of decency.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Knight's intentional interference with prospective economic advantage claim fails because he had no economic relationship with the customers he serviced.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Knight's claims against Respondents Patricia Williams and George Scott Ralston are barred by the manager's privilege.

## NINETEENTH AFFIRMATIVE DEFENSE

Knight's claims are barred, in whole or in part, by the applicable statute of limitations.

## TWENTIETH AFFIRMATIVE DEFENSE

The claims are barred by the doctrines of laches, waiver, estoppel, and unclean hands.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Knight could have mitigated any alleged damages and, upon information and belief, has failed to do so.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The claims are barred in whole or in part because any and all losses sustained by Knight were due to his own failures or his own omissions or his own conduct or negligence.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Knight is precluded from any recovery because the damages he seeks are necessarily speculative and not recoverable as a matter of law.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Knight fails to state a claim for punitive damages because no conduct alleged to have been engaged in by Respondents could possibly be considered to constitute conduct "so extreme and outrageous as to go beyond the bounds of all decency tolerated by a civilized community" as required by law. Furthermore, an award of punitive damages would be an unconstitutional denial of Respondents' right to due process and/or equal protection under the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of California.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Knight's claim for attorney's fees and/or costs is barred in whole or in part because he fails to assert any cause of action warranting an award of attorney's fees and/or costs.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Merrill Lynch reserves the right to raise any and all other affirmative defenses that may become evident during discovery and during any other proceeding in this action.

WHEREFORE, Respondents request that Knight's claims be denied in their entirety and that Respondents be awarded all other relief that the Arbitration Panel deems reasonable and

appropriate under the circumstances presented in this proceeding.

Respectfully Submitted,

By: _Michael J. Fortunato_ _____

Michael J. Fortunato
Patricia Bailey Tsipras
RUBIN, FORTUNATO & HARBISON P.C.
MCS Building, Suite 202
10 South Leopard Road
Paoli, PA  19301
(610) 408-2005
(610) 408-9050 (telecopy)

Attorneys for Respondents
Merrill Lynch, Pierce, Fenner & Smith Incorporated
Patricia Williams and George Scott Ralston

Dated:  October 2, 2006

9

## CERTIFICATE OF SERVICE

I, Patricia Bailey Tsipras, Esquire, do hereby certify that true and correct copies of

Respondents' Answer and Affirmative Defenses to Claimant's Statement of Claim were served

via overnight mail as follows:

Timothy Canning, Esquire
Two Commercial Blvd.
Suite 203
Novato, California 94949

Counsel for Claimant

NASD Dispute Resolution
Western Processing Center
525 Market Street, Suite 300
San Francisco, CA 94105-2711

Patricia Bailey Tsipras

Dated: October 2, 2006

# EXHIBIT A

# MERRILL LYNCH, PIERCE, FENNER & SMITH INC.

# COMPLIANCE OUTLINE
# FOR
# PRIVATE CLIENT FINANCIAL ADVISORS

### JANUARY 2002

This outline is a reminder and quick reference source. It does not replace the *Merrill Lynch & Co. Policy Manual*, the *Branch Office Policy Manual*, the *Procedures Manual for Branch Offices* or other more detailed sources. It is intended to help Financial Advisors avoid situations that can lead to complaints, regulatory problems or adverse publicity.

**You are required to review the outline and acknowledge your understanding of its contents annually.**

**IF YOU HAVE QUESTIONS ABOUT THIS MATERIAL OR OTHER COMPLIANCE RELATED ISSUES, PLEASE CONSULT WITH YOUR MANAGER OR COMPLIANCE OFFICER.**

# ETHICS, COMPLIANCE AND BUSINESS CONDUCT

## OUR MOST VALUABLE ASSET

The Firm and its employees must safeguard our most important asset, our reputation for integrity. This means being guided not just by what is legal or permissible, but by the higher standard of what is right. This will benefit our clients, our Firm, our stockholders, and each of us.

We have long recognized that but for our unwavering commitment to integrity, would not remain in business. Perhaps we cannot calculate a "return on integrity"--but let integrity slip and take second place to revenue--then it will cost us more than dollars. The cost could be fatal to our Firm and to everything that has made it respected and great.

> Rosemary T. Berkery
> Executive Vice President
> General Counsel

**Good compliance is good business and the responsibility of every FA.**

## ETHICS HOTLINE

**No one's bottom line is more important than the reputation of the Firm.**

To protect the Firm and its clients, you have an obligation to discuss concerns about possible unethical conduct with your Manager. If this is not feasible, you can bring concerns to senior management without reprisal by calling **(212) 449-9590** or **(800) 338-8954** or write to **General Counsel Ethics Hotline, P.O. Box 490, Church Street Station, New York, NY 10080.** All contacts will be treated with confidence to the extent allowed by law. You should report:

- theft, embezzlement, or other misappropriations of Firm or client assets

- acceptance or distribution of bribes or kickbacks

- forgeries or alterations of documents, securities or negotiable instruments

- alteration or manipulation of manual or computer-generated records or documents

- inappropriate or improper use of non-public information

- willful violation of Firm policies on business or personal conduct, or client relationships

- other dishonest, unethical, illegal or inappropriate activities

## ELDERLY CLIENTS, continued

Elderly clients may view the market as a pastime or wish to engage in activities inconsistent with their financial objectives or circumstances. Some transactions may be inappropriate despite prior experience. Problems can arise (and activity may be viewed with hindsight) if the client trades aggressively and is later disabled or left with diminished capacities due to illness or advancing age. Such developments are unpredictable and may be undetected if all contact is by telephone.

Elderly clients may give trading authorizations to younger persons. Remember that the account belongs to the elderly principal and act accordingly. Claims are often brought by heirs or other third parties that allege unsuitable activity or a "dissipation of assets." Courts or regulators may be especially sympathetic if elderly clients are in poor health, appear unsophisticated, or have been left in tenuous financial circumstances. Plaintiffs' attorneys may seek **punitive damages** or use them as a threat to gain substantial settlements.

**Suitability, care and good judgment are critical.**  You must carefully consider whether margin, speculation or long-term non-liquid investments are appropriate. We cannot discriminate against elderly clients on the basis of age, but we must treat them with **sensitivity.**

## COMPLAINTS

Industry rules require that disagreements with clients, or written or oral complaints alleging unethical or illegal conduct or sales practices violations are reported **promptly.** You must immediately report all such complaints to the MD/Director/RM for review and resolution. Tardiness in reporting complaints may cause otherwise innocuous complaints to escalate unnecessarily.

## ACTIVE ACCOUNT REVIEWS

MD/Director/RMs and Administrative Managers regularly review actively traded accounts (e.g., those with a high commissions-to-equity ratio) and accounts sustaining substantial losses. Your manager is encouraged by the Firm to initiate contact with clients of actively traded accounts to ensure awareness of the level of activity, commissions generated, and profit or loss, and that the activity is appropriate in light of the client's investment objectives, sophistication, and financial circumstances. This process can protect clients by detecting and addressing potential problems -- and protect you, the MD/Director/RM and the Firm against future complaints. Your full cooperation is required.

# EXHIBIT B

Knight, Robert J  (SAN JOSE SY 233)

| | |
|---|---|
| **From:** | Tyler, Charles S (SAN JOSE SY 233) |
| **Sent:** | Wednesday, April 03, 2002 7:28 PM |
| **To:** | Knight, Robert J  (SAN JOSE SY 233) |
| **Subject:** | TYLER |

Don't worry about today's call.  The only relationship we have with that guy is that we have been SENDING him $900 per month from Steve Fertitta's IRA.  He has us mixed up with another firm.

*Charles S. Tyler*

*Vice President*
*Senior Financial Advisor*
*Tyler-Warthen Group*

*Merrill Lynch*
*50 W. San Fernando St.*
*16th Floor*
*San Jose, CA 95113*

*(408) 283-3039 (direct)*
*(408) 283-3129 (fax)*



1

# EXHIBIT C

MAY 24 '02  12:33PM MERRILL LYNCH                                    P.2

# REDACTED

May 19, 2002

Mr. Robert Knight,
Resident Manager, Merrill Lynch
50 West San Fernando Street
   10th Floor
San Jose, CA  95113


Dear Sir:

Your name came to my attention in August 1998 when First Trust of Den-
ver, Colorado, had discussions with you concerning Merrill Lynch Account
            registered to Steve Fertitta, owner.

My funds were ultimately transferred to                       . For
your information, his letter to me, dated July 22nd 1998 is attached, and
to which I will refer.

Repeatedly, I had requested an accounting of my holdings. Multiple
entreaties to his office Staff failed to evoke a response. On December
28th, 2001 I received the letter, copy enclosed, indicating, "As of Sept.
5th, 2001, I have liquidated the fund and put them into a bond fund".
"I will provide a copy of this bond to you at a later date". It is incon-
ceivable to me that a bond fund held at Merrill Lynch does not have its
contents revealed after more than 3½ months following the transaction.

This year, 2002, I called the office of Steve Fertitta at least 3 times
per week. I could not obtain a Quarterly statement, I did not receive calls
back, and had no knowledge about the bond fund.

First week March, Steve Fertitta came to my office and told me that I
was invested in a Federal bond account with Merrill Lynch, that it was a
rolling 6 month bond returning 3.5%, exempt from State and Federal taxes.
When I inquired why he never responded to my numerous calls about my account,
he replied that "small accounts receive less attention than larger ones,that
Merrill Lynch's office in San Jose had closed and moved, and that he had
computer problems in his office". He promised to send me a Quarterly state-
ment after March 31st.

I have called his office almost daily for the past 6 weeks to inquire
about the bond fund and the Quarterly statement. The letter, dated July
22nd 1998 states unequivocally: "We will be providing Quarterly reports".
This has proven to be a deception.

Since I am not able to obtain information from him, then I request you, as Resident Manager, provide me with the following:

1) The name and identifying number of the bond fund being held at Merrill Lynch.

2) The contents of the bond and its current value.

3) The identifying number of the money market fund and its current value.

This failure on the part of Mr. Fertitta raises suspicion in my mind that he may have co-mingled my account with others and/or he is embezzling. He has not honoured his fiduciary responsibility according to the written commitments made when I became a client. I also believe that Merrill Lynch has a responsibility in protecting its clients.

Mr. Knight, please provide me with the information I am requesting so that we may both move on. I do not wish to burden you but must have my questions answered. It is my intent to not pursue this matter any further if the information is forthcoming. Your timely response would be greatly appreciated

**REDACTED**

# EXHIBIT 4

**RECEIVED**

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

OCT 2 6 2006

------------------------------------------------------------x

| | |
|---|---|
| In the Matter of the Arbitration<br>Between | : |
| | : |
| **ROBERT KNIGHT,** | : |
| | : |
| Claimant, | : |
| | : |
| -against- | : |
| | : |
| **MERRILL LYNCH, PIERCE, FENNER &<br>SMITH INCORPORATED,<br>PATRICIA WILLIAMS, and<br>GEORGE SCOTT RALSTON,** | : |
| | : |
| | : |
| | : |
| Respondents. | : |

NASD Dispute Resolution
Western Region

**NASD No. 06-03430**

**RESPONDENTS' MOTION
TO DISMISS**

------------------------------------------------------------x

Respondents Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"),

Patricia Williams, and George Scott Ralston, by and through their counsel, Rubin, Fortunato &

Harbison P.C., respectfully submit this motion to dismiss, with prejudice, the claims filed by

Claimant Robert Knight ("Knight") in this arbitration because they are barred by the applicable

statute of limitations.

## I.    INTRODUCTION

On or about July 20, 2006, Knight filed this arbitration action against Respondents

Merrill Lynch, Patricia Williams, and George Scott Ralston.  Knight's claims for (i) discharge in

breach of implied contract, including breach of the covenant of good faith and fair dealing, (ii)

tortious discharge in violation of public policy, (iii) defamation and trade libel, (iv) intentional

infliction of emotional distress, and (v) intentional interference with prospective economic

advantage all stem from the termination of his employment, which occurred on July 26, 2002 –

nearly four years before he filed this action.  All of Knight's claims are time-barred.  Indeed, no

conduct alleged in Knight's Statement of Claim occurred within the statute of limitations period. For these reasons, and as set forth more fully below, all of Knight's claims should be dismissed.

## II.    THE PANEL IS EMPOWERED TO GRANT THIS MOTION TO DISMISS.

Rule 10214 of the National Association of Securities Dealers ("NASD") Code of Arbitration Procedure specifically provides that "arbitrators shall be empowered to award any relief that would be available in court under law." This grant of authority includes the ability to grant a motion to dismiss. See, e.g., Sheldon v. Vermonty, 269 F.3d 1202, 1206 (10th Cir. 2001) (holding that Rule 10214 permits an NASD panel to grant a pre-hearing motion to dismiss with prejudice); Warren v. Tacher, 114 F. Supp. 2d 600, 602 (W.D. Ky. 2000) (holding that arbitrators had authority to decide and grant a pre-hearing motion to dismiss); Max Marx Color & Chem. Co. v. Barnes, 37 F. Supp. 2d 248, 255 (S.D.N.Y. 1999) (denying a motion to vacate an arbitrator's award granting a pre-hearing motion to dismiss); Prudential Sec. v. Dalton, 929 F. Supp. 1411, 1417 (N.D. Okla. 1996) (holding that arbitrators have authority to dismiss a claim if the complaint does not state a claim entitling the claimant to relief, "frivolous or not").

Furthermore, NASD arbitration panels have granted motions to dismiss for the same reason that Respondents seek to dismiss Knight's claims – because they are barred by the statute of limitations. See, e.g., Copley v. Wilmington Brokerage Svs. Co., No. 05-06633, 2006 NASD Arb. LEXIS 1341 (August 15, 2006) ("the Panel granted Respondent's Motion to Dismiss with prejudice all claims, on the grounds that they are barred by the applicable federal and Delaware state statutes of limitations.) and Duffy v. SunAmerica Securities, Inc., No. 05-05901, 2006 NASD Arb. LEXIS 1208 (July 24, 2006) ("the Panel granted Respondent's motion to dismiss on the ground that Claimant's claims are barred by the governing statutes of limitation.") attached hereto as Exhibit A.

Accordingly, Respondents are entitled to a dismissal if a majority of the Panel agrees that it is appropriate. <u>See</u> NASD Rule 10325.

## III.    STANDARD OF REVIEW

A respondent is entitled to judgment on the pleadings if a complaint does not state facts sufficient to constitute a cause of action. <u>See</u> CAL CODE CIV PROC § 438 (2006); <u>see also</u> <u>Stoops v. Abbassi</u>, 100 Cal. App. 4th 644, 650 (Cal. Ct. App. 2002). All properly pleaded, material facts are deemed true. <u>Kapsimallis v. Allstate Ins. Co.</u>, 104 Cal. App. 4th 667, 672 (Cal. Ct. App. 2002). However, contentions, deductions, or conclusions of fact or law are not to be considered. <u>Id.</u>

## IV.    KNIGHT'S CLAIMS ARE TIME-BARRED.

### A.    Knight's Claim for Discharge in Breach of Implied Contract, Including Breach of the Covenant of Good Faith and Fair Dealing, Is Time-Barred.

Knight alleges that Respondents breached an implied contract and breached the covenant of good faith and fair dealing when it terminated his employment. <u>See</u> Knight's Statement of Claim at 6-9. A claim for breach of an implied contract accrues at the time of the alleged breach. <u>See</u> <u>Kourtis v. Cameron</u>, 419 F.3d 989, 1000 (9th Cir. 2005) (<i>citing</i> <u>Menefee v. Ostawari</u>, 228 Cal. App. 3d 239, 246 (Cal. Ct. App. 1991) ("a cause of action for breach of contract ordinarily accrues at the time of breach regardless of whether any substantial damage is apparent or ascertainable"); <u>In re Estate of Fincher</u>, 119 Cal. App. 3d 343, 352 (Cal. Ct. App. 1981) ("The general rule is that a suit for breach of an implied agreement accrues at the time of the breach.")). In this case, Knight's cause of action accrued on July 26, 2002 -- the date of his termination. <u>See</u> <u>Romano v. Rockwell Int'l, Inc.</u>, 926 P.2d 1114, 1121 (Cal. 1996) (statute of limitations for claim of breach of an implied contract not to terminate employment without good cause accrues at time of termination); <u>Mullins v. Rockwell Int'l Corp.</u>, 936 P.2d 1246, 1249 (Cal. 1997) (same).

In California, claims of breach of an implied contract or breach of the implied covenant of good faith and fair dealing are governed by a two-year statute of limitations. See CAL. CODE CIV. PROC. § 339(1) ("an action upon a contract, obligation or liability not founded upon an instrument of writing" must be filed "within two years"); see also Kourtis, 419 F.3d at 1000-01 (citing section 339 and upholding district court's dismissal of breach of implied contract claim because it was barred by a two-year statute of limitations); Abedi v. Schlossman, No. 01-56013, 2002 U.S. App. LEXIS 15039, *4-5 (9th Cir. July 22, 2002) (citing section 339 and upholding district court's dismissal of breach of implied covenant of good faith and fair dealing claim because the two-year statute of limitations barred the claim).

Knight's claims for breach of an implied contract and breach of the covenant of good faith and fair dealing accrued on July 26, 2002. He failed to bring these claims by July 26, 2004. Therefore, they are time-barred and should be dismissed.

**B.  Knight's Claim for Tortious Discharge in Violation of Public Policy is Time-Barred.**

Knight also alleges that his termination violated public policy. See Knight's Statement of Claim at 6. In California, "an employer's discharge of an employee in violation of a fundamental public policy embodied in a constitutional, or statutory provision *gives rise to a tort action.*" Lamke v. Sunstate Equipment Co., LLC, 387 F. Supp. 2d 1044, 1051 (N.D. Cal. 2004) (emphasis added) (*citing* Barton v. New United Motor Mfg., 43 Cal. App. 4th 1200, 1205 (Cal. Ct. App. 1996)). Currently, California recognizes a two-year statute of limitations for torts. Lamke, 387 F. Supp. 2d 1051 (*citing* CAL. CODE CIV. PROC. § 335.1 ["Within two years: An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another."]). However, the two-year limitations statute did not become effective until January 1, 2003 and at least one state appellate court has held that the statute is not

4

retroactive. <u>See</u> <u>Krupnick v. Duke Energy Morro Bay, LLC</u>, 115 Cal. App. 4th 1026, 1028, 1030 (Cal. Ct. App. 2004). At the time Knight allegedly was injured -- when he was terminated on July 26, 2002 -- the controlling law provided for a one-year statute of limitations. <u>See</u> CAL. CODE CIV. PROC. § 340(3) (2001).

Regardless of whether this Panel applies a one or two-year statute of limitations, Knight's claim for tortious discharge in violation of public policy, which was filed nearly four years following his termination, is time-barred and should be dismissed.

**C.      Knight's Claims for Defamation and Trade Libel Are Time-Barred.**

Knight appears to premise his defamation and trade libel claims on his allegations that Respondents made "derogatory statements…on claimant's U-5" or were "telling his clients that he retired from the securities industry." <u>See</u> Statement of Claim at 5 ¶ 27 and at 9. Neither of these allegations can support Knight's claims.

A cause of action for defamation accrues at the time the defamatory statement is published. <u>Shively v. Bozanich</u>, 80 P.3d 676, 686 (Cal. 2003). A publication occurs when a defamatory statement is communicated to a person other than the person being defamed. <u>Id.</u> With respect to written materials, publication occurs, and the cause of action for defamation accrues, when the materials are first generally distributed to the public. <u>See, e.g.</u>, <u>McGuiness v. Motor Trend Magazine</u>, 129 Cal. App. 3d 59, 61 (Cal. Ct. App. 1982). An action for libel or slander must be commenced within one year of the alleged conduct. CAL. CODE CIV. PROC. § 340.

Knight's U5 was filed on August 23, 2002 -- within 30 days of his termination and in accordance with securities industry regulations. <u>See</u> Respondents' Answer and Affirmative Defenses at 4. Therefore, Knight's defamation or trade libel claims accrued on August 23, 2002

and Knight was required to file them by August 23, 2003. Because Knight did not file these claims until July 2006, they are time-barred and should be dismissed.

With respect to Knight's allegation that Respondents told Merrill Lynch customers that he had retired, Knight offers absolutely no specifics. This fact, alone, warrants dismissal of the claim. See, e.g., Keiser v. Lake County Superior Court, No. C05-02310MJJ, 2005 U.S. Dist. LEXIS 40378, at *45 (N.D.Cal. Dec. 12, 2005) (dismissing plaintiff's defamation claim because it failed to meet the minimal notice-pleading requirement in that plaintiff did not allege which of the defendants made the defamatory statements, when the statements were made, the form of the statements, or to whom defendants made the statements).

Although Knight does not allege when the defamatory statements were made, he does allege that they were made in an effort to "hasten his departure." See Statement of Claim at 9. Knight's "departure" occurred on July 26, 2002. Therefore, Respondents and this Panel are left to conclude that the alleged defamatory statements were made on or around July 26, 2002. Accordingly, Knight would have had to bring his defamation or trade libel claims by July 26, 2003. Because Knight did not file this arbitration action until July 2006, his claims are time-barred and should be dismissed.

**D.    Knight's Claim for Intentional Infliction of Emotional Distress Is Time-Barred.**

Knight claims that, by terminating him, Respondents intentionally inflicted emotional distress upon him. Knight's cause of action for intentional infliction of emotional distress accrued on July 26, 2002, the date on which he was terminated. See Henein v. Saudi Arabian Parsons Ltd., 818 F.2d 1508, 1515 (9th Cir. 1987) (holding that a cause of action for intentional infliction of emotional distress accrues at the time the defendant "is alleged to have done the acts constituting intentional infliction of emotional distress.").

6

The statute of limitations period for claims based on emotional distress is one year. See Burton v. New United Motor Mfg., No. 03-16287, 2005 U.S. App. LEXIS 5352, **3 (9th Cir., Feb. 17, 2005) (*citing* Magpali v. Farmers Group, Inc., 48 Cal. App. 4th 471, 485 (Cal. Ct. App. 1996)); see also Cantu v. Resolution Trust Corp., 4 Cal. App. 4th 857, 889 (Cal. Ct. App. 1992) (applying one-year statute of limitations to intentional infliction of emotional distress claim).[1]

Knight's claim accrued on July 26, 2002, the date of his termination, and, therefore, had to be filed by July 26, 2003. Knight's claim for intentional infliction of emotional distress – filed four years after his termination – is time-barred and should be dismissed.

### E. Knight's Claim for Intentional Interference with Prospective Economic Advantage Is Time-Barred.

Knight also claims that, based upon their alleged wrongful termination of his employment and their alleged defamation of him (time-barred causes of action discussed above), Respondents intentionally interfered with his prospective economic advantage. Such a claim is barred if not filed within two years. See High Country Linens v. Block, No. C 01-02180, 2002 U.S. Dist. LEXIS 16403, at *6 n.1 (N.D.Cal. 2002) ("Plaintiff's claim of interference with prospective economic advantage is also time-barred by the two-year statute of limitations established by CAL. CIV. PROC. CODE § 339"); Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd., 909 F. Supp. 1353, 1361 (C.D. Cal. 1995) (interpreting California Civil Procedure Code section 339 as "providing that [a] claim based on obligation not founded on instrument of writing, such as interference with prospective advantage, must be brought within two years."). Knight filed his cause of action for intentional interference with prospective economic advantage nearly four

---

[1] Even if this Panel determines that Knight's claim of intentional infliction of emotional distress is a tort action, which carries a statute of limitations of two years, Knight's claim still is time-barred. See CAL. CIV. CODE § 335.1 ("Within two years: 1. An action for assault, battery, or injury to, or for the death of, an individual caused by the wrongful act or neglect of another.").

years after the alleged interference.  Accordingly, his claim is time-barred and should be dismissed.

## V.     CONCLUSION

Knight failed to assert any of his causes of action in a timely manner.  His claims are barred – not by days -- but by years.  Because each and every cause of action that Knight asserted is time-barred, Respondents respectfully request that the Panel grant its motion to dismiss.

Respectfully Submitted,

By: _____

Michael J. Fortunato
Patricia Bailey Tsipras
RUBIN, FORTUNATO & HARBISON P.C.
MCS Building, Suite 202
10 South Leopard Road
Paoli, PA  19301
(610) 408-2005
(610) 408-9050 (telecopy)

Attorneys for Respondents
Merrill Lynch, Pierce, Fenner & Smith Incorporated
Patricia Williams and George Scott Ralston

Dated:  October 25, 2006

## CERTIFICATE OF SERVICE

I, Patricia Bailey Tsipras, Esquire, do hereby certify that true and correct copies of

Respondents' Motion to Dismiss were served via overnight mail as follows:

>
> Timothy Canning, Esquire
> Two Commercial Blvd.
> Suite 203
> Novato, California 94949
>
> Counsel for Claimant
>
>
> NASD Dispute Resolution
> Western Processing Center
> 300 South Grand Avenue
> Suite 900
> Los Angeles, CA 90071

Patricia Bailey Tsipras

Dated: October 25, 2006

# EXHIBIT A

1 of 71 DOCUMENTS

AWARD
NASD REGULATION, INC.

William E. Copley and Gertrude H. Copley, Claimants
v.
Wilmington Brokerage Services Company, Respondents

CASE NO. 05-06633

2006 NASD Arb. LEXIS 1341

August 15, 2006

**COUNSEL:**
[*1] Claimants, William E. Copley and Gertrude H. Copley, hereinafter collectively referred to as "Claimants", were represented by Debra G. Speyer, Esq., Attorney at Law, Philadelphia, Pennsylvania.

Respondent, Wilmington Brokerage Service Company ("Respondent") was represented by Karen V. Sullivan, Esq. and Kathy Jennings, Esq., Oberly, Jennings & Rhodunda, P.A., Wilmington, Delaware.

**CASE-INFORMATION:**
Statement of Claim filed on December 23, 2005.
Claimants signed the Uniform Submission Agreement on December 7, 2005.
Amended Statement of Claim filed by Claimants on or about January 27, 2006.
Claimants filed Arbitration Brief Regarding Inapplicability of Statutes of Limitations to Private Contractual Arbitration Proceedings and Response to the Motion to Strike on April 11, 2006.
Claimants filed a Response to the Motion to Dismiss and Motion to Strike on July 21, 2006.
Statement of Answer to Amended Statement of Claim, Motion to Dismiss all Claims as Time Barred and Motion to Strike All Allegations Related to Wilmington Trust Company filed by Respondent on March 28, 2006.
A representative of Respondent executed the Uniform Submission Agreement on March 29, 2006.
Respondent filed a Reply Memorandum in Support [*2] of Motion to Dismiss and Strike on July 14, 2006.

**HEARING-DOCKET:**
Hearing Site: Wilmington, Delaware

Nature of the Dispute: Customers vs. Member.

**CASE-SUMMARY:**
In their Amended Statement of Claim, Claimants asserted the following causes of action, among others: unsuitability, misrepresentation and omissions, negligence, breach of fiduciary duty, breach of contract, secondary liability, violation of Delaware State securities laws, and failure to supervise. The causes of action relate to the investment of Claimants' funds in various mutual funds.

Unless specifically admitted in its Answer, Respondent denied the allegations made in the Statement of Claim and asserted the following defenses, among others: Claimants fail to state a claim upon which relief may be granted, failure to mitigate damages, ratification, and Claimants' claims are barred by the applicable Delaware or federal statute of limitations.

**RELIEF-REQUESTED:**
Claimants in their Amended Statement of Claim requested:
Compensatory Damages      $ 300,000.00

| | |
|---|---|
| Punitive Damages | amount unspecified |
| Interest | amount unspecified |
| Attorneys' Fees | amount unspecified |
| Other Costs | amount unspecified |

Respondent in its Statement of Answer and Motion to Dismiss requested that the Arbitration [*3] Panel (the "Panel") dismiss Claimants' claims in their entirety and award to Respondent its costs and attorneys' fees.

**OTHER-ISSUES:**
Having reviewed the parties' written submissions and heard oral argument, the Panel granted Respondent's Motion to Dismiss with prejudice all claims, on the grounds that they are barred by applicable federal and Delaware state statutes of limitations. The Panel's decision rendered moot Respondent's Motion to Strike Wilmington Trust Company.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

**AWARD:**
After considering the pleadings and hearing oral arguments on Respondent's Motion to Dismiss, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Claimants' claims against Respondent are dismissed with prejudice in their entirety;

2. All claims for punitive damages and attorneys' fees are denied in their entirety;

3. The parties shall bear their respective costs, including attorneys' fees, except as Fees are specifically addressed below; and

4. Any and all relief not specifically addressed herein is denied in its entirety.

**FORUM-FEES:**
Pursuant [*4] to the Code, the following fees are assessed:

Filing Fees

NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | = $ 300.00 |

Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firms that employed the associated person(s) at the time of the events giving rise to the dispute. Accordingly, Respondent is a party.

| | |
|---|---|
| Member surcharge | = $ 1,700.00 |
| Pre-hearing process fee | = $ 750.00 |
| Hearing process fee | = $ 2,750.00 |
| Total Member Fees | = $ 5,200.00 |

Forum Fees and Assessments

The Panel has assessed forum fees for each session conducted. A session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less. Fees associated with these proceedings are:

| | |
|---|---|
| Two (2) Pre-hearing sessions with Panel @ $ 1,125.00 | = $ 2,250.00 |

2006 NASD Arb. LEXIS 1341, *

Pre-hearing conferences:           June 30, 2006        1 session
                                   August 1, 2006       1 session
Total Forum Fees                                                  = $ 2,250.00


1. The Panel has assessed $ 1,125.00 of the forum fees jointly and severally to Claimants.

2. The Panel has [*5]  assessed $ 1,125.00 of the forum fees to Respondent.

   **FEE SUMMARY**

1. Claimants are jointly and severally assessed and shall pay the following fees:
Initial Filing Fee                 = $ 300.00
Forum Fees                         = $ 1,125.00
Total Fees                         = $ 1,425.00
Less payments                      = $ 00.00
Balance Due NASD Dispute Resolution = $ 1,425.00


3. Respondent is assessed and shall pay the following fees:
Member Fees                        = $ 5,200.00
Forum Fees                         = $ 1,125.00
Total Fees                         = $ 6,325.00
Less payments                      = $ 5,200.00
Balance Due NASD Dispute Resolution = $ 1,125.00


All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

**ARBITRATORS:**
Concurring Arbitrators: Marvin Elster, Esq., Public Arbitrator, Presiding Chairperson; Antoinette C. Robbins, Esq., Non-Public Arbitrator, Panelist

Dissenting Arbitrators: T.S.L. Perlman, Public Arbitrator, Panelist

2 of 71 DOCUMENTS

AWARD
NASD REGULATION, INC.

In the Matter of the Arbitration Between Helen Ann Duffy, Claimants
v.
SunAmerica Securities, Inc., Respondents

CASE NO. 05-05901

2006 NASD Arb. LEXIS 1208

July 24, 2006

**COUNSEL:**
[*1] For Claimant: Mark J. Michaud, Esq., The Michaud Law Group, LLC, Eagle, Idaho

For Respondent: Jason C. Roberts Esq., Law Offices of Edgerton & Weaver, Hermosa Beach, California

**CASE-INFORMATION:**
Statement of Claim filed: November 18, 2005
Claimant's Uniform Submission Agreement signed: October 31, 2005
Statement of Answer filed by Respondent: March 10, 2006
Respondent's Uniform Submission Agreement signed: April 11, 2006

**HEARING-DOCKET:**
Hearing Site: Phoenix, Arizona

Nature of the Dispute: Customer v. Member

**CASE-SUMMARY:**
Claimant alleged unsuitability, negligence, breach of fiduciary duty, and failure to supervise. Claimant's allegations involved investments in Class B Van Kampen Aggressive Growth Mutual Fund, Alliance Technology Fund, Delaware Technology and Innovation Fund, Munder Net Fund, Global Star, Telecommunications, Broadcom, Brocade Communications, Valance Technology, JDS Uniphase, Qualcomm, and short term call options.

Respondent denied the allegations of wrongdoing set forth in the Claimant's Statement of Claim and set for the various affirmative defenses.

**RELIEF-REQUESTED:**
Claimant requested $ 175,981.00 in compensatory damages, pre- and post-judgment interest and costs, including attorney's fees.

Respondent requested dismissal [*2] of the Claimant's Statement of Claim in its entirety, that forum fees be assessed to the Claimant, reimbursement of member surcharges, and costs, including attorney's fees.

**OTHER-ISSUES:**
On or about June 1, 2006, Respondent moved the Panel to issue an Order dismissing the Statement of Claim on the ground that Claimant's claims are governed by two-year statutes of limitations and Claimant's claims are therefore time barred. On July 17, 2006, after the Parties fully briefed the statute of limitations question, a telephonic pre-hearing conference was held, attended by the Parties and the Panel. After due deliberation in an executive session, the Panel granted Respondent's motion to dismiss on the ground that Claimant's claims are barred by the governing statutes of limitation.

The Panel agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

**AWARD:**

After considering Respondent's Motion to Dismiss, the Panel decided in full and final resolution of the issues submitted for determination as follows:

1) Claimant's claims are dismissed in their entirety, with prejudice.

2) The parties shall bear their respective costs, including attorney's [*3]  fees.

3) Any and all other relief requested, including punitive damages, and not expressly granted is denied.

**FORUM-FEES:**

Pursuant to the Code, the following fees are assessed:

**Filing Fees**

NASD Dispute Resolution received or will collect the non-refundable filing fees for each claim as follows:

| | |
|---|---|
| Initial claim filing fee | = $ 300.00 |

**Member Fees**

Member fees are assessed to each member firm that is either a party in the matter or an employer of a respondent associated person at the time of the events that gave rise to the dispute, claim, or controversy. Accordingly, the member firm SunAmerica Securities Inc. is a party and the following fees are assessed:

| | |
|---|---|
| Member Surcharge | = $ 1,700.00 |
| Pre-Hearing Process Fee | = $ 750.00 |
| Hearing Process Fee | = $ 2,750.00 |
| Total Member Fees | = $ 5,200.00 |

**Forum Fees and Assessments**

The Panel assessed forum fees for each session conducted or each decision rendered on a discovery-related motion on the papers. A session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:

| | | | |
|---|---|---|---|
| (2) Pre-hearing conference sessions with the Panel @ $ 1,125.00/session | | | = $ 2,250.00 |
| Pre-hearing conferences: | May 15, 2006 | 1 session | |
| | July 17, 2006 | 1 session | |
| Total Forum Fees | | | = $ 2,250.00 |

[*4]

1. The Panel assessed $ 1,125.00 of the forum fees to Claimant.

2. The Panel assessed $ 1,125.00 of the forum fees to Respondent.

**Fee Summary**

1. Claimant is charged with the following fees and costs:

| | |
|---|---|
| Initial Filing Fee | = $ 300.00 |
| Forum Fees | = $ 1,125.00 |

2006 NASD Arb. LEXIS 1208, *

| | |
|---|---|
| Total Fees | = $ 1,425.00 |
| Less payments | = $ (1,425.00) |
| Balance Due NASD Dispute Resolution | $ 0.00 |

2. Respondent is charged with the following fees and costs:

| | |
|---|---|
| Member Fees | = $ 5,200.00 |
| Forum Fees | = $ 1,125.00 |
| Total Fees | = $ 6,325.00 |
| Less payments | = $ (5,200.00) |
| Balance Due NASD Dispute Resolution | = $ 1,125.00 |

All balances are payable to NASD Dispute Resolution and are due upon the receipt of the Award pursuant to Rule 10330(g) of the Code.

**ARBITRATORS:**

Concurring Arbitrators: Marc Kalish, Public Arbitrator, Presiding Chair; S. Jeffrey Minker, Esq., Public Arbitrator; Frederick B. Mueller, Non-Public Arbitrator