# EXHIBIT 9

# TIMOTHY A. CANNING
### ATTORNEY AT LAW

Two Commercial Blvd., Suite 203
Novato, California 94949

Telephone: (415) 382-7899
Facsimile: (415) 382-9421
E-Mail: tc@tclaws.com
Website: www.tclaws.com

March 23, 2007

Panel of Arbitrators
NASD
c/o Derek Sorrells
300 S. Grand Avenue, Suite 900
Los Angeles, CA 90071

   Re: Robert Knight v. Merrill Lynch, Pierce Fenner & Smith Inc.,
     Patricia Williams and Scott Ralston
     NASD Case No. 06-03430
     Amended Statement of Claim

Dear Panel:

  **Claimant Robert Knight** ("**Claimant**"), formerly an "Associated Person," initiated this proceeding with the filing of a statement of claim on July 20, 2006. Claimant was terminated by respondents on July 26, 2002, within four years from the date of his termination.

  Pursuant to an order of the arbitration panel dated January 15, 2007, claimant respectfully amends the statement of claim as follows:

  1) Claimant restates and reaffirms each and every allegation and request for relief contained in the statement of claim.

  2) On or about September 9, 1992 claimant entered into a written agreement with Respondent Merrill Lynch with respect to his employment. A true copy of this agreement, entitled: <u>Financial Consultant Employment Agreement and Restrictive Covenants</u> is attached hereto as Exhibit A.

  3) That agreement, which provides the terms and conditions of claimant's employment at Merrill Lynch, includes, in relevant part:

     a. *I agree that at all times during my employment, I owe Merrill Lynch a duty of loyalty and a duty to act in good faith.*"

NORTH COAST OFFICE: 1125 16th Street, Suite 204 • Arcata, CA 95521• Tel: (707) 822-1620 • Fax: (707) 760-3523
P.O. Box 4201 • Arcata, CA 95518

03/23/2007  15:56    4153829421    TIMOTHY L CANNING FSB    PAGE 03
Case 3:07-cv-02753-SC    Document 15    Filed 07/27/2007    Page 3 of 60

2

4)   Claimant asserts that, at all times relevant hereto, he was a loyal employee who acted with good faith toward Merrill Lynch, its employees and its customers. In truth, the evidence will show that he was an exemplary employee

5)   Claimant asserts, that under California law, Merrill Lynch owes a similar duty of loyalty and to act in good faith at all times. Otherwise, claimant will be rendered unable to fulfill his end of the contractual bargain which he entered into with respondents in or about September 1992.

> "There is implied in every contract a covenant by each party not to do anything which will deprive the other parties thereto of the benefits of the contract. ... This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." Harm v. Frasher (1960) 181 C.A.2d 405, 417; and see 1 Witkin, Summary of California Law, Contracts. §798 (10th ed. 2005)

6)   Claimant asserts and alleges that Respondent Merrill Lynch breached its duty of loyalty and good faith, by terminating his employment without good cause, and for asserting, falsely, that it had good cause to terminate him. Claimant alleges that Merrill Lynch breached the specific terms of the written employment contract, namely that each party owed the other party a duty of loyalty and a duty to act in good faith.

7)   Implicit in the written employment contract was the requirement that claimant follow Merrill's written policies and procedures (first paragraph). Equally implicit is the requirement that Merrill act in accordance with its own written policies and procedures as well.

8)   At the time of his employment, claimant was given a policy manual entitled:  Working at Merrill Lynch: An Employee's Guide.  Portions of that Guide are set forth as Exhibit B. These pages set forth the "inappropriate actions" that "might" lead Merrill to immediately discharge an employee. They include:

1) theft
2) threats
3) refusal to follow management's instructions
4) damaging Merrill Lynch property
5) proof or admission of a crime
6) falsely filling out pre-employment forms
7) possession of drugs and similar serious infractions.

9) Claimant reasonably believed that Merrill would not terminate his employment "for cause" unless he engaged in one of these inappropriate acts, or an act or acts of similar severity. Claimant clearly did not violate any of the above listed "inappropriate actions".

10) Claimant's U-5 states *"Mr. Knight was terminated on July 26, 2002, after it was determined that he failed to timely and fully inform management of allegations made by an individual who was not a firm client relating to wrong doing by a firm client"*.

11) Claimant asserts that that the reason set forth for his termination: that *"he failed to timely and fully inform management"* is factually incorrect, but even if it were correct, it does not meet the burden that each party to the written employment contract *"owed the other a duty of loyalty and a duty to act in good faith"*. What respondents will be unable to demonstrate is that claimant's actions in any way harmed Merrill Lynch, or any of its clients, a most significant point. Further, Merrill Lynch will be unable to provide any back up to prove that what claimant was accused to have done, represented any violation of any policy at Merrill Lynch, thereby rendering his termination as orchestrated in bad faith.

12) Claimant asserts that the reason for his termination: that *"he failed to timely and fully inform management, management of allegations made by an individual who was not a firm client relating to wrong doing by a firm client"*, fails to meet the standard of "inappropriate actions", provided to claimant in writing by Merrill Lynch, sufficient for dismissal under his contract. Claimant asserts that such an action does not even exist in any Merrill Lynch compliance or other supervisory documentation.

13) Claimant further asserts that the customs and standards of the securities industry would consider a broker's termination for the reason listed above, just a few months short of claimant's tenth year of employment, qualifying claimant for certain retirement benefits (page 27 of exhibit B) also violates the letter, if not the spirit of claimant's employment contract.

14) Claimant therefore asserts that Merrill Lynch breached his contract of employment when:

a) it terminated him for an inappropriate action that did not occur,

b) it arbitrarily determined that *"that he failed to timely and fully inform management of allegations made by an individual who was not a firm client relating to wrong doing by a firm client"* was grounds for termination.

4

## Discussion

Under California law a termination can be wrongful where the termination violates the **covenant of good faith and fair dealing**, which can exist in an employment contract, regardless of whether the contract is express or implied, written or oral. *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654. One term of the implied contract is that claimant would not be terminated except for good cause. "Good cause" has been judicially defined as "a *fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.*" *Pugh v. See's Candies Inc.* ("*Pugh I*") (1981) 116 Cal.App.3d 311, 330. If the panel determines that respondents' reasons for terminating claimant were "*trivial, capricious, or pre-textual,*" then the termination was not made for a fair and honest cause or reason" *Pugh v. See's Candies, Inc.* ("*Pugh II*") (1988) 203 Cal.App.3d 743, 769.

The evidence to be presented here will show that respondents did not have good cause to terminate claimant. Indeed, once claimant shows that there was an express employment contract, and that his performance was adequate, the burden falls on respondents to show that they conducted a reasonable investigation and reached an honest belief that that was good cause for terminating claimant. See *Binder v. Aetna* (1999) 75 Cal.App.4th 832 and see also *Cotran v. Rollins Hudig Hall International, Inc.* (1998) 17 Cal.4th 93, 108. Claimant has alleged and will prove that his termination and the subsequent destruction of his career could in no way be considered as reasonable.

Therefore, the terms that each party owes the "*other a duty of loyalty and a duty to act in good faith*" would implicitly be taken to mean that firing any employee for a trumped up charge, destroying a career and made out to be a scapegoat, would violate the first "object and purpose" of NASD's very existence, namely "...*to promote therein high standards of commercial honor, and to encourage and promote among members observance of Federal and State securities laws*". That language, and the language found in claimant's U-4, (item 2) require that each party comply with these NASD rules as they are binding upon all associated persons.

In interpreting a contract, when there is a custom or standard practice in a certain industry, those engaged in that industry are deemed to have contracted in reference to that practice unless the contrary appears. The prevailing industry custom binds those engaged in the business. The industry practice becomes part of the contract, and the evidence of that custom is admissible to supply a missing term or to aid in interpretation if it does not alter or vary the terms of the contract. *Midwest Television, Inc. v. Scott, Lancaster, Mills & Atha, Inc.* (1988) 205 Cal. App. 3d 442; see also *Elite Show Services, Inc. v. Staffpro, Inc.*, (2004) 119 Cal. App. 4th 263. No sane associated person would knowingly work for Merrill Lynch, or any other brokerage company, if they knew that that firm routinely terminated individuals without cause, or for a trumped up cause. That is the industry standard and without that, no one could build a career in the securities industry.

03/23/2007 15:56 4153829421 TIMOTHY A CANNING ESQ PAGE 06
Case 3:07-cv-02753-SC     Document 15     Filed 07/27/2007     Page 6 of 60

5

Merrill Lynch has stonewalled claimant on discovery. It has refused to provide discovery for a number of reasons, but perhaps one of the reasons is because the evidence may show that Merrill Lynch likely knew about the problems regarding Steve Fertitta, a Merrill Lynch client, stealing money from his clients and depositing these monies in his Merrill Lynch account, back in October 2001, long before claimant was alleged to have failed to notify Merrill Lynch in a timely manner of a non client's problem (April 2002). Claimant believes that because the first suit involving Mr. Fertitta stealing from his clients was filed in Santa Clara County Superior Court in October 2001, by Dr. Siegel's brother, the victim referred to as the non Merrill client on Claimant's U-5. If this is indeed the case, then Merrill Lynch has lied to claimant and lied to this panel about the reasons for terminating claimant, apart from what has already been stated in the pleadings.

Claimant had a written employment contract the terms of which were violated, namely, that each party owed the *"other a duty of loyalty and a duty to act in good faith"*. Merrill Lynch made a number of promises in that agreement (first paragraph) that include *"the supervision of my career"*. Claimant alleges that supervising his career does not imply or provoke the termination and destruction of his career for pre textual reasons. In California parties have four years in which to file a claim for breach of written contract. Claimant was terminated on July 26, 2002, and filed this claim on July 20, 2006, clearly inside of four years. Respondents' motion that this claim be dismissed because it is time barred is incorrect and should be denied.

Respectfully submitted,

Richard Sacks
Securities Arbitration Consultant

Timothy A. Canning
Attorney for Claimant

Enclosures

cc:    Patricia Bailey Tsipras, Esq.

# EXHIBIT A

# FINANCIAL CONSULTANT

# EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS

In consideration of Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") employing me; compensating me; providing to me employment related benefits; training me; sponsoring me for the General Securities Examination; registering me with various exchanges; licensing me in various states; providing me with office facilities and sales support; executing, processing and clearing transactions; providing research and investment recommendations; supervising the development of my career; and other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, and intending to be legally bound; I hereby agree that:

1.    All records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sales representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only on a "need to know" basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

2.    If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

(a)    to transfer from Merrill Lynch to me or to my new employer, or

(b)    to open a new account with me or with my new employer, or

(c)    to otherwise discontinue its patronage and business relationship with Merrill Lynch.

FSJM

ML RK 00001

3.      I agree that at all times during my employment I owe Merrill Lynch a duty of loyalty and a duty to act in good faith. I agree that during my employment I will not individually, or in combination with any other employee or competitor of Merrill Lynch, violate or breach the terms of this agreement.

4.      In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION ordering:

       (a)      that I immediately return to Merrill Lynch all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

       (b)      that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Merrill Lynch, in any office and in any capacity; and

       (c)      that I be further enjoined and restrained, for a period of one year, from accepting business from any Account who was solicited in violation of paragraph 2 or whose records and information was used in violation of paragraph 1.

The above restraints shall apply to each and every Account whom I served or whose name became known to me while employed at Merrill Lynch, in any office and in any capacity, including without limitation, reassignments, walk-ins, call-ins, write-ins, transfers, referrals, prospects, cold-calls, seminars, mailers, lead lists, and etc. During my employment, some of the accounts I expect to develop and acquire are likely to be those of individuals I knew or was familiar with prior to joining Merrill Lynch ("Prior Acquaintances"). Nevertheless, because I will be acting as a representative of Merrill Lynch and I will be utilizing and benefiting from Merrill Lynch's goodwill, reputation, name recognition, and other assets and resources, I further agree that the Accounts of such Prior Acquaintances will be subject to the same restraints as all the other Accounts. The only exception will be my family and relatives.

5.      For the purposes of paragraph 4, I agree to submit to, and confer exclusive jurisdiction on, the United States District Court or the State Court which has original jurisdiction for judicial district or county in which I last worked for Merrill Lynch. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

6.      If after issuance of a TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION, the parties voluntarily agree, or are ordered, to arbitrate a dispute arising out of this Agreement, each party agrees and demands that any such arbitration be conducted in strict compliance with the applicable written

*continued*

ML RK 00002

Rules of Arbitration, as published, amended, effective and in force at the time of my termination. The parties further agree that any Order of the Court shall stay in full force and effect until a Panel of Arbitrators can be properly constituted in accordance with the above referenced written Rules of Arbitration and until said Panel renders a full and final decision.

7. NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM. MERRILL LYNCH MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME.

8. I HAVE READ AND REVIEWED THIS EMPLOYMENT AGREEMENT AND RE-STRICTIVE COVENANTS IN ITS ENTIRETY. I HAVE BEEN GIVEN AN OPPORTUNITY TO ASK MERRILL LYNCH QUESTIONS ABOUT IT. I HAVE ALSO BEEN GIVEN AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF MY CHOICE. I FULLY UNDER-STAND THE TERMS OF THIS DOCUMENT AND KNOWINGLY AND FREELY AGREE TO ABIDE BY THEM.

IN ADDITION TO THE FOREGOING, I UNDERSTAND THAT I HAVE AN ADDITIONAL THIRTY DAYS FROM THE DAY I SIGN THIS AGREEMENT TO CONTINUE TO REVIEW IT AND SEEK LEGAL COUNSEL. AT ANY TIME WITHIN THIS THIRTY DAYS, I MAY RESCIND THIS AGREEMENT BY DISCONTINUING MY EMPLOYMENT WITH MERRILL LYNCH WITHOUT ANY OF THE PROVISIONS HEREIN BEING ENFORCED AGAINST ME. TO THE CONTRARY, HOWEVER, IF I CONTINUE MY EMPLOYMENT WITH MERRILL LYNCH BEYOND SAID THIRTY DAYS, MY CONTINUATION OF EMPLOYMENT WILL CONSTITUTE MY RATIFICATION AND COMPLETE ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

Date: 09-09-92

_Robert J Knight_
Financial Consultant

Date: 9-16-92

_R J Cannwith_
For Merrill Lynch, Pierce, Fenner & Smith Inc.

ML RK 00003

# EXHIBIT B

*Working
At
Merrill Lynch.*

*An
Employee's
Guide*

*Leaving Merrill Lynch*

*Resignation*

If for any reason you plan to resign, please talk it over with your supervisor or manager before making a final decision. The talk may be helpful to you both; many problems can be resolved through such a discussion.

If you definitely decide to leave, submit a formal letter of resignation to your department or office manager at least two weeks in advance of your departure. The letter should include your reasons for leaving the firm.

*Termination*

When the firm finds it necessary to release an employee, the individual is informed by the supervisor or manager. During this meeting, the reasons for release should be discussed and the benefits to which the employee may be entitled should be explained.

Specific inappropriate actions that may lead to immediate discharge include but are not limited to:

- theft;

- unprovoked threats to anyone during working hours or on Merrill Lynch premises;

- refusal to follow management's directions;

- damaging Merrill Lynch property;

- proof or admission of any crime that presents a substantial risk of injury to any person or to Merrill Lynch;

- falsely filling our pre-employment or employment forms;

- possession, sale, use or purchase of illegal drugs or marijuana;

- selling or distributing material (except United Way, U.S. Savings Bond and Merrill Lynch Blood Drive) during working hours or on Merrill Lynch premises;

EG - 1/90

_ failure to qualify for a fidelity bond from a private, public, or govern-
ment source; and

_ misinforming management about the reason for an absence.

*Staff Reduction*

In some rare cases, jobs may be discontinued due to certain business
conditions. However, termination will only occur as a last resort. If you are
released, you may be eligible to receive salary continuation according to
your length of service. Any such payment programs vary according to
business conditions.

*Retirement*

Generally, once you have completed 10 years of service, you may elect to
retire at age 55 or later. Please refer to the Retirement section of this
manual for further information.

# EXHIBIT 10

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.

-------------------------------------------------------x

In the Matter of the Arbitration      :

   Between                          :      NASD No. 06-03430

                                :

ROBERT KNIGHT,             :

                                :

             Claimant,     :

                                :

  -against-              :

                                :      RESPONDENTS' ANSWER AND

MERRILL LYNCH, PIERCE, FENNER &amp;   :      AFFIRMATIVE DEFENSES TO

SMITH INCORPORATED,          :      CLAIMANT'S AMENDED

PATRICIA WILLIAMS, and        :      STATEMENT OF CLAIM

GEORGE SCOTT RALSTON,      :

                                :

            Respondents.    :

-------------------------------------------------------x

Pursuant to Rules 10314(b) and 10328(a) of the National Association of Securities Dealers Code of Arbitration Procedure, Respondents Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Patricia Williams ("Williams"), and George Scott Ralston ("Ralston") (collectively "Respondents") hereby answers the Amended Statement of Claim filed by Claimant Robert Knight ("Knight"). Respondents expressly deny any allegations not specifically admitted in this *Answer*.

## I.    FACTUAL BACKGROUND

In September 1992, Merrill Lynch hired Knight as a Financial Advisor in its San Jose, California branch office. As a Merrill Lynch Financial Advisor, Knight served as a fully licensed retail broker, who provided investment advice and recommendations to Merrill Lynch customers. In July 1996, Knight became the Resident Manager of the Cupertino, California office. As a Resident Manager, Knight was responsible for sales supervision, compliance, and implementation of Merrill Lynch policy. In September 1998, Knight rejoined the San Jose office as a Financial Advisor. In January 2002, Williams became the Director of the San Jose office

and reported to Ralston, the Managing Director of the Golden Gate District, of which the San

Jose office was a part. At all times, Knight was an at-will employee. Therefore, he was free to

resign his employment with or without notice, and Merrill Lynch was free to terminate his

employment for any reason or for no reason at all.

###### A.    Employees Are Required to Report Complaints.

Both securities industry and Merrill Lynch rules require employees to report complaints.

Specifically, Merrill Lynch's Compliance Outline for Private Client Financial Advisors

("Compliance Outline") provides as follows:

> Industry rules require that disagreements with clients, or written or
> oral complaints alleging unethical or illegal conduct or sales
> practices violations are reported **promptly**. You must immediately
> report all such complaints to the MD/Director/RM for review and
> resolution. Tardiness in reporting complaints may cause otherwise
> innocuous complaints to escalate unnecessarily.

See Compliance Outline, January 2002, at 19 attached hereto as Exhibit A (emphasis in original).

The Compliance Outline further provides:

> To protect the Firm and its clients, you have an obligation to
> discuss concerns about possible unethical conduct with your
> Manager. If this is not feasible, you can bring concerns to senior
> management without reprisal by calling…or write to….All
> contacts will be treated with confidence to the extent allowed by
> law. You should report: theft, embezzlement, or other
> misappropriation of Firm or client assets…

See Exhibit A at 2.

###### B.    Knight Failed to Timely and Fully Inform Management of Complaints.

On or about April 3, 2002, Knight received a telephone call from Jackie Parraz, who

described herself as an assistant or bookkeeper for Dr. Joel Siegel. Ms. Parraz believed that

Knight still was the manager of Merrill Lynch's Cupertino, California office. She informed

Knight that she located his name on a piece of correspondence that Knight had sent in August

1998 (when Knight indeed was the Resident Manager in Cupertino) to First Trust Corporation, where Dr. Siegel had an account, accepting, on behalf of Merrill Lynch, a wire transfer from a First Trust account to an unrelated Merrill Lynch IRRA account in the name of Steven Fertitta ("Fertitta").[1] Despite knowing that Ms. Parraz wished to speak (indeed, believed she was speaking) to a manager, Knight continued with the call instead of immediately transferring it to a manager. Ms. Parraz informed Knight that Dr. Siegel believed his retirement funds had been misappropriated. She asked Knight for his contact information and told him that she would be following up her oral complaint with a letter further detailing Dr. Siegel's allegations.

Instead of immediately informing management of the oral complaint, Knight – who left management in September 1998 – began conducting his own investigation. He spoke with Ellen Traina, the assistant to the Administrative Manager, to determine who serviced the account of Dr. Siegel. Ms. Traina tracked Dr. Siegel's relationship to the primary account of Fertitta. Charles Tyler ("Tyler"), another Financial Advisor in the office, serviced Fertitta's account.

Knight then proceeded to discuss Dr. Siegel's complaint directly with Tyler. Together, Knight and Tyler contacted Fertitta about the telephone call that Knight received from Ms. Parraz. Later that day, Tyler sent an email to Knight stating, "Don't worry about today's call. The only relationship we have with that guy is that we have been SENDING him $900 per month from Steve Fertitta's IRA. He had us mixed up with another firm." See email dated April 3, 2002 from Tyler to Knight attached hereto as Exhibit B. Knight never brought Tyler's email to management's attention.

---

[1] Fertitta was a Merrill Lynch customer and CEO of an employee benefits company in Roseville, California. He was arrested on November 20, 2003 on three counts of felony grand theft and three counts of selling securities without a license. The charges related to his misconduct against Dr. Siegel and two other investors. In February 2005, Fertitta plead guilty to three counts of felony grand theft.

At some point after receiving the call from Ms. Parraz, Knight spoke to Marilyn Taylor Meyer (hereinafter "Ms. Meyer"), an Administrative Manager in the San Jose office. Knight asked Ms. Meyer only whether the name "Fertitta" meant anything to her and mentioned that he received an inquiry about the account. Knight failed to offer any specifics about the call.

On or about May 19, 2002, Knight received Dr. Siegel's written complaint. In it, Dr. Siegel alleged, among other things, that Fertitta, to whom Dr. Siegel had given a substantial amount of money to invest, either had co-mingled his account with others or is embezzling. See letter from Dr. Siegel to Knight attached hereto as Exhibit C. Again, rather than immediately presenting the complaint to management, Knight made copies of Dr. Siegel's letter, one of which he gave to Tyler.

When management finally became aware of Dr. Siegel's written complaint, they, along with members of Merrill Lynch's Office of General Counsel, commenced a two-month investigation into Dr. Siegel's allegations. At the conclusion of its investigation, Merrill Lynch determined that the facts and circumstances warranted termination of employment for Knight and Tyler. On July 26, 2002, Merrill Lynch terminated Knight and Tyler and, pursuant to its regulatory obligations, Merrill Lynch prepared Knight's Uniform Termination Notice for Securities Industry Registration ("Form U-5") reflecting the reason for his termination.

On August 23, 2002, Merrill Lynch filed Knight's Form U-5, which truthfully and accurately stated: "Mr. Knight was terminated on July 26, 2002, after it was determined that he failed to timely and fully inform management of allegations made by an individual who was not a Firm client related to wrongdoing by a Firm client."

WHEREFORE, Respondents request that Knight's claims be denied in their entirety and that Respondents be awarded all other relief that the Arbitration Panel deems reasonable and appropriate under the circumstances presented in this proceeding.

## II.    PROCEDURAL BACKGROUND

In July 2006, four years after his termination, Knight filed a statement of claim against Respondents asserting claims of (1) discharge in breach of implied contract, including breach of the covenant of good faith and fair dealing; (2) tortious discharge in violation of public policy; (3) defamation and trade libel; (4) intentional infliction of emotional distress; and (5) intentional interference with prospective economic advantage. Because all of these claims were time-barred pursuant to the applicable statutes of limitations, in October 2006, Respondents filed a *Motion to Dismiss.*

In December 2006, Knight opposed Respondents' *Motion to Dismiss.* In his opposition brief, Knight challenged the Panel's authority – which clearly is derived from the NASD Code of Arbitration Procedure and its interpreting case law – to grant a dispositive motion. He further argued – despite NASD rules, guidelines, and case law to the contrary – that statutes of limitations are applicable only in court actions. Lastly, Knight argued – for the first time – that his claims were based upon a written employment agreement, despite his assertion of claims only for breach of an *implied* contract. Respondents filed a reply in support of their *Motion to Dismiss* in December 2006.

In January 2007, the Panel conducted a pre-hearing conference to hear oral argument on Respondents' *Motion to Dismiss.* Following that hearing, the Panel issued an Order dated January 15, 2007 in which it granted limited discovery (to be exchanged by March 12, 2007) and permitted Knight to "amend his claim to assert discharge in breach of a written contract," if

applicable. The Panel also permitted further briefing on Respondents' *Motion to Dismiss* (to be filed by March 23, 2007).

Following the exchange of limited discovery, on March 23, 2007, Respondents filed a supplemental brief in support of their *Motion to Dismiss*. Recognizing that none of his initial causes of action were timely under their respective limitations periods, on March 23, 2007, Knight filed an *Amended Statement of Claim* in which he abandoned four of his five previous claims and asserted only that his termination violated the covenant of good faith and fair dealing. This claim is both untimely and legally insufficient and, therefore, should be dismissed.

## III.   KNIGHT'S CLAIM SHOULD BE DISMISSED.

### A.   Knight's Amended Statement of Claim Violates the Panel's Order.

In its Order dated January 15, 2007, the Panel permitted Knight to amend his statement of claim "to assert discharge in breach of a written contract." Unable to identify any written contract that Respondents breached, Knight instead amended his statement of claim to assert a claim for breach of the implied covenant of good faith and fair dealing, which, as explained in Respondents' *Motion to Dismiss*, carries a two-year statute of limitations. Assertion of this claim violates the express language of the Panel's Order. On this basis alone, the claim should be dismissed.

### B.   Knight's Claim for Breach of the Covenant of Good Faith and Fair Dealing Is Time-Barred.

Knight asserts that, by terminating him, Respondents breached the implied covenant of good faith and fair dealing. See *Amended Statement of Claim* at 4. Knight also asserted this cause of action in his initial statement of claim. Respondents moved to dismiss that claim because it clearly is time-barred. See *Motion to Dismiss* at IV(A).

6

A claim for breach of an implied contract accrues at the time of the alleged breach. See Kourtis v. Cameron, 419 F.3d 989, 1000 (9th Cir. 2005) (*citing* Menefee v. Ostawari, 228 Cal. App. 3d 239, 246 (Cal. Ct. App. 1991) ("a cause of action for breach of contract ordinarily accrues at the time of breach regardless of whether any substantial damage is apparent or ascertainable"); In re Estate of Fincher, 119 Cal. App. 3d 343, 352 (Cal. Ct. App. 1981) ("The general rule is that a suit for breach of an implied agreement accrues at the time of the breach.")). In this case, Knight's cause of action accrued on July 26, 2002 – the date of his termination. See Romano v. Rockwell Int'l, Inc., 926 P.2d 1114, 1121 (Cal. 1996) (statute of limitations for claim of breach of an implied contract not to terminate employment without good cause accrues at time of termination); Mullins v. Rockwell Int'l Corp., 936 P.2d 1246, 1249 (Cal. 1997) (same).

In California, claims for breach of the implied covenant of good faith and fair dealing are governed by a two-year statute of limitations. See CAL. CODE CIV. PROC. § 339(1) ("an action upon a contract, obligation or liability not founded upon an instrument of writing" must be filed "within two years"); see also Kourtis, 419 F.3d at 1000-01 (citing section 339 and upholding district court's dismissal of breach of implied contract claim because it was barred by a two-year statute of limitations); Abedi v. Schlossman, No. 01-56013, 2002 U.S. App. LEXIS 15039, *4-5 (9th Cir. July 22, 2002) (citing section 339 and upholding district court's dismissal of breach of implied covenant of good faith and fair dealing claim because the two-year statute of limitations barred the claim).

Knight's claim for breach of the covenant of good faith and fair dealing accrued on July 26, 2002. He failed to bring this claim – initially or by amendment – by July 26, 2004. Therefore, it is time-barred and should be dismissed.

C.      **Even If This Panel Considers Knight's Claim to Be Based Upon a Written Contract, It Still Must Be Dismissed.**

Knight asserts that his *Financial Consultant Employment Agreement and Restrictive Covenants* ("Agreement") supports his claim that, by terminating his employment, Respondents breached the implied covenant of good faith and fair dealing. However, the express employment-at-will provision in the Agreement bars Knight's claim.

The Agreement expressly and conspicuously states that Knight's employment with Merrill Lynch is at-will:

> NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM. MERRILL LYNCH MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME.

Exhibit D at ¶ 7. This language appears in all capital letters on the very page that Knight signed. By signing the Agreement, Knight acknowledged that he had read and reviewed it in its entirety, had been given an opportunity to ask questions about it, had been given an opportunity to consult with an attorney, and fully understood the terms of the Agreement. Id. ¶ 8.

Knight's employment-at-will status also was made clear to him even before he commenced employment with Merrill Lynch. His Employment Application provides, in relevant part, and in bold:

> **My employment and compensation can be terminated *with or without cause*, and with or without notice, *at any time*, at the option of either Merrill Lynch or myself.**

See Knight Employment Application, p. 1 (attached hereto as Exhibit E) (italics added).

Knight's reliance on a provision of a Merrill Lynch employment manual entitled Working at Merrill Lynch: An Employee's Guide (see *Amended Statement of Claim* at 2) does not warrant a different result. Indeed, that manual states on its first page:

8

> Since employment with the firm is "at will" in all cases, each
> employee has the right to resign at any time. Conversely, the firm
> has the right to terminate employment at any time, in its sole
> discretion, with or without cause.

See Exhibit F.[2]

Even if the parties had not expressly agreed that Knight's employment was at-will,

California law presumes employment is at-will unless the parties have expressly agreed

otherwise. Cal. Labor Code Section 2922 ("an employment, having no specified term, may be

terminated at the will of either party...."). This presumption of at-will status can be overcome

only where evidence exists that the parties agreed that the employer's power to terminate would

be limited in some way, e.g., by a requirement that termination be based only on "good cause."

Foley v. Interactive Data Corp., 765 P.2d 373, 385 (Cal. 1988) (citations omitted).

However, where, as here, an express, written at-will employment contract signed by the

employee exists, the at-will presumption cannot be overcome. Indeed, the California Supreme

Court began its analysis in Foley by noting that it cannot ignore the fundamental principle of

freedom of contract: "employer and employee are free to agree to a contract terminable at

will.... Their agreement will be enforced so long as it does not violate legal strictures external to

the contract...." Id. at 384. Thus, when, as here, an employee expressly agrees to employment

at-will, implied contract claims are barred as a matter of law. Randell v. Levi Stauss & Co., No.

C 05-1047 CW, 2006 U.S. Dist. LEXIS 32177 (N.D. Cal. May 12, 2006); Dore v. Arnold

Worldwide, Inc., 39 Cal. 4th 384, 46 Cal. Rptr. 3d 668 (Cal. 2006); Tomlinson v. Qualcomm.

Inc., 97 Cal. App. 4th 934, 118 Cal. Rptr.2d 822 (2002); Camp v. Jeffer, Mangels, Butler &

---

[2] Moreover, it was not reasonable, as Knight suggests, for him to "reasonably believe[] that Merrill would not terminate his employment 'for cause' unless he engaged in one of the[] inappropriate acts" listed in the manual. Just above a list of inappropriate actions that may lead to an employee's termination, the manual expressly states that the list is not exhaustive. See Exhibit B to Knight's Amended Statement of Claim at 27 ("Specific inappropriate actions that may lead to immediate discharge *include but are not limited to:....*") (emphasis added).

Marmaro, 35 Cal. App. 4th 620, 41 Cal. Rptr.2d 329 (1995); Slivinsky v. Watkins-Johnson Co.

221 Cal. App. 3d 799, 270 Cal. Rptr. 585 (1990).

In Tomlinson, plaintiff had signed both an employment application warning that she

would be hired at-will, and an employment agreement, confirming her at-will status. In

affirming the dismissal of her breach of implied contract claim, the Court of Appeals reasoned as

follows:

> Even assuming the statements cited by Tomlinson contradicted the express
> agreement by guaranteeing her continued employment . . ., under well-established
> case law, '[t]here cannot be a valid express contract and an implied contract, each
> embracing the same subject, but requiring different results. [Citation]. The
> express term is controlling even if it is not contained in an integrated employment
> contract. [Citation]. Thus, the . . . express at-will agreement precluded the
> existence of an implied contract requiring good cause for termination.'

Tomlinson, 118 Cal. Rptr.2d at 830 (quoting Camp, 35 Cal. App. 4th at 630). This logic applies

with equal force here. Knight was expressly warned when he applied for employment with

Merrill Lynch that his employment would be at-will. His at-will status later was confirmed in

his written, signed employment agreement. He cannot now claim that an implied agreement

stating otherwise exists. Such an allegation flies in the face of fundamental contractual

principles, and, therefore, is barred.

Furthermore, in Guz v. Bechtel National, Inc., the California Supreme Court held that the

implied covenant of good faith and fair dealing cannot impose substantive terms and conditions

beyond those to which the parties contractually agreed, and thus an employee at-will cannot

sustain a cause of action for breach of the duty of good faith and fair dealing. 8 P.3d 1089, 1110-

1111 (Cal. 2000). The court reasoned as follows:

> Labor Code section 2922 established the presumption that an employer may
> terminate its employees at will, for any or no reason. A fotiori, the employer may
> act peremptorily, arbitrarily, or inconsistently, without providing specific
> protections such as prior warning, fair procedures, objective evaluation, or

> preferential reassignment. Because the employment relation is "fundamentally contractual" [citing Foley], limitations on these employer prerogatives are a matter of the parties' specific agreement, express or implied in fact. *The mere existence of an employment relationship affords no expectation, protectible by law, that employment will continue, or will end only on certain conditions, unless the parties have actually adopted such terms. Thus if the employer's termination decisions, however arbitrary, do not breach such a substantive contract provision, they are not precluded by the covenant.*

Id. at 110 (emphasis added). Here, the parties' express agreement that Knight's employment was at-will, and the lack of any substantive contract provision to the contrary, precludes an implied covenant claim. The Court in Guz further explained that just as the implied covenant cannot be read to impose a duty, for example, to terminate only for good cause, "the employee cannot complain about a deprivation of the benefits of continued employment, for the agreement never provided for a continuation of its benefits in the first instance." Id. at 1110 (quoting Hejmadi v. AMFAC, Inc., 202 Cal. App. 3d 525, 547, 249 Cal. Rptr. 5 (1988)). It then disapproved any prior case law that suggested that the implied covenant imposes limits on an employer's termination rights beyond those either expressed or implied in fact in the employment contract itself. Id. at 1111.[3]

Because Knight's implied covenant claim seeks to impose duties beyond (and in fact contrary to) those to which the parties' expressly agreed, his claim is barred as a matter of law.

---

[3] The court specifically rejected the following holdings, among others, to the extent that they contradicted an express at-will agreement: (1) the covenant was breached where employer refused to follow its own policies and practices (citing Rulon-Miller v. Int'l Business Machines, Corp., 208 Cal. Rptr. 524 (Cal. App. 1984)); (2) that the covenant required that "like cases be treated alike" (citing Rulon-Miller); (3) that long service plus violation of employer policies may establish breach of the covenant (citing Gray v. Superior Court, 226 Cal. Rptr. 570 (Cal. App. 1986)); (4) that the covenant was violated where an employer engaged in bad faith actions, extraneous to the contract, to frustrate benefits of employment (citing Khanna v. Microdata Corp., 215 Cal. Rptr. 860 (Cal. App. 1985)); and (5) that termination after long service, in violation of employer policies, may breach implied covenant to refrain from arbitrary treatment (citing Pugh v. See's Candies, Inc., 171 Cal. Rptr. 917 (Cal. App. 1981)). Guz, 8 P.3d at 110-111.

## IV.    AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Knight fails to set forth any facts upon which relief can be granted, including satisfaction of any of the predicate acts necessary to state a basic claim or any requisite duty on the part of the Respondents; failure to state a statutory basis for a claim; and failure to establish recoverable damages.

### SECOND AFFIRMATIVE DEFENSE

The claims are barred in whole or in part because Knight has sustained no legally recognized injury arising from the conduct alleged.

### THIRD AFFIRMATIVE DEFENSE

Some or all of the claims lack evidentiary support and/or are frivolous or unwarranted by existing law.

### FOURTH AFFIRMATIVE DEFENSE

Knight's claims are barred because he was an at-will employee of Merrill Lynch.

### FIFTH AFFIRMATIVE DEFENSE

Knight's tortious discharge claim must fail because he failed to plead a violation of a fundamental public policy supported by constitutional or statutory provisions.

### SIXTH AFFIRMATIVE DEFENSE

Respondents' actions with respect to Knight were taken in good faith and for proper and lawful business reasons.

### SEVENTH AFFIRMATIVE DEFENSE

Merrill Lynch's actions with respect to Knight were taken in good faith and without fraudulent motives, fraudulent intent, malice, or reckless disregard of his rights.

## EIGHTH AFFIRMATIVE DEFENSE

Knight's claim for breach of the covenant of good faith and fair dealing fails because he has not plead the breach of an explicit contract provision.

## NINTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, because he failed to plead any facts supporting a claim of defamation.

## TENTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, because any alleged defamatory statements are true.

## ELEVENTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, because the alleged defamatory statements constitute nonactionable opinion.

## TWELFTH AFFIRMATIVE DEFENSE

Knight's defamation claim is barred, in whole or in part, by the doctrines of absolute privilege and qualified privilege.

## THIRTEENTH AFFIRMATIVE DEFENSE

By execution of a Form U4, Knight consented to Merrill Lynch's publication of information concerning his employment, both within Merrill Lynch and also to others, including the NASD and the CRD.

## FOURTEENTH AFFIRMATIVE DEFENSE

Knight's trade libel claim fails because he has not plead any disparagement to the quality of his property.

## FIFTEENTH AFFIRMATIVE DEFENSE

Knight's trade libel claim fails because he has not plead special damages.

## SIXTEENTH AFFIRMATIVE DEFENSE

Knight's intentional infliction of emotional distress claim fails because he has not alleged any outrageous or extreme conduct that exceeds all bounds of decency.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Knight's intentional interference with prospective economic advantage claim fails because he had no economic relationship with the customers he serviced.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Knight's claims against Respondents Patricia Williams and George Scott Ralston are barred by the manager's privilege.

## NINETEENTH AFFIRMATIVE DEFENSE

Knight's claims are barred, in whole or in part, by the applicable statute of limitations.

## TWENTIETH AFFIRMATIVE DEFENSE

The claims are barred by the doctrines of laches, waiver, estoppel, and unclean hands.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Knight could have mitigated any alleged damages and, upon information and belief, has failed to do so.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

The claims are barred in whole or in part because any and all losses sustained by Knight were due to his own failures or his own omissions or his own conduct or negligence.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Knight is precluded from any recovery because the damages he seeks are necessarily speculative and not recoverable as a matter of law.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Knight fails to state a claim for punitive damages because no conduct alleged to have been engaged in by Respondents could possibly be considered to constitute conduct "so extreme and outrageous as to go beyond the bounds of all decency tolerated by a civilized community" as required by law. Furthermore, an award of punitive damages would be an unconstitutional denial of Respondents' right to due process and/or equal protection under the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of California.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Knight's claim for attorney's fees and/or costs is barred in whole or in part because he fails to assert any cause of action warranting an award of attorney's fees and/or costs.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Merrill Lynch reserves the right to raise any and all other affirmative defenses that may become evident during discovery and during any other proceeding in this action.

WHEREFORE, Respondents request that Knight's claims be denied in their entirety and

that Respondents be awarded all other relief that the Arbitration Panel deems reasonable and

appropriate under the circumstances presented in this proceeding.

Respectfully Submitted,

By: _____

Michael J. Fortunato
Patricia Bailey Tsipras
RUBIN, FORTUNATO & HARBISON P.C.
MCS Building, Suite 202
10 South Leopard Road
Paoli, PA 19301
(610) 408-2005
(610) 408-9050 (telecopy)

Attorneys for Respondents
Merrill Lynch, Pierce, Fenner & Smith Incorporated
Patricia Williams and George Scott Ralston

Dated: April 2, 2007

## CERTIFICATE OF SERVICE

I, Patricia Bailey Tsipras, Esquire, do hereby certify that true and correct copies of

Respondents' Answer and Affirmative Defenses to Claimant's Amended Statement of Claim

were served via overnight mail as follows:

> Timothy Canning, Esquire
> Two Commercial Blvd.
> Suite 203
> Novato, California 94949
>
> Counsel for Claimant
>
>
> Derek Sorrells
> NASD Dispute Resolution
> 300 S. Grand Avenue, Suite 900
> Los Angeles, California 90071

Patricia Bailey Tsipras

Dated: April 2, 2007

# EXHIBIT A

MERRILL LYNCH, PIERCE, FENNER & SMITH INC.

# COMPLIANCE OUTLINE
## FOR
# PRIVATE CLIENT FINANCIAL ADVISORS

### JANUARY 2002

This outline is a reminder and quick reference source. It does not replace the *Merrill Lynch & Co. Policy Manual*, the *Branch Office Policy Manual*, the *Procedures Manual for Branch Offices* or other more detailed sources. It is intended to help Financial Advisors avoid situations that can lead to complaints, regulatory problems or adverse publicity.

You are required to review the outline and acknowledge your understanding of its contents annually.

**IF YOU HAVE QUESTIONS ABOUT THIS MATERIAL OR OTHER COMPLIANCE RELATED ISSUES, PLEASE CONSULT WITH YOUR MANAGER OR COMPLIANCE OFFICER.**

# ETHICS, COMPLIANCE AND BUSINESS CONDUCT

## OUR MOST VALUABLE ASSET

The Firm and its employees must safeguard our most important asset, our reputation for integrity. This means being guided not just by what is legal or permissible, but by the higher standard of what is right. This will benefit our clients, our Firm, our stockholders, and each of us.

We have long recognized that but for our unwavering commitment to integrity, would not remain in business. Perhaps we cannot calculate a "return on integrity"--but let integrity slip and take second place to revenue--then it will cost us more than dollars. The cost could be fatal to our Firm and to everything that has made it respected and great.

> Rosemary T. Berkery
> Executive Vice President
> General Counsel

Good compliance is good business and the responsibility of every FA.

## ETHICS HOTLINE

No one's bottom line is more important than the reputation of the Firm.

To protect the Firm and its clients, you have an obligation to discuss concerns about possible unethical conduct with your Manager. If this is not feasible, you can bring concerns to senior management without reprisal by calling **(212) 449-9590** or **(800) 338-8954** or write to **General Counsel Ethics Hotline, P.O. Box 490, Church Street Station, New York, NY 10080.** All contacts will be treated with confidence to the extent allowed by law. You should report:

- theft, embezzlement, or other misappropriations of Firm or client assets
- acceptance or distribution of bribes or kickbacks
- forgeries or alterations of documents, securities or negotiable instruments
- alteration or manipulation of manual or computer-generated records or documents
- inappropriate or improper use of non-public information
- willful violation of Firm policies on business or personal conduct, or client relationships
- other dishonest, unethical, illegal or inappropriate activities

## ELDERLY CLIENTS, continued

Elderly clients may view the market as a pastime or wish to engage in activities inconsistent with their financial objectives or circumstances. Some transactions may be inappropriate despite prior experience. Problems can arise (and activity may be viewed with hindsight) if the client trades aggressively and is later disabled or left with diminished capacities due to illness or advancing age. Such developments are unpredictable and may be undetected if all contact is by telephone.

Elderly clients may give trading authorizations to younger persons. Remember that the account belongs to the elderly principal and act accordingly. Claims are often brought by heirs or other third parties that allege unsuitable activity or a "dissipation of assets." Courts or regulators may be especially sympathetic if elderly clients are in poor health, appear unsophisticated, or have been left in tenuous financial circumstances. Plaintiffs' attorneys may seek **punitive damages** or use them as a threat to gain substantial settlements.

**Suitability, care and good judgment are critical.** You must carefully consider whether margin, speculation or long-term non-liquid investments are appropriate. We cannot discriminate against elderly clients on the basis of age, but we must treat them with **sensitivity.**

## COMPLAINTS

Industry rules require that disagreements with clients, or written or oral complaints alleging unethical or illegal conduct or sales practices violations are reported **promptly.** You must immediately report all such complaints to the MD/Director/RM for review and resolution. Tardiness in reporting complaints may cause otherwise innocuous complaints to escalate unnecessarily.

## ACTIVE ACCOUNT REVIEWS

MD/Director/RMs and Administrative Managers regularly review actively traded accounts (e.g., those with a high commissions-to-equity ratio) and accounts sustaining substantial losses. Your manager is encouraged by the Firm to initiate contact with clients of actively traded accounts to ensure awareness of the level of activity, commissions generated, and profit or loss, and that the activity is appropriate in light of the client's investment objectives, sophistication, and financial circumstances. This process can protect clients by detecting and addressing potential problems -- and protect you, the MD/Director/RM and the Firm against future complaints. Your full cooperation is required.

# EXHIBIT B

Knight, Robert J  (SAN JOSE SY 233)

From:                    Tyler, Charles S (SAN JOSE SY 233)
Sent:                    Wednesday, April 03, 2002 7:28 PM
To:                      Knight, Robert J  (SAN JOSE SY 233)
Subject:                 TYLER

Don't worry about today's call.  The only relationship we have with that guy is that we have been SENDING him $900 per month from Steve Fertitta's IRA.  He has us mixed up with another firm.

*Charles S. Tyler*

*Vice President*
*Senior Financial Advisor*
*Tyler-Warthen Group*

*Merrill Lynch*
*50 W. San Fernando St.*
*16th Floor*
*San Jose, CA 95113*

*(408) 283-3039 (direct)*
*(408) 283-3129 (fax)*



1

# EXHIBIT C



# REDACTED

May 19, 2002


Mr. Robert Knight,
Resident Manager, Merrill Lynch
50 West San Fernando Street
    10th Floor
San Jose, CA  95113


Dear Sir:

    Your name came to my attention in August 1998 when First Trust of Den-
ver, Colorado, had discussions with you concerning Merrill Lynch Account
                    registered to Steve Fertitta, owner.

    My funds were ultimately transferred to                    . For
your information, his letter to me, dated July 22nd 1998 is attached, and
to which I will refer.

    Repeatedly, I had requested an accounting of my holdings.  Multiple
entreaties to his office Staff failed to evoke a response.  On December
28th, 2001 I received the letter, copy enclosed, indicating, "As of Sept.
5th, 2001, I have liquidated the fund and put them into a bond fund".
"I will provide a copy of this bond to you at a later date".  It is incon-
ceivable to me that a bond fund held at Merrill Lynch does not have its
contents revealed after more than 3½ months following the transaction.

    This year, 2002, I called the office of Steve Fertitta at least 3 times
per week.  I could not obtain a Quarterly statement, I did not receive calls
back, and had no knowledge about the bond fund.

    First week March, Steve Fertitta came to my office and told me that I
was invested in a Federal bond account with Merrill Lynch, that it was a
rolling 6 month bond returning 3.5%, exempt from State and Federal taxes.
When I inquired why he never responded to my numerous calls about my account,
he replied that "small accounts receive less attention than larger ones,that
Merrill Lynch's office in San Jose had closed and moved, and that he had
computer problems in his office".  He promised to send me a Quarterly state-
ment after March 31st.

    I have called his office almost daily for the past 6 weeks to inquire
about the bond fund and the Quarterly statement.  The letter, dated July
22nd 1998 states unequivocally: "We will be providing Quarterly reports".
This has proven to be a deception.

Since I am not able to obtain information from him, then I request you, as Resident Manager, provide me with the following:

1) The name and identifying number of the bond fund being held at Merrill Lynch.

2) The contents of the bond and its current value.

3) The identifying number of the money market fund and its current value.

This failure on the part of Mr. Fertitta raises suspicion in my mind that he may have co-mingled my account with others and/or he is embezzling. He has not honoured his fiduciary responsibility according to the written commitments made when I became a client. I also believe that Merrill Lynch has a responsibility in protecting its clients.

Mr. Knight, please provide me with the information I am requesting so that we may both move on. I do not wish to burden you but must have my questions answered. It is my intent to not pursue this matter any further if the information is forthcoming. Your timely response would be greatly appreciated

**REDACTED**

# EXHIBIT D

# FINANCIAL CONSULTANT

# EMPLOYMENT AGREEMENT AND RESTRICTIVE COVENANTS

In consideration of Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") employing me; compensating me; providing to me employment related benefits; training me; sponsoring me for the General Securities Examination; registering me with various exchanges; licensing me in various states; providing me with office facilities and sales support; executing, processing and clearing transactions; providing research and investment recommendations; supervising the development of my career; and other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, and intending to be legally bound, I hereby agree that:

1.    All records, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein, including names, addresses, phone numbers, and financial information of any account, customer, client, customer lead or prospect ("Account"), are confidential and are the sole and exclusive property of Merrill Lynch. This information, whether provided to me by Merrill Lynch or by any Account, is entrusted to me as an employee and sales representative of Merrill Lynch. I will not use this information or remove any such records from the Merrill Lynch office except for the sole purpose of conducting business on behalf of Merrill Lynch. I agree not to divulge or disclose this information to any third party and under no circumstances will I reveal or permit this information to become known by any competitor of Merrill Lynch either during my employment or at any time thereafter.

This information is extremely valuable to Merrill Lynch and Merrill Lynch takes all reasonable measures to maintain its confidentiality and to guard its secrecy. This information is not generally known outside Merrill Lynch and within Merrill Lynch this information is confidential and used only on a "need to know" basis. This information is developed and acquired by great expenditures of time, effort, and money. This information is unique and cannot be lawfully duplicated or easily acquired. Consequently, I agree that these records and the information contained therein are the property of Merrill Lynch and are deserving of trade secret status and protection.

2.    If, at any time, I resign from Merrill Lynch, provoke my termination, or am terminated for cause, I agree that for a period of one year following my termination I will not solicit by mail, by phone, by personal meeting, or by any other means, either directly or indirectly, any Account whom I served or whose name became known to me during my employment at Merrill Lynch in any office and in any capacity. My agreement "not to solicit" means that I will not, during my employment and for a period of one year thereafter, initiate any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting any Account:

    (a)    to transfer from Merrill Lynch to me or to my new employer, or

    (b)    to open a new account with me or with my new employer, or

    (c)    to otherwise discontinue its patronage and business relationship with Merrill Lynch.

ML RK 00001

3.     I agree that at all times during my employment I owe Merrill Lynch a duty of loyalty and a duty to act in good faith. I agree that during my employment I will not individually, or in combination with any other employee or competitor of Merrill Lynch, violate or breach the terms of this agreement.

4.     In the event I breach any of the covenants of paragraphs 1, 2 or 3, I agree that Merrill Lynch will be entitled to injunctive relief. I recognize that Merrill Lynch will suffer immediate and irreparable harm and that money damages will not be adequate to compensate Merrill Lynch or to protect and preserve the status quo. Therefore, I CONSENT TO THE ISSUANCE OF A TEMPORARY RESTRAINING ORDER or A PRELIMINARY or PERMANENT INJUNCTION ordering:

(a)     that I immediately return to Merrill Lynch all records whether original, duplicated, computerized, handwritten, or in any other form whatsoever, and that I be enjoined and restrained from using or disclosing any information contained in such records; and

(b)     that, for a period of one year, I be enjoined and restrained from soliciting any Account whom I served or whose name became known to me while employed by Merrill Lynch, in any office and in any capacity; and

(c)     that I be further enjoined and restrained, for a period of one year, from accepting business from any Account who was solicited in violation of paragraph 2 or whose records and information was used in violation of paragraph 1.

The above restraints shall apply to each and every Account whom I served or whose name became known to me while employed at Merrill Lynch, in any office and in any capacity, including without limitation, reassignments, walk-ins, call-ins, write-ins, transfers, referrals, prospects, cold-calls, seminars, mailers, lead lists, and etc. During my employment, some of the accounts I expect to develop and acquire are likely to be those of individuals I knew or was familiar with prior to joining Merrill Lynch ("Prior Acquaintances"). Nevertheless, because I will be acting as a representative of Merrill Lynch and I will be utilizing and benefiting from Merrill Lynch's goodwill, reputation, name recognition, and other assets and resources, I further agree that the Accounts of such Prior Acquaintances will be subject to the same restraints as all the other Accounts. The only exception will be my family and relatives.

5.     For the purposes of paragraph 4, I agree to submit to, and confer exclusive jurisdiction on, the United States District Court or the State Court which has original jurisdiction for judicial district or county in which I last worked for Merrill Lynch. This Agreement shall be construed, governed by, and enforced in accordance with the laws of said jurisdiction.

6.     If after issuance of a TEMPORARY RESTRAINING ORDER or a PRELIMINARY or PERMANENT INJUNCTION, the parties voluntarily agree, or are ordered, to arbitrate a dispute arising out of this Agreement, each party agrees and demands that any such arbitration be conducted in strict compliance with the applicable written

*continued*

ML RK 00002

Rules of Arbitration, as published, amended, effective, and in force at the time of my termination. The parties further agree that any Order of the Court shall stay in full force and effect until a Panel of Arbitrators can be properly constituted in accordance with the above referenced written Rules of Arbitration and until said Panel renders a full and final decision.

7.    NOTHING HEREIN IS A PROMISE OF EMPLOYMENT FOR A FIXED TERM. MERRILL LYNCH MAY TERMINATE MY EMPLOYMENT FOR ANY REASON OR FOR NO REASON, JUST AS I MAY RESIGN AT ANY TIME.

8.    I HAVE READ AND REVIEWED THIS EMPLOYMENT AGREEMENT AND RE-STRICTIVE COVENANTS IN ITS ENTIRETY. I HAVE BEEN GIVEN AN OPPORTUNITY TO ASK MERRILL LYNCH QUESTIONS ABOUT IT. I HAVE ALSO BEEN GIVEN AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY OF MY CHOICE. I FULLY UNDER-STAND THE TERMS OF THIS DOCUMENT AND KNOWINGLY AND FREELY AGREE TO ABIDE BY THEM.

IN ADDITION TO THE FOREGOING, I UNDERSTAND THAT I HAVE AN ADDITIONAL THIRTY DAYS FROM THE DAY I SIGN THIS AGREEMENT TO CONTINUE TO REVIEW IT AND SEEK LEGAL COUNSEL. AT ANY TIME WITHIN THIS THIRTY DAYS, I MAY RESCIND THIS AGREEMENT BY DISCONTINUING MY EMPLOYMENT WITH MERRILL LYNCH WITHOUT ANY OF THE PROVISIONS HEREIN BEING ENFORCED AGAINST ME. TO THE CONTRARY, HOWEVER, IF I CONTINUE MY EMPLOYMENT WITH MERRILL LYNCH BEYOND SAID THIRTY DAYS, MY CONTINUATION OF EMPLOYMENT WILL CONSTITUTE MY RATIFICATION AND COMPLETE ACCEPTANCE OF THE TERMS OF THIS AGREEMENT.

Date:    09-09-92

Robert J. Knight
Financial Consultant

Date:    9-16-92

R J Carmencita
For Merrill Lynch, Pierce,
Fenner & Smith Inc.

ML RK 00003

# EXHIBIT E

## Merrill Lynch

### Employment Application

**REDACTED**

**Personal Information**
Please Print

| Last Name | First | Middle |
|---|---|---|
| KNIGHT | ROBERT | JAMES |

**Position Applied for**
FINANCIAL CONSULTANT

| Street Address | City | State | Zip |
|---|---|---|---|
| 285 QUINAULT WY | FREMONT | CA | 94539 |

| Business Phone | Home Phone | Social Security Number |
|---|---|---|
| | (510) 683-3857 | |

| Referred by | | | | |
|---|---|---|---|---|
| ☒ Employer | ☐ Newspaper | ☐ Agency | ☐ School | ☐ Other, please explain |

Name: MRS. TRACEY MERCHANT

Have you ever been employed by Merrill Lynch?  ☐ Yes (when? where?)  ☒ No
Do you have relatives employed by Merrill Lynch?  ☐ Yes (when? where?)  ☒ No

Are you legally authorized to work in the United States on a permanent basis?  ☐ Yes  ☐ No

I certify that if offered employment, I will produce documents to establish my identity and certify that I am legally authorized to work in the United States.

Initial Here

In consideration of my employment, I agree to conform to the rules and regulations of Merrill Lynch. My employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either Merrill Lynch or myself. I understand that falsification of any information given, or any failure to state information, is also grounds for immediate dismissal.

**Employment Information**

| Present or last position | Name of Company | From Mo/Yr | To Mo/Yr |
|---|---|---|---|
| PART TIME MATH PROFESSOR | COLUMBIA COLLEGE | 06/92 | PRESENT |

| Street Address | City | State | Zip |
|---|---|---|---|
| BUILDING #25 | NAS MOFFETT FIELD | CA | 94035 |

| Duties | Reason for leaving |
|---|---|
| ALGEBRA INSTRUCTOR | N/A |

| Annual Salary | Rate | Draw | Commission | Bonus | Total |
|---|---|---|---|---|---|
| $1,041/CLASS | | | | | $1,041/CLASS |

| Next previous position | Name of Company | From Mo/Yr | To Mo/Yr |
|---|---|---|---|
| OFFICER / PILOT | U.S. NAVY | 10/90 | 07/92 |

| Street Address | City | State | Zip |
|---|---|---|---|
| ANTARCTIC DEVELOPMENT SQUADRON 6 | NAWS PT MUGU | CA | 93041 |

| Duties | Reason for leaving |
|---|---|
| MAINTENANCE DEPARTMENT HEAD | CAREER CHANGE |

| Annual Salary | Rate | Draw | Commission | Bonus | Total |
|---|---|---|---|---|---|
| 66.9K | $44.9K | | | | $66.9K |

| Next previous position | Name of Company | From Mo/Yr | To Mo/Yr |
|---|---|---|---|
| OFFICER IN CHARGE | ANTI SUBMARINE WARFARE OPERATIONS CENTER | 05/87 | 05/90 |

| Street Address | City | State | Zip |
|---|---|---|---|
| c/o ASWOC ROOSEVELT RDS | USNS ROOSEVELT RDS, PR | | 00635 |

| Duties | Reason for leaving |
|---|---|
| PILOT, OFFICER IN CHARGE, OPERATIONS DEPARTMENT HD | TRANSFERED BY USN |

| Annual Salary | Rate | Draw | Commission | Bonus | Total |
|---|---|---|---|---|---|
| | $40K | | | | |

| Next previous position | Name of Company | From Mo/Yr | To Mo/Yr |
|---|---|---|---|
| PART TIME PROFESSOR | CENTRAL TEXAS COLLEGE | 06/89 | 06/90 |

| Street Address | City | State | Zip |
|---|---|---|---|
| | USNS ROOSEVELT RDS PR | | 00635 |

| Duties | Reason for leaving |
|---|---|
| TAUGHT 12 COLLEGE MATH COURSES | TRANSFERED BY USN |

| Annual Salary | Rate | Draw | Commission | Bonus | Total |
|---|---|---|---|---|---|
| $4.6K | | | | | $4.6K |

**Education Information**

| | | | Dates (optional) | |
|---|---|---|---|---|
| | Degree | | From Mo/Yr | To Mo/Yr |
| High School PACIFIC HIGH SCHOOL (NO LONGER EXISTS) RECORDS c/o SAN LEANDRO H.S. CA | H.S. | | 09/65 | 06/68 |
| College ANNAPOLIS, Major MATH H.S. NAVAL ACADEMY, MD | B.S. | | 06/69 | 06/73 |
| College | Degree | | | |
| Graduate School U.S. NAVAL POST-GRADUATE SCHOOL, MONTEREY, CA Major SYSTEMS TECHNOLOGY | M.S. | | 02/78 | 03/80 |
| Other | Degree | | From Mo/Yr | To Mo/Yr |

Code 81131 (8/87) Printed in U.S.A.

ML RK 00018

What part of expenses did you earn during college?

*100%*

List honors, awards, extracurricular activities (school or community), hobbies and grades

"FULL RIDE" TO US NAVAL ACADEMY, HIGH SCHOOL VIKING AWARD – ACADEMICS, SERVICE

AND SPORTS, VARSITY FOOTBALL, BASKETBALL, SWIMMING. COLLEGE FOOTBALL (2 YRS) & SWIMMING (2 YRS)

**U.S. Military Service**

| Branch of Service | Date entered | Date discharged / separated |
|---|---|---|
| U.S. NAVY | 07-07-68 | 07-01-92 |

Major duties

OFFICER, PILOT

Service schools attended

U.S. NAVAL POSTGRADUATE, U.S. NAVAL ACADEMY, P-3 INSTRUCTOR PILOT,
P-3 SECOND TOUR, P-3 FIRST TOUR, C-130 PILOT IN COMMAND

Have you ever been convicted of a crime? This includes misdemeanors. If yes, or you are court, please explain below. A criminal record will not necessarily bar you from employment at Merrill Lynch, but an untruthful answer will Falsification will be grounds for immediate dismissal.
☐ Yes   ☒ No

If applying for a clerical position, what business machines do you operate?

IBM, APPLE COMPUTERS

| Steno (words/minute) | Typing (words/minute) |
|---|---|
| | APPROX 35 WPM |

Do you have any disabilities physical or mental, which would interfere with your ability to perform the job for which you have applied?
☐ Yes   ☒ No

If yes, please explain

If necessary, will you relocate to any Merrill Lynch location in the United States?
List preferences
SAN JOSE, CA , SAN FRANCISCO BAY AREA
☒ Yes   ☐ No

Tell something about yourself, including reasons you feel you are qualified for the position

SELF-DISCIPLINED, AGGRESSIVE SELF-STARTER. ACHIEVEMENT/GOAL
ORIENTED. THRIVE ON TIME CRITICAL/PRESSURE SITUATIONS. AMBITIOUS,
WILLING TO LEARN. WORK VERY WELL WITH PEOPLE. PROVEN MANAGER.
PRODUCE QUALITY RESULTS THE FIRST TIME. FAIRLY WELL READ IN FINANCIAL
ARENA. LEARNING ABOUT INVESTING AND WALL STREET HAS BEEN A HOBBY
FOR 2½ YEARS.

Date: JULY 20, 1992   Signature: Robert J. Knight

Merrill Lynch is an Equal Opportunity Employer.

Code 811-FE Back (8/87)

ML RK 00019

# EXHIBIT F

*Working
At
Merrill Lynch:*

*An
Employee's
Guide*

**Name**

This is your personal copy of *Working at Merrill Lynch: An Employee's Guide*. Because this is the only copy that will be given to you, you may want to write your name in the space provided above.

The material contained in this guide is solely intended as general information for employees. None of its provisions grants a legal right or privilege of any nature to any future or current employee of Merrill Lynch & Co., Inc. and affiliates (hereafter referred to as Merrill Lynch or the firm).

Since employment with the firm is "at will" in all cases, each employee has the right to resign at any time. Conversely, the firm has the right to terminate employees at any time, in its sole discretion, with or without cause.

This guide is subject to periodic change or modification.

# EXHIBIT 11



⋰ Previous                                                                                      Next ⋰

## 10303. Hearing Requirements—Waiver of Hearing

**This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.**

(a) Any dispute, claim or controversy except as provided in Rule 10203 (Simplified Industry Arbitration) or Rule 10302 (Simplified Arbitration), shall require a hearing unless all parties waive such hearing in writing and request that the matter be resolved solely upon the pleadings and documentary evidence.

(b) Notwithstanding a written waiver of a hearing by the parties, a majority of the arbitrators may call for and conduct a hearing. In addition, any arbitrator may request the submission of further evidence.

⋰ Previous                                                                                      Next ⋰

© 2007 NASD. All rights reserved.

Case 3:07-cv-02753-SC    Document 15    Filed 07/27/2007    Page 54 of 60



**Location:** NASD > Manual > Rules of the Association > Procedural Rules (8000–14000) > 10000. Code of Arbitration Procedure > 10300. Uniform Code of Arbitration > 10304. Time Limitation Upon Submission

❖ Previous                                                                                           Next ❖

## 10304. Time Limitation Upon Submission



NASD Notices to Members
(1 link)

This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.

(a) No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy. The panel will resolve any questions regarding the eligibility of a claim under this Rule.

(b) Dismissal of a claim under this Rule does not prohibit a party from pursuing the claim in court. By requesting dismissal of a claim under this Rule, the requesting party agrees that if the panel dismisses a claim under the Rule, the party that filed the dismissed claim may withdraw any remaining related claims without prejudice and may pursue all of the claims in court.

(c) This Rule shall not extend applicable statutes of limitations; nor shall the six-year time limit on the submission of claims apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person.

---

Amended by SR-NASD-2003-101 eff. May 1, 2005.
Amended eff. Oct. 1, 1984.

**Selected Notice to Members:** 05-10.

---

❖ Previous                                                                                           Next ❖

© 2007 NASD. All rights reserved.



Location: NASD > Manual > Rules of the Association > Procedural Rules (8000–14000) > 10000. Code of Arbitration Procedure > 10300. Uniform Code of Arbitration > 10305. Dismissal of Proceedings

∙‹ **Previous**                                                                                      **Next** ›∙

## 10305. Dismissal of Proceedings

This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.

(a) At any time during the course of an arbitration, the arbitrators may either upon their own initiative or at the request of a party, dismiss the proceeding and refer the parties to their judicial remedies, or to any dispute resolution forum agreed to by the parties, without prejudice to any claims or defenses available to any party.

(b) The arbitrators may dismiss a claim, defense, or proceeding with prejudice as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective.

(c) The arbitrators shall at the joint request of all the parties dismiss the proceedings.

Amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (8/14/97).

∙‹ **Previous**                                                                                      **Next** ›∙

© 2007 NASD. All rights reserved.

NASD | This section is part of a frameset This page contains the non Filed 07/27/2007 of the Page 56 of 60 1 of 2
Case 3:07-cv-02753-SC Document 15 Filed 07/27/2007 Page 56 of 60



Location: NASD > Manual > Rules of the Association > Procedural Rules (8000–14000) > 10000. Code of Arbitration Procedure > 10300. Uniform Code of Arbitration > 10321. General Provisions Governing Pre-Hearing Proceedings

‹‹ Previous                                                                                            Next ››

## 10321. General Provisions Governing Pre-Hearing Proceedings

**This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.**

#### (a) Requests for Documents and Information

The parties shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the arbitration. Any request for documents or other information should be specific, relate to the matter in controversy, and afford the party to whom the request is made a reasonable period of time to respond without interfering with the time set for the hearing.

#### (b) Document Production and Information Exchange

(1) Any party may serve a written request for information or documents ("information request") upon another party 45 calendar days or more after service of the Statement of Claim by the Director of Arbitration or upon filing of the Answer, whichever is earlier. The requesting party shall serve the information request on all parties and file a copy with the Director of Arbitration. The parties shall endeavor to resolve disputes regarding an information request prior to serving any objection to the request. Such efforts shall be set forth in the objection.

(2) Unless a greater time is allowed by the requesting party, information requests shall be satisfied or objected to within thirty (30) calendar days from the date of service. Any objection to an information request shall be served by the objecting party on all parties and filed with the Director of Arbitration.

(3) Any response to objections to an information request shall be served on all parties and filed with the Director of Arbitration within ten (10) calendar days of receipt of the objection.

(4) Upon the written request of a party whose information request is unsatisfied, the matter will be referred by the Director of Arbitration to either a pre-hearing conference under paragraph (d) of this Rule or to a selected arbitrator under paragraph (e) of this Rule.

#### (c) Pre-Hearing Exchange

At least twenty (20) calendar days prior to the first scheduled hearing date, all parties shall serve on each other copies of documents in their possession they intend to present at the hearing and shall identify witnesses they intend to present at the hearing. The arbitrators may exclude from the arbitration any documents not exchanged or witnesses not identified. This paragraph does not require service of copies of documents or identification of witnesses which parties may use for cross-examination or rebuttal.

#### (d) Pre-Hearing Conference

(1) Upon the written request of a party, an arbitrator, or at the discretion of the Director of Arbitration, a pre-hearing conference shall be scheduled. The Director of Arbitration shall set the time and place of a pre-hearing conference and appoint a person to preside. The pre-hearing conference may be held by telephone conference call. The presiding person shall seek to achieve agreement among the parties on any issue which relates to the pre-hearing process or to the hearing, including but not limited to exchange of information, exchange or production of documents, identification of witnesses, identification and exchange of hearing documents, stipulation of facts, identification and briefing of contested issues, and any other matters which will expedite the arbitration proceedings.

(2) Any issues raised at the pre-hearing conference that are not resolved may be referred to a single member of the arbitration panel for decision.

#### (e) Decisions by Selected Arbitrator

The Director of Arbitration may appoint a single member of the arbitration panel to decide all unresolved issues under

NASD | This section is part of a frameset This page contains the majority of the frames. Page 2 of 2

Case 3:07-cv-02783-BC   Document 19   Filed 07/27/2007   Page 57 of 60

this Rule. In matters involving public customers, such single arbitrator shall be a public arbitrator, except that the arbitrator may be either public or industry when the public customer has requested a panel consisting of a majority from the securities industry. Such arbitrator shall be authorized to act on behalf of the panel to issue subpoenas, direct appearances of witnesses and production of documents, set deadlines for compliance, and issue any other ruling which will expedite the arbitration proceedings. Decisions under this Rule shall be made upon the papers submitted by the parties, unless the arbitrator calls a hearing. The arbitrator may elect to refer any issue under this Rule to the full panel.

Amended by SR-NASD-98-91 eff. Jan. 11, 1999.
Amended by SR-NASD-95-05 eff. Mar. 23, 1995.
Amended eff. May 10, 1989.

∴ Previous

Next ∴

© 2007 NASD. All rights reserved.



‹‹ Previous                                                                                                          Next ››

## 10322. Subpoenas and Power to Direct Appearances



NASD Notices to Members
(1 link)

**This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.**

(a) To the fullest extent possible, parties should produce documents and make witnesses available to each other without the use of subpoenas. Arbitrators shall have the authority to issue subpoenas for the production of documents or the appearance of witnesses.

(b) A party may make a written motion requesting that an arbitrator issue a subpoena to a party or a non-party. The motion must include a draft subpoena and must be filed with the Director, with an additional copy for the arbitrator. The requesting party must serve the motion and draft subpoena on each other party, at the same time and in the same manner as on the Director. The requesting party may not serve the motion or draft subpoena on a non-party.

(c) If a party receiving a motion and draft subpoena objects to the scope or propriety of the subpoena, that party shall, within 10 calendar days of service of the motion, file written objections with the Director, with an additional copy for the arbitrator, and shall serve copies on all other parties at the same time and in the same manner as on the Director. The party that requested the subpoena may respond to the objections within 10 calendar days of receipt of the objections. After considering all objections, the arbitrator responsible for deciding discovery-related motions shall rule promptly on the issuance and scope of the subpoena .

(d) If the arbitrator issues a subpoena, the party that requested the subpoena must serve the subpoena at the same time and in the same manner on all parties and, if applicable, on any non-party receiving the subpoena.

(e) Any party that receives documents in response to a subpoena served on a non-party shall provide notice to all other parties within five days of receipt of the documents. Thereafter, any party may request copies of such documents and, if such a request is made, the documents must be provided within 10 calendar days following receipt of the request.

(f) An arbitrator shall be empowered without resort to the subpoena process to direct the appearance of any person employed by or associated with any member of the Association and/or the production of any records in the possession or control of such persons or members. Unless an arbitrator directs otherwise, the party requesting the appearance of a person or the production of documents under this Rule shall bear all reasonable costs of such appearance and/or production.

---

Amended by SR-NASD-2005-079 eff. April 2, 2007.
Amended eff. May 10, 1989.

Selected Notice to Member: 07-13.

---

‹‹ Previous                                                                                                          Next ››

© 2007 NASD. All rights reserved.

Case 3:07-cv-02753-SC    Document 19    Filed 07/27/2007    Page 59 of 60



**Location:** NASD > Manual > Rules of the Association > Procedural Rules (8000-14000) > 10000. Code of Arbitration Procedure > 10300. Uniform Code of Arbitration > 10324. Interpretation of Provisions of Code and Enforcement of Arbitrator Rulings

:<: **Previous**                                                                                                          **Next** :>:

## 10324. Interpretation of Provisions of Code and Enforcement of Arbitrator Rulings

This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.

The arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code and to take appropriate action to obtain compliance with any ruling by the arbitrator(s). Such interpretations and actions to obtain compliance shall be final and binding upon the parties.

| Amended eff. Nov. 16, 1992. |
|---|

:<: **Previous**                                                                                                          **Next** :>:

© 2007 NASD. All rights reserved.

NASD | This section is part of a frameset. This page contains the main content of the page.

Case 9.07-cv-02755-SC    Document 95    Filed 07/27/2007    Page 60 of 60    Page 1 of 1



Location: NASD > Manual > Rules of the Association > Procedural Rules (8000–14000) > 10000. Code of Arbitration Procedure > 10300. Uniform Code of Arbitration > 10326. Record of Proceedings

❖ Previous                                                                                                          Next ❖

## 10326. Record of Proceedings

**This Code will be superseded by the Customer Code (Rule 12000 Series) and the Industry Code (Rule 13000 Series) on April 16, 2007, for claims filed on or after that date. This Code will remain in effect, however, for cases filed before April 16, 2007.**

(a) A verbatim record by stenographic reporter or a tape, digital, or other recording of all arbitration hearings shall be kept. If a party or parties to a dispute elect to have the record transcribed, the cost of such transcription shall be borne by the party or parties making the request unless the arbitrators direct otherwise. The arbitrators may also direct that the record be transcribed. If the record is transcribed at the request of any party, a copy shall be provided to the arbitrators.

(b) A verbatim record of mediation conducted pursuant to the Rule 10400 Series shall not be kept.

```
Amended by SR-NASD-2006-102 eff. Aug. 23, 2006.
Amended by SR-NASD-95-25 eff. Aug. 1, 1995.
Amended eff. May 10, 1989.
```

❖ Previous                                                                                                          Next ❖

© 2007 NASD. All rights reserved.