**8**

LEXSEE 2005 U.S. DIST. LEXIS 37288

**STANLEY J.KATZ, et al., Petitioners, v. ROUND HILL SECURITIES, INC., et al., Respondents.**

No. C 05-1453 PJH

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2005 U.S. Dist. LEXIS 37288**

**September 16, 2005, Decided**
**September 16, 2005, Filed**

**COUNSEL:** [*1] For Stanley J. Katz, Edwin L. Katz, First Alliance Asset Management, Inc., Petitioners: Richard T. White, Dawn Newton, Fitzgerald Abbot & Beardsley LLP, Oakland, CA; Rachael L. Rodman, Thomas P. Whelley, II, Chernesky Heymen & Kress P.L.L., Dayton, OH.

For Round Hill Securities, Inc., First Allied Securities, Inc., Respondents: Michael R. Simmonds, Wineberg, Simmonds & Narita, San Francisco, CA.

**JUDGES:** PHYLLIS J. HAMILTON, United States District Judge.

**OPINION BY:** PHYLLIS J. HAMILTON

**OPINION**

**ORDER GRANTING PETITION TO CONFIRM ARBITRATION AWARD**

On August 31, 2005, the court heard argument in connection with the petition of Stanley J. Katz, Edwin L. Katz, and First Alliance Management, Inc., to confirm an arbitration award entered in favor of petitioners and against respondents Round Hill Securities, Inc., and First Allied Securities, Inc. Petitioners appeared by their counsel Richard T. White and Thomas P. Whelley II, and respondents appeared by their counsel Michael R. Simmonds. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS the petition to confirm the arbitration award.

**[*2] INTRODUCTION**

Petitioners Stanley J. Katz and Edwin L. Katz ("the Katz brothers") are residents of Dayton, Ohio. Petitioner First Alliance Management, Inc. ("First Alliance"), is an Ohio corporation owned by the Katz brothers, and is registered with the Securities and Exchange Commission as an investment advisor. Respondent Round Hill Securities, Inc. ("Round Hill") is a California corporation and a registered broker-dealer of securities.

On March 26, 1998, each of the Katz brothers executed a National Association of Securities Dealers ("NASD") Form U-4 (Uniform Application for Securities Industry Registration or Transfer). Round Hill filed the Form U-4s, which also stated that each of the Katz brothers would be transferring as a broker from Paine Webber on March 27,1998, with the appropriate regulators. In signing the Form U-4, the Katz brothers agreed to

arbitrate any dispute, claim, or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in item 10 as may be amended from time to time and that any arbitration award rendered against [*3] me may be entered as a judgment in any court of competent jurisdiction. [1]

1   The only box checked under "item 10" on the Form U-4s was "NASD."

On March 27, 1998, the Katz brothers and First Alliance entered into a Registered Representative Agree-

Case 3:07-cv-02753-SC    Document 26    Filed 08/24/2007    Page 3 of 44

Page 2
2005 U.S. Dist. LEXIS 37288, *

ment ("the Agreement") with Round Hill, whereby Round Hill appointed petitioners independent "Contractors" for Round Hill in the sales of securities to the public.

The Agreement, which was drafted by Round Hill, provided in P 8.3 that "any" controversy between the parties "arising out of or relating to this Agreement or the breach thereof" would be submitted to binding arbitration in accordance with the rules of either NASD or the American Arbitration Association ("AAA"), "as the Contractor [i.e., the petitioners herein] may elect." The Agreement provided further that any court -- state or federal -- having jurisdiction was granted power to enter a judgment on any award resulting from arbitration because the arbitration award resulting from arbitration was to [*4] be a final and nonappealable decision on the controversy submitted.

In January 2003, a dispute arose between the parties concerning the payment of commissions to the Katz brothers, and management fees to First Alliance. This was a matter "arising out of" the Agreement. Petitioners elected to take the matter to arbitration with the AAA. An arbitrator was selected and confirmed in September 2003, and the arbitrator held hearings and heard evidence. On April 4, 2005, the arbitrator issued an award in favor of petitioners in the amount of $ 306,902, plus $ 141,000 in attorneys' fees. On April 8, 2005, petitioners filed the present petition for confirmation of the award.

On May 9, 2005, Round Hill filed an application for an order vacating the arbitration award (in lieu of filing an opposition to the petition). Round Hill asserted that the arbitrator had exceeded his powers because he did not have jurisdiction to hear the Katz brothers' claim, and because the award ordered Round Hill to pay commissions to a non-broker-dealer and non-NASD member (First Alliance), in violation of NASD rules.

In June 2005, Round Hill merged with respondent First Allied Securities, Inc. ("First Allied"), [*5] a New York corporation with its principal place of business in San Diego, with First Allied as the surviving entity. After Round Hill and First Allied merged, petitioners filed a supplemental petition to confirm the award, and served First Allied. First Allied then filed a notice of joinder in the application to vacate the award.

## DISCUSSION

### A. Legal Standard

The Federal Arbitration Act ("FAA") "gives federal courts only limited authority to review arbitration decisions, because broad judicial review would diminish the benefits of arbitration." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010,1012 (9th Cir. 2004)

(citing *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 998 (9th Cir. 2003) (en banc)). Under the FAA, if a party seeks a judicial order confirming an arbitration award, "the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. Confirmation is required "even in the face of erroneous findings of fact or misinterpretations of law." *French v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 784 F.2d 902, 906 (9th Cir. 1986) [*6] (citation and quotation omitted).

Section 10 permits vacatur only

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C.§ 10(a).

The grounds set forth in § 10(a) "afford an extremely limited review authority, a limitation that is designed to preserve due process but not to permit unnecessary public intrusion into private arbitration procedures." *Kyocera*, 341 F.3d at 997. The "exceeded their powers" provision of § 10(a)(4) allows vacatur only when arbitrators purport to exercise powers that the parties did not intend them to possess or otherwise display a [*7] manifest disregard for the law. *Id.* at 1002. Arbitrators exceed their powers in this regard not when they merely interpret or apply the governing law incorrectly, but when the award is "completely irrational," *French*, 784 F.2d at 906, or exhibits a "manifest disregard of law," *Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056,1059-60 (9th Cir. 1991). See *Kyocera*, 341 F.3d at 997.

The risk that arbitrators may construe the governing law imperfectly in the course of delivering a decision that at-

tempts in good faith to interpret the relevant law, or may make errors with respect to the evidence on which they base their rulings, is a risk that every party to arbitration assumes, and such legal and factual errors lie far outside the category of conduct embraced by § 10(a)(4).

*Id.* at 1002-03.

## B. The Parties' Arguments

Petitioners assert that the award should be confirmed under § 9 of the FAA. They note that the parties agreed that "any dispute" between Round Hill and a Contractor (the Katz brothers and First Alliance) "arising out of" the Agreement should be settled by arbitration [*8] pursuant to the rules of either NASD, or AAA -- at the election of the Contractors. They contend that because the arbitration went forward before the AAA, as specified in the Agreement, and the arbitrator issued the award, the award should now be confirmed. They argue that respondents should not now be permitted to declare a provision in their own agreement invalid.

Respondents assert that the award should be vacated because the arbitrator exceeded his powers. Based on the fact that the Katz brothers signed the NASD Form U-4 agreeing to arbitrate any disputes under the rules of the NASD, respondents contend that the NASD had exclusive jurisdiction to hear the claims raised by the Katz brothers, and that the arbitrator exceeded his powers by improperly exercising jurisdiction over those claims and by awarding commissions to the Katz brothers. Respondents argue that the Form U-4 requires arbitration of all claims before NASD (not another entity, such as AAA), and that the arbitration provision in the Agreement between petitioners and Round Hill was "superceded as a matter of law" by the arbitration clause in the Form U-4.

Respondents contend that the Agreement between Round Hill and [*9] petitioners cannot be read to confer jurisdiction contrary to NASD rules. They note that the § 4.2 of the Agreement provides that "[i]n connection with all of Contractor's activities" under the Agreement, "Contractor shall comply with all rules and regulations of the Securities Act of 1933, the Securities Exchange Act of 1934, the Adviser Act, the NASD, SEC and securities laws of the states and all Interpretations therof, where securities will be offered for sale." Respondents submit that to the extent that the arbitration provision of the Agreement conflicts with other provisions of the agreement (such as the provision requiring compliance with NASD rules), it must be deemed invalid and unenforceable. They argue that NASD member firms and associated persons cannot simply "agree" to violate the rules

and regulations of the NASD, which have been approved by the SEC and which govern them.

Petitioners respond that Round Hill was aware of the NASD rules and the contents of the Form U-4 at the time it signed the Agreement with petitioners, and that it agreed to arbitrate before either the NASD or the AAA, with petitioners to make the choice. Petitioners contend that Round Hill has never [*10] challenged the basic premise that it is bound to arbitrate the claims brought by petitioners, nor has it challenged the viability of its Registered Representative Agreement, but has instead asserted that the contractual arbitration agreement was superceded by a subsequent agreement, the NASD Form U-4, with its requirement of arbitration under the NASD rules. Petitioners claim, however, that the Katz brothers signed the Form U-4 on March 26, 1998, the day before they signed the Agreement with Round Hill on March 27, 1998. Thus, they assert, the Form U-4 could not have "superceded" the arbitration provision in the Agreement.

Petitioners argue further that the respondents' jurisdictional arguments were waived because they were not timely raised in the AAA arbitration, noting that there was a six-month delay between the filing of the statement of claim in April 2003 and Round Hill's filing of the motion to dismiss in October 2003. Petitioners assert that during that period, Round Hill actively participated in the AAA proceedings, submitting briefing on the subject of the location of the arbitration, and participating in the choosing of the arbitrator. Petitioners assert that only after [*11] completion of these activities did Round Hill file a jurisdictional challenge to the arbitrability of claims by the Katz brothers (but not the claims of First Alliance). Petitioners assert that the failure to timely raise these arguments in the AAA arbitration, and failure to seek a stay of the arbitration in district court, constitute a waiver of the arguments.

Respondents contend that Round Hill did not waive the requirement that the dispute be arbitrated before the NASD. They claim there was no substantial delay and that petitioners did not suffer undue prejudice, because after the issue was raised in Round Hill's motion to dismiss, the Katz brothers continued to press their claims before the AAA for twenty months more, finally obtaining the award that is the subject of this action. Respondents maintain that the Katz brothers knew that Round Hill would eventually seek to vacate any award on that ground, but nonetheless improperly proceeded with the AAA arbitration.

Petitioners also dispute respondents' assertion that the arbitration provision in Form U-4 and the NASD rules require arbitration before the NASD. Petitioners argue that the reference in Form U-4 to "any dispute . . . [*12] ." that is "required to be arbitrated" under the rules

of NASD simply means that there must be an arbitration of any such dispute, but does not mean that the arbitration must be conducted in accordance with the NASD rules or under the auspices of an NASD arbitrator. Respondents, on the other hand, contend that Form U-4 should be interpreted as requiring that any dispute, claim, or controversy be arbitrated under the NASD rules.

With regard to the NASD rules, petitioners argue that NASD Code of Arbitration Rule 10201, which requires arbitration under the NASD rules *at the instance of*" an NASD member or person associated with a member against another member or person associated with a member means that the arbitration must be brought with the NASD where one of the parties to the arbitration demands that it be brought with the NASD. Petitioners contend that the NASD is not concerned with members who may agree to arbitrate in another forum.

Respondents, on the other hand, contend that the language of Rule 10201 means that except for special claims, "all disputes *shall* be arbitrated under the [NASD] Code." However, they omit the four words following that clause -- "at the instance [*13] of" -- and argue that there is no authority for petitioners' "novel interpretation" of the phrase. Instead, they cite NASD Code of Arbitration Rule 10101, which simply states that the rules in the Code are prescribed and adopted "for the arbitration of any dispute, claim or controversy . . . (b) between or among members and associated persons. . . ."

Respondents claim that their interpretation is supported by the fact that the NASD recently announced proposed rule changes (still under consideration by the SEC), which include a New Proposed Rule 13200, "Required Arbitration," stating "Except as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises under the business activities of a member or an associated member and is between or among . . . Members and Associated Persons. . . ." Respondents contend that the present dispute does not fall under any of the enumerated exceptions, and argue that because the NASD has stated that these proposed rules represent "no substantive change" from the current rules, the court should find that NASD arbitration is required in the present dispute. They also assert that if the Katz brothers' interpretation [*14] of the phrase "at the instance of" were the correct one, then the New Proposed Rule 13200 would constitute a radical change.

In a final argument, petitioners contend that in arguing that the arbitration should properly have been brought before the NASD, and that First Alliance cannot arbitrate before the NASD because it is not a member, respondents are attempting to deprive First Alliance of a forum in which to arbitrate its claims against respondents. Petitioners assert that the AAA was the only jurisdiction where all interested parties could obtain relief, as NASD rules do not permit First Alliance (a non-member) to bring its claims to arbitration before the NASD. Petitioners argue that enforcing the award in favor of First Alliance would not violate public policy because there is no clearly defined statutory or other explicit public policy that would be violated by confirming the arbitration award in the present case.

In response, respondents contend that while First Alliance was free to submit its claim for arbitration before the AAA, the Katz brothers were not. Respondents also contend that because the arbitrator did not indicate the specific amount awarded to First Alliance, [*15] the entire $ 306,902 can be viewed as an award of "commissions" to First Alliance. They argue that because it is a violation of NASD rules and regulations for a member firm (such as Round Hill) to pay commissions to a nonmember (such as First Alliance), an award that orders Round Hill to pay commissions to a non-NASD-licensed or-registered broker-dealer is therefore a violation of law and a violation of public policy.

C. Analysis

Proceedings under § 9 of the FAA are intended to be summary, and confirmation can be denied only if an award has been corrected, vacated, or modified in accordance with the FAA. *See, e.g., Northrop Corp. v. Triad Int'l Marketing, S.A.,* 842 F.2d 1154, 1157 & n.7 (9th Cir. 1988); Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial* (2004) § 16:132. Based on the clear policy favoring confirmation of arbitration awards, the court finds that the petition to confirm the award should be GRANTED. The court finds further that the application to vacate the award should be DENIED, as respondents have not met the high standard for vacating arbitration awards.

Respondents have not established that the arbitrator exceeded [*16] his powers. Section 10(a)(4) of the FAA has been interpreted by the Ninth Circuit as meaning that the award is "completely irrational" or "exhibits a manifest disregard of the law." Respondents do not argue that the award falls into either of those categories. Arbitrators may also "exceed their powers" where they purport to exercise powers that the parties did not intend them to possess. Here, the Agreement provided that petitioners would be permitted to choose whether they wanted to arbitrate before the AAA or the NASD. There is no question of the arbitrator purporting to exercise powers that the parties did not intend him to have.

The court finds that the NASD rules on which respondents rely are ambiguous and far from clear. The court does not agree with respondents that the language in Rule 10201 -- "shall be arbitrated under the Code, at

the instance of" a member or associated person -- simply means "shall be arbitrated under the Code." The word "instance" as used in the phrase "at the instance of" means "urgent solicitation or insistence." *Black's Law Dictionary* (7th ed. 1999) at 800; *see also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* (2nd ed., Oxford Press, [*17] 2001), at 454-55. In the court's view, the requirement that a dispute "shall be arbitrated under the Code at the instance of" a member or associated person appears to be a requirement that the dispute be arbitrated under the NASD Code if a request to arbitrate under the Code is made by a member or associated person. At a bare minimum, the provision is ambiguous.

Moreover, the other rules cited by respondents do not compel arbitration under the NASD Code or rules -- but rather simply require arbitration of certain issues, without specifying the arbitral body. The court finds nothing in the rules cited by respondents that clearly prohibits parties from agreeing to arbitrate in a forum other than the NASD. The case cited by respondents, *Burns v. New York Life Ins. Co.*, 202 F.3d 616 (2nd Cir. 2000), simply stated (not as part of the holding) that the "relevant rules' and by-laws'" referenced in Form U-4's agreement to arbitrate ("I agree to arbitrate any dispute . . . that may arise . . . that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations with which I register") referred in that case to the NASD Code of Arbitration Procedure. [*18] *Burns*, 202 F.3d at 619. However, the Form U-4 agreement does not state that any dispute between NASD members must be arbitrated under the auspices of the NASD, but rather simply that the person signing agrees that he or she will arbitrate any dispute that the NASD rules require to be arbitrated.

The court is also not persuaded by respondents' argument with regard to the "New Proposed Rule 13200" and the statement by NASD that none of the proposed new rules represents any substantive change from the old rules. The new rules have not yet been approved, and there is no way of knowing whether they will. A "proposed rule" is not a rule, and provides no basis for finding that the arbitration award should be vacated.

Finally, with regard to the claim that the award improperly awards "commissions" to First Alliance because it does not distinguish between the award to the Katz brothers and the award to First Alliance, the court is not persuaded that respondents have articulated a valid basis under the FAA for vacating the award. At the arbitration, the petitioners collectively asserted a total damage claim of $ 252,297.54, plus interest, costs, and attorneys' fees, plus "miscellaneous [*19] claims" of $ 7,329.29. Among the "miscellaneous claims," First Alliance asserted that Round Hill had improperly retained a portion of "management fees" billed to Bear Stearns accounts for the quarter in which First Alliance was terminated. Respon-dents argue that it is impossible to tell from the award whether any of the $ 6,164.29 requested for "management fees" was awarded by the arbitrator, or whether First Alliance was also improperly awarded "commissions."

The court is not in a position to know for certain how much of the award was intended to be allocated to First Alliance, as that knowledge lies with the arbitrator. However, Thomas Whelley, counsel for petitioners, who also represented the petitioners at the arbitration, represented to the court at the hearing that Round Hill never requested payment of commissions to First Alliance, that the amount of the final award approximated the total sought by claimants in the arbitration, and that the amount of the management fees sought by First Alliance was such a minor concern that it was not even raised during the arbitration proceeding itself. Thus, the court has no basis to assume that the respondents contemplated or that the arbitrator [*20] intended that First Alliance recover any amount in excess of its $ 6,164.29 in management fees.

## CONCLUSION

In accordance with the foregoing, the court CONFIRMS the award of the arbitrator. The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 16, 2005

PHYLLIS J. HAMILTON

United States District Judge

## JUDGMENT

The court having granted the motion of petitioners Stanley J. Katz, Edwin L. Katz, and First Alliance Management, Inc., to confirm an arbitration award issued on April 4, 2005,

It is Ordered and Adjudged

that the award of the arbitrator be confirmed, and that judgment be entered in favor of Stanley J. Katz, Edwin L. Katz, and First Alliance Management, Inc., and against respondents Round Hill Securities, Inc., and First Allied Securities, Inc., in the amount of $ 306,902.00, plus attorneys' fees in the amount of $ 141,000.00, for a total of $ 447,902.00, plus one-half of the compensation and expenses of the arbitrator, as provided in the award.

**IT IS SO ORDERED.**

Dated: September 16, 2005

PHYLLIS J. HAMILTON

2005 U.S. Dist. LEXIS 37288, *

United States District Judge

**9**

5 of 8 DOCUMENTS

**EVA M. KEISER, Plaintiff, v. LAKE COUNTY SUPERIOR COURT, et al., Defendants.**

No. C05-02310MJJ

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

2005 U.S. Dist. LEXIS 40378

**December 12, 2005, Decided**
**December 12, 2005, Filed**

**COUNSEL:** [*1] For Eva M. Keiser, Plaintiff: Pro se, Lakeport, CA.

For Lake County Superior Court, employer & a government entity, William E. Jaynes, individually & in his official capacity, Barbara Mallinen, individually & in her official capacity, Wily, Price & Radulovich, LLP, a contract service provider, Defendants: Joan Pugh Newman, Joseph E. Wiley, Wiley Price & Radulovich LLP, Alameda, CA.

For County of Lake, government entity & contract service provider, Defendant: Heather Bussing Smith, Clay J. Christianson Kelly Jackson Christiran & Smith LLP, Santa Rosa, CA; Joan Pugh Newman, Joseph E. Wiley, Wiley Price & Radulovich LLP, Alameda, CA.

**JUDGES:** MARTIN J. JENKINS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARTIN J. JENKINS

**OPINION:**

### ORDER RE MOTIONS TO DISMISS

Pending before the Court are: (1) Defendants Wiley Price & Radulovich, LLP ("WPR") and Barbara Armanino's Motion to Dismiss (Doc. # 11); (2) Defendant County of Lakes's "Rule 12(b)(6) Motion for Failure to State a Claim" (Doc. # 17); and (3) Defendants William Jaynes and the Superior Court of California's Motion to Dismiss (Doc. # 20). Plaintiff *pro per* Eva Keiser has filed Oppositions in response to each of the pending Motions [*2] (Docs. # # 23, 24, 25), and Defendants have filed Replies n1 (Docs. # 26 (County Reply), # 27 (Mr. James and Superior Court), # 28 (WPR and Ms. Armanino).) The Court now rules as follows.

n1 The County has filed a Notice of Joinder in Defendants WPR and Ms. Armanino's Motion. (Doc. # 16.)

### I. Legal Standard -- Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). Because the focus of a 12(b)(6) motion is on the legal sufficiency, rather than the substantive merits of a claim, the Court ordinarily limits its review to the face of the complaint. *See Van Buskirk v. Cable News Network, Inc.,* 284 F.3d 977, 980 (9th Cir. 2002). Generally, dismissal is proper only when the plaintiff has failed to assert a cognizable legal theory or failed to allege sufficient facts under a cognizable legal theory. *See SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.,* 88 F.3d 780, 782 (9th Cir. 1996); [*3] *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1988); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984). Further, dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of a claim. *See Abramson v. Brownstein,* 897 F.2d 389, 391 (9th Cir. 1990). In considering a 12(b)(6) motion, the Court accepts the plaintiff's material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir. 2000).

### II. Plaintiff's Allegations

Plaintiff filed her Complaint against Defendants on June 7, 2005. (Doc. # 1.) The material allegations, taken

as true and construed in the light most favorable to Plaintiff, are summarized as follows. n2

n2 As discussed more fully at oral argument on Defendants' Motions, because of the lack of structure in Plaintiff's Complaint, and Plaintiff's failure to specifically identify which of the Defendants she claims acted in specific situations, it is difficult to discern the allegations supporting Plaintiff's claims. In this Order, the Court has summarized the material allegations supporting Plaintiff's claims as best it can.

[*4]

In October 1994, Plaintiff was hired on a 900-hour contract basis with the Superior Court of California, County of Lake. Later, in February 2005, Plaintiff obtained a permanent position as a County Court Clerk. In 2000, Plaintiff applied for a competitive selection position offered by the County's Local Agency Merit System, and was selected for the position of judicial secretary. In early 2001, in addition to her judicial secretary position, Plaintiff was appointed to a Courthouse Safety Officer position. Additionally, beginning in 2001, and again in 2002, Plaintiff was appointed as Grand Jury Commissioner for the Superior Court, County of Lake.

Plaintiff alleges that in 2002, Court Manager, Barbara Mallinen, informed Plaintiff that her office area would be used as an office lounge/break area for court staff. Plaintiff opposed the change, claiming it was intrusive and disruptive to her work area. Ms. Mallinen responded that the change was necessary to monitor all conversations. Plaintiff, however, avers that the change was "an attempt to spy" on the activities of Plaintiff and the Grand Jury."

Plaintiff alleges that in January 2002, she "began experiencing and documenting an escalation [*5] of harassment directed at [her], namely a probate secretary, Doe." Plaintiff claims that the probate secretary challenged Plaintiff's "by the book" procedures and called Plaintiff profanities. As a result, Plaintiff complained to Mr. William Jaynes, the Court Executive Officer, n3 and Ms. Mallinen. Neither took any action. Plaintiff alleges that, "[d]uring the next four months harassment against Plaintiff escalated in the form of work procedure sabotage (changing procedures without cause or necessity), increase in work load (from coworker's backlog by order of court manager), name calling, subordinates without any authority giving Plaintiff orders, ultimatums over requested sick leave, pointed emails, and disparate treatment by manager in front of coworkers." (Id. at P 22.)

n3 Mr. Jaynes became the Court Executive Officer in October 2002.

In 2002, following the September 11 terrorist attacks, the County Safety Council appointed Plaintiff to the position of Courthouse Building Evacuation Coordinator. Plaintiff [*6] alleges that around that time the courthouse was under alert status and, pursuant to orders from the State Office of Emergency Services, she had to evacuate the courthouse as part of emergency preparation drills. According to Plaintiff, "[t]hese drills were highly resented by Court Management [] as it gave access and authority to Plaintiff to order anyone from the building and search without prior notice, as well as, cite anyone refusing to cooperate." In particular, Plaintiff claims that Ms. Mallinen "let Plaintiff know, in no uncertain terms, how much she resented having to take orders from Plaintiff." She also alleges that court management failed or refused to report safety incidents and would delay notifying Plaintiff about emergency situations.

Subsequently, in May 2003, Plaintiff was assigned the responsibility of coordinating court reporters and interpreters in five departments. She alleges that Ms. Mallinen repeatedly told her to conceal unequal wages, treatment, and reimbursement rates of overtime and mileage among the court reporters. Because Plaintiff suspected that these procedures were illegal and violated wage and labor laws, she refused to comply. Plaintiff further [*7] alleges that she "believed that these unfair labor practices were wide spread within the rank of the non[-]merit system employees and began to organize these employees in an effort to standardize their pay under equal pay for equal work standards." In response to these efforts, Plaintiff alleges that the court management n4 advised employees that they should "be careful with whom they had lunch." According to Plaintiff, her efforts "to standardize the wages of court reporters was protected and presented an obstacle to the ensuing labor negotiation of the Defendants."

n4 Plaintiff fails to identify which of the Defendants comprise "court management" or who among the Defendants made this statement.

In June 2003, Plaintiff continued to advocate on behalf of the court employees, and in anticipation of the implementation of the Trial Court Employment Protection and Governance Act ("TCEPGA"), assisted in establishing a non-profit 501(c)(3) charitable organization, pursuant to California Government Code § 71632 [*8] .

On September 23, 2003, Plaintiff received a disciplinary notice seeking her termination on the ground that

she was one day late in scheduling a second fingerprinting for a background check. On September 26, 2003, Plaintiff filed a grievance with Lake County, but the Lake County Personnel Director informed Plaintiff that she had no right to grievance through the County. Plaintiff then retained counsel to defend against the disciplinary action. "Plaintiff alleges that Defendants' act in serving notice of adverse action five days before the mandated implementation of the TCEPGA was a pretext to prevent Plaintiff from utilizing the protection provision of retained rights and status upon implementation of the TCEPGA."

On September 28, 2003, the TCEPGA went into effect. Plaintiff alleges that, "[i]t was in and about this time that Plaintiff became aware of the efforts by Defendants to reclassify Plaintiff to make her status in the confidential unit an excluded position, and suspected a plan to combine that unit with the management bargaining unit." Plaintiff opposed the reclassification, but was not offered a transfer because she was facing a disciplinary charge.

On November 12, 2003, Plaintiff [*9] claims that the Defendants attempted to use the disciplinary proceedings to convince her that she had no protection under the TCEPGA because she was an excluded employee under the TCEPGA. On November 25, 2003, Plaintiff prevailed at the disciplinary hearing, and all charges against her were dismissed.

Thereafter, on December 4, 2003, Plaintiff alleges that a union representative approached her and asked her to sign a document. Plaintiff signed the document, but after realizing that it was a loyalty oath for labor relations, withdrew her signature. She alleges that her refusal to sign was a protected activity.

Plaintiff alleges that throughout December 2003 and January 2004, she continued to experience further acts of hostility and harassment from court management and other subordinate workers. She claims that this hostility and harassment escalated every time she expressed her dissatisfaction over her suspected placement. At the end of 2004, Plaintiff began to inquire about transferring to another position.

On February 3, 2004, Plaintiff received a disciplinary notice indicating that she had allegedly committed fraud in securing employment with the court. At this time, security [*10] escorted Plaintiff out of the building and took her keys. Plaintiff believes that Defendants "conspired and violated Labor Code § 432.7 to bring this action against Plaintiff in an effort to prevent her defecting from the newly formed management bargaining group that was being used to exclude Plaintiff from her retained rights through [the court's] implementation of the TCEPGA." Thereafter, a disciplinary hearing was held, which resulted in Plaintiff's discharge. After Plain-

tiff appealed, her employment was reinstated, and she returned to work on May 25, 2004. However, Plaintiff did not receive her back wages of approximately $ 6,000; she therefore appealed. Plaintiff alleges that Defendants held these wages as a penalty for engaging in the protected activity of advocating that an agency shop fee of unrepresented objectors should be allowed to paid to a 501(c)(3) non-profit organization of an employee's choice.

On May 5, 2004, Plaintiff accepted Defendant's n5 reinstatement benefits package. She states that, as an act of good faith, she did not file any claim against Defendants, but did appeal the wage taking by writ. On May 25, 2004, Plaintiff returned to work in accordance with [*11] the reinstatement order. n6 At that time, she received another disciplinary notice terminating her employment based on job performance. It was at this point that Plaintiff discovered that Ms. Mallinen and the probate secretary had raided Plaintiff's office, and that Defendants had no intention of allowing her to return to work. Security then escorted Plaintiff out of the building and took her keys. Plaintiff asserts that the motivation for this action "was based on bias and prejudice against Plaintiff's gender and esteemed career status."

> n5 As previously noted, throughout her Complaint, Plaintiff repeatedly refers to "Defendant" and "Defendants," generally, without specifying which of the named Defendants committed the action.

> n6 It is unclear whether Plaintiff returned to work as a result of the alleged "reinstatement package" or because Plaintiff appealed her termination and prevailed at the hearing. (See Compl. at P P 33-35.) Plaintiff alleges that both led to her returning to work on May 25, 2004.

[*12]

On May 28, 2004, June 15, 2004, and June 18, 2004, Plaintiff wrote former presiding Judge David Herrick, and requested that he remove Mr. Jaynes from his position as CEO. Plaintiff alleges that, on July 1, 2004, Mr. Jaynes "stepped aside rather than defend against Plaintiff's charge of bias and prejudice." n7 In an effort to appeal her termination, Plaintiff contacted the court to obtain the procedures for the selection of an impartial hearing officer under the court policies and the TCEPGA. On July 1, 2004, Plaintiff received a letter from the court indicating that, based on her classification, she was not entitled to a evidentiary hearing. On July 30, 2004, Plaintiff appealed the decision of discharge. The court referred Plaintiff's appeal to WPR, n8

which the court previously retained as counsel in Plaintiff's wage appeal.

n7 The Court is unclear what Plaintiff means by "stepp[ing] aside."

n8 Plaintiff alleges that Wiley, Price & Radulovich is a contracted Employment and Labor Relations Service Provider for the court.

[*13]

On August 30, 2004, Plaintiff filed an unfair practice charge with the Public Employment Relations Board ("PERB"). Plaintiff claims that after she filed her charge, WPR contacted her to propose submitting her claim to arbitration. Plaintiff rejected WPR's proposal, and submitted requests for discovery. On February 14, 2005, Plaintiff claims that WPR wrote her, stating that "Defendants" would make no further effort to provide a hearing.

On February 28, 2005, Plaintiff requested reinstatement to a court position that was being advertised. On March 2, 2005, Mr. Jaynes rejected Plaintiff's request, citing the third adverse employment action. Plaintiff thereafter filed an appeal with the PERB for an evidentiary hearing, which Plaintiff states is under review by an administrative law judge.

Based on the foregoing events, Plaintiff alleges that "[f]rom January 2003 to present, [she] has suffered retaliation and deprivation of her fundamentally vested right of employment." (Compl. at P 50.) She states that, "[s]he has been harassed, perjured, conspired against, humiliated, deceived, defrauded, insulted, defamed, libeled, slandered, exposed to emotional and physical distress, ridiculed, [*14] suffered bias and prejudice against her gender, privacy invaded, [experienced] disparate treatment, and held against her will in a pattern of perpetual disciplinary discharge procedures which ultimately amount[ed] to [the] constructive discharge of her employment on September 23, 2003, February 3, 2004, May 25, 2004, and July 30, 2004." (Id.)

As a result, Plaintiff asserts the following claims against Defendants: (1) violation of her constitutional rights (42 U.S.C. § 1983); (2) refusal to prevent interference with deprivation of constitutional rights (42 U.S.C. § 1986); (3) age discrimination (29 U.S.C. § 623); (4) retaliation for political activity (Labor Code § 1101 and § 1105); (5) intentional misrepresentation; (6) breach of contract; (7) breach of covenant of good faith and fair dealing; (8) defamation; (9) discharge in violation of public policy; and (10) intentional infliction of emotional distress. Each of the Defendants has moved to dismiss Plaintiff's Complaint on the ground that Plaintiff has failed to state any claim upon which this Court may grant relief.

## III. Discussion

[*15] **A. Preemption under the Trial Court Employment Protection and Governance Act**

Defendants first urge the Court to dismiss Plaintiff's claims because under the TCEPGA, n9 the PERB has exclusive jurisdiction over disputes regarding wages, hours, and terms and conditions of employment. Particularly, Defendants argue that Article 3 of the Act provides:

> A complaint alleging any violation of this article or of any rules and regulation adopted by a trial court pursuant to Section 71636 shall be processed as an unfair practice charge by the [PERB]. The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purposes of this article, shall be a matter within the exclusive jurisdiction of the board.

Cal. Gov't Code § 71639.1(c). Based on this provision, Defendants argue that "the Act requires that complaints by trial court employees alleging unfair labor practices must be presented *only* to PERB." Thus, Defendants advance that, to the extent Plaintiff alleges she was treated unfairly because she engaged in protected labor-related and/or union-related activities, [*16] this Court lacks jurisdiction to adjudicate those matters because such claims are within PERB's exclusive jurisdiction.

n9 California Government Code § § 71600 *et seq.*

In support, Defendants cite *El Rancho Unified School District v. National Education Association*, 33 Cal. 3d 946, 192 Cal. Rptr. 123, 663 P.2d 893 (Cal. 1983). In that case, the California Supreme Court addressed whether the PERB had exclusive jurisdiction over a school district's state court tort action for damages resulting from a teachers' strike led by four employee organizations -- none of which had been recognized as the exclusive representative of the district's teachers under the Education Employment Relations Act ("EERA"). *Id.* at 948. To determine whether the district's claims were preempted, the court first assessed whether the activity complained of arguably constituted an unfair prac-

tice under the EERA. On this factor, the court found that at least two theories supported the conclusion that the unions' strike [*17] was prohibited under EERA's unfair practice provisions. The court then proceeded to analyze whether the controversy presented to the state court was identical to or different from that which the district could have brought before the PERB. The court found that, if presented to the PERB, the issue would have been whether the strike was unlawful because it violated a section of the EERA. Similarly, in the state trial court action, the district was challenging the legality of the strike, which required the Court to examine the strike under the EERA. The court therefore concluded that the controversy presented in both forums was the same. Accordingly, the court held that the EERA divested the trial court of jurisdiction to adjudicate the district's complaint, and the district was restricted to litigating its claims before the PERB.

Here, Defendants argue that Plaintiff's claims are based on essentially the same underlying conduct as that which she alleged in her PERB charge, or which she could have alleged in a PERB charge, and are therefore preempted. Defendants proffer that Plaintiff has alleged: (1) that her "activity to standardize the wages of court reporters was protected" (Compl. [*18] at P 23); (2) that she engaged in "protected activity regarding working conditions and right to choice of representation" by Superior Court employees (*Id.* at P 24); (3) that Defendants' act of serving her with a disciplinary notice was a "pretext to prevent" her from the protections to which she was purportedly entitled under the Act (*Id.* at P 27); (4) that she complained about her placement in the management bargaining unit (*Id*); (5) that her refusal to sign a union "signature document" was a "protected activity" (*Id.* at P 30); (6) that she suffered "hostility and harassment" by Superior Court employees because her concerns about her "placement in management" (*Id.* at P 31); (7) that she was subjected to discipline "in an effort to prevent her from defecting from the newly formed management bargaining group" (*Id.* at P 32); (8) that she suffered wage loss during her disciplinary suspension "as a form of penalty for engaging in protected activity" (*Id.* at P P 33-34); (9) that because she was allegedly denied an "evidentiary due process hearing" following her termination, she filed an unfair practice charge with PERB (*Id.* at P P 40-41); and (10) that her [*19] challenge of the Superior Court's policies "adopted in plaintiff's absence" resulted in adverse employment action (*i.e.*, her termination) (*Id.* at P 43). (Doc. # 20 at 5.)

While the Court agrees with Defendants that Plaintiff previously asserted similar claims to the PERB, Defendants have failed to cite any authority indicating that the TCEPGA precludes Plaintiff from concurrently or subsequently bringing federal claims based on the same

conduct underlying her PERB charge. In *El Rancho School District*, the Supreme Court held that the plaintiffs could not seek damages in state court based on state law tort claims because the claims fell within the scope of the EERA, and were therefore within the PERB's exclusive jurisdiction. Here, in contrast, Plaintiff is asserting claims alleging that the various Defendants acted to deprive her of her federally-protected constitutional rights and discriminated against her in violation of federal law. While the conduct supporting her claims is the same as that alleged in her charge filed with the PERB, Defendants have failed to cite any authority, and the Court has found none, indicating that the TCEPGA or any similar statute preempts [*20] an individual's civil rights claims under federal law. Absent citation to such authority, the Court declines to find that Plaintiff is precluded from bringing her federal claims in this lawsuit.

Nor does it appear that any of Plaintiff's state law claims, at least as currently plead, fall within the ambit of the TCEPGA. As indicated above, the TCEPGA vests exclusive jurisdiction over disputes concerning wages, hours, and terms and conditions of employment in the PERB. While Plaintiff's allegations surely rest, in part, on her union-related activities, her claims for retaliation, intentional misrepresentation, breach of contract, breach of covenant of good faith and fair dealing, defamation, discharge in violation of public policy, and intentional infliction of emotional distress claims are premised on conduct and theories which exceed the wages, hours, and terms and conditions of Plaintiff's employment. However, because Plaintiff's Complaint is difficult to decipher, and the true nature of Plaintiff's claims may only be distilled after discovery, the Court will deny Defendants' Motion to Dismiss Plaintiff's state law claims based on TCEPGA-preemption without prejudice. Accordingly, [*21] the Court turns to Defendants' alternate arguments.

### B. Plaintiff's Federal Claims

As detailed above, Plaintiff has alleged three claims arising under federal law: a § 1983 claim; a § 1986 claim; and a claim under the Age Discrimination in Employment Act ("ADEA"). Because the Court's subject matter jurisdiction hinges on the presence of these claims, the Court turns to them first.

#### 1. Section 1983 claim

In her First Cause of Action, Plaintiff asserts a claim pursuant to Section 1983 for deprivation of her constitutional rights. n10 Specifically, Plaintiff alleges that, beginning on June 30, 2003, and continuing through July 30, 2004, she "began exercising her rights to freedom of speech and association by publicly voicing her and other employee's [sic] rights and entitlements under the Trial Court Employment Protection and Governance Act," by meeting with other employees during lunch and by phon-

ing employees after work "to secure representation of an employees association or union of their choice." As a result of these efforts, Plaintiff alleges that on February 3, 2004, and again on May 25, 2004, she was "wrongfully locked out of her office and removed from her government [*22] job." Thus, Plaintiff avers that "Defendant(s)[] intentionally deprived [her], and other employees, [of] the rights of free speech and association to prevent Plaintiff's ability to exercise a protected activity in securing employment representation, rights, and protection afforded by the [TCEPGA]." She alleges that, "Defendants' [] conduct of seeking removal by unfounded disciplinary actions was pretextual and in violation of the First Amendment of the United States."

> n10 "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40, (1988).

Additionally, Plaintiff alleges that Defendants promised to reinstate her employment on May 25, 2004, but "immediately deprived Plaintiff of her fundamentally vested right of employment absent countervailing state interest of overriding [*23] significance in violation of their own policies, and the Fourteenth Amendment of the United States Constitution." She alleges that from June 2004, through July 2005, "Defendants refused to afford her the opportunity to be heard by denying Plaintiff the right to be heard orally at a meaningful time and manner." Similarly, she alleges that, she "was denied the opportunity to be heard before she was deprived of her fundamentally vested right of employment, and was discharged by a hearing officer who by [g]overnment [s]tatute was prohibited from making such decision."

Based on these actions, Plaintiff charges that Defendants have violated her rights under the United States and California Constitutions, including her rights to equal protection of the laws; right to due process; and her rights of free speech and association under the First Amendment.

Each of the Defendants has moved to dismiss Plaintiff's Section 1983 claim. The Court will assesses each of their challenges, in turn.

### a) The County

The County moves to dismiss Plaintiff's Section 1983 claim on the ground that Plaintiff has failed to allege any "state action" by the County that deprived her of a constitutional [*24] right. Rather, the County argues

that the only actions that Plaintiff has alleged relate to the disciplinary measures taken against her and the termination of her employment. According to the County, because it neither disciplined nor terminated Plaintiff's employment, Plaintiff has failed to allege any County conduct amounting to a civil rights violation under Section 1983.

In response, Plaintiff contends that she has alleged that on September 26, 2003, she filed for grievance with the County personnel director, who told her that she had no right to grievance. Because the County would not process her grievance, Plaintiff argues she was forced to proceed with the "*Skelly* hearing" before the PERB. Thus, Plaintiff claims that the County deprived her of her due process rights.

The County, however, argues that Plaintiff has not alleged that she was employed by the County, and thus has not pled any basis for a right to a grievance under County personnel policies. Additionally, the County proffers that it properly rejected Plaintiff's grievance "presumably because a new procedure and system was being implemented to handle such complaints." Specifically, the County argues that because [*25] the contract between the courts and the union had expired, the TCEPGA provided the mechanism for resolving Plaintiff's claims. However, to dismiss Plaintiff's claim against the County based on the County's defense that it had no duty to process Plaintiff's grievance, the Court would have to look beyond the four corners of Plaintiff's Complaint, which it cannot do in the context of a 12(b)(6) motion. As it stands, Plaintiff has alleged that the County wrongfully refused to process her grievance and thereby denied her of her right to due process. Further, although there is some ambiguity as to when and if the County was Plaintiff's employer, Plaintiff has alleged that the County terminated her employment because she was engaging in conduct protected by the First Amendment. Accordingly, Plaintiff has pled a cognizable Section 1983 claim against the County.

### b) Defendants Superior Court and Mr. Jaynes

In their Motion, the Superior Court and Mr. Jaynes contend that Plaintiff's Section 1983 claim against them is barred by the Eleventh Amendment. With respect to the Superior Court, the Ninth Circuit has recognized that "a suit against the Superior Court is a suit against the State, [*26] [and is therefore] barred by the Eleventh Amendment." *Greater Los Angeles Council on Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1110 (9th Cir. 1987). Accordingly, the Court grants the Superior Court's request to dismiss Plaintiff's Section 1983 claim against it.

With respect to Mr. Jaynes, however, the answer is not as straight-forward. Specifically, Mr. Jaynes argues that because the Superior Court is an arm of the state,

and because he was acting in his official capacity as CEO, he is entitled Eleventh Amendment immunity from suit. The Court agrees with Defendant Jaynes that, to the extent that Plaintiff has sued him in his official capacity, he is immune from suit under the Eleventh Amendment. n11 *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) ("[N]either a State or its officials acting in their official capacities are "persons" under [Section] 1983."). Accordingly, the Court will grant Mr. Jaynes's request to dismiss Plaintiff's Section 1983 claim against him in his official capacity.

> n11 Generally, "A functional approach governs the Eleventh Amendment's application to actions for money damages against state officials." *Id.* The Eleventh Amendment bars suits against state officials, if "the state is the real, substantial party in interest." *Id.* (quoting *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S. Ct. 900, 79 L. Ed. 2d 67 (1984)). To make this determination, the Court "must look beyond the pleadings to determine whether a decree in this case would operate in fact against [the State]. If the judgment would actually run against the state treasury, the action is barred." *Id.*

[*27]

Nevertheless, Plaintiff has also sued Mr. Jaynes in his individual capacity. Generally, "state officials, sued in their individual capacities, are persons' within the meaning of [Section] 1983. The Eleventh Amendment does not bar such suits, nor are state officers absolutely immune from personal liability under [Section] 1983 solely by virtue of the official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 30, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Accordingly, Plaintiff's Section 1983 claim against Mr. Jaynes in his individual capacity survives.

### c) WPR and Ms. Armanino

Defendants WPR and Ms. Armanino argue that Plaintiff's Section 1983 claim against them fails as a matter of law. First, WPR argues that Plaintiff has not alleged that it was acting under color of state law. In response, Plaintiff states that, "Defendant, WPR, as described in [Complaint paragraphs 9 and 40] acted under color of authority named in [Complaint paragraphs 37 and 39] and committed acts in [Complaint paragraphs 40, 41, 42, 43, 45, 50]." (Resp. at 2.) The Court has reviewed these paragraphs, and finds that none of them allege or can be construed as alleging that WPR committed any actions under color [*28] of state law that deprived Plaintiff of her federally-protected rights. Accordingly,

the Court will dismiss Plaintiff's Section 1983 claim against WPR.

Next, Ms. Armanino argues that she is protected from Plaintiff's Section 1983 claim by Eleventh Amendment immunity. Based on the reasoning set forth above, the Court finds that Plaintiff's Section 1983 claim against Ms. Armanino in her official capacity is barred by the Eleventh Amendment. However, Plaintiff's Section 1983 claim against Ms. Armanino in her individual capacity falls outside the protection of the Eleventh Amendment. The Court therefore denies Ms. Armanino's request to dismiss Plaintiff's Section 1983 claim, at least as it is asserted against her in her personal capacity.

### 2. Section 1986 Claim

In her Second Claim for Relief, Plaintiff asserts a claim for "Refusal to Prevent Interference with Deprivation of Civil Rights" under 42 U.S.C. § 1986. This section imposes liability on every person who knows of an impending violation of § 1985, n12 and has the power to prevent or aid in preventing the violation, but neglects or refuses to do so. Each of the Defendants has moved to dismiss this [*29] claim on various theories.

> n12 Section 1985 proscribes conspiracies to interfere with certain civil rights. To assert a viable claim under section 1985, the plaintiff must allege facts to support the allegation that the defendants conspired together; "[a] mere allegation of conspiracy without factual specificity is insufficient." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988).

The County argues that Plaintiff's second claim for violation of 42 U.S.C. § 1986 fails because Plaintiff has not asserted a claim for violation of 42 U.S.C. § 1985, which is required to maintain a claim under § 1986. Plaintiff, however, asserts that the County was in a position to prevent a conspiracy, and was therefore negligent. She argues that, because negligence is sufficient to maintain a claim under § 1986 claim, the Court should deny the County's Motion with respect to her § 1986 claim. The Court, however, agrees with the County. [*30]

"A claim can be stated under section 1986 only if the complaint contains a valid claim under section 1985." *Karim-Panahi*, 839 F.3d at 626. Because Plaintiff has not asserted a claim under § 1985, she cannot maintain a claim under § 1986. Consequently, the Court dismisses Plaintiff's Section 1986 claim against all Defendants. n13

n13 If Plaintiff intends to assert a viable claim under § 1986, she must sufficiently allege facts constituting a conspiracy under § 1985.

## 3. Violation of the Age Discrimination in Employment Act

In her Third Cause of Action Plaintiff has asserted a claim for violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. n14 She alleges that, "[b]y doing the action complained of above, Defendant, County of Lake Superior Court[,] has discriminated against Plaintiff on the basis of her age, over 40[.]" n15

n14 In their Motion to Dismiss and in their Supplemental Brief filed after oral argument, Defendants Lake County Superior Court, Mr. Jaynes, Ms. Mallinen, and WPR proffer that Plaintiff's Third Cause of Action is a claim under California's Fair Employment and Housing Act. Reviewing Plaintiff's Complaint, she has identified it as a claim under the ADEA. However, Plaintiff cites to certain sections of the California Government Code in her claim. Thus, as alleged, the Court construes Plaintiff's Third Cause of Action as a claim for violation of the ADEA. To the extent that Plaintiff seeks to assert a separate claim for discrimination in violation of California's FEHA, she must amend her Complaint and specifically identify her claim as such. Thus, the Court denies without prejudice Defendants' challenges relating to any FEHA claim.

[*31]

n15 The County and Defendants WPR, Armanino, and Jaynes have also moved to dismiss Plaintiff's age discrimination claim against them. Reviewing Plaintiff's Complaint, she has only alleged a discrimination claim against her employer, the Superior Court. (See Compl. PP 66-68.) If Plaintiff intends to assert such a claim against any Defendants in addition to the Superior Court, Plaintiff must seek leave to amend to specifically allege which Defendants she claims violated the ADEA.

Defendant Superior Court argues that Plaintiff's claim for age discrimination is fatally flawed because Plaintiff failed to exhaust her administrative remedies. Specifically, it argues that Plaintiff concedes in her Complaint that she has not received a right to sue letter from either the Department of Fair Employment and Housing or the Equal Employment Opportunity Commission. Thus, the Superior Court argues that Plaintiff cannot maintain her claim because she has not exhausted her administrative remedies. However, unlike claims under Title VII, the ADEA does not require a claimant to first obtain a right to sue letter [*32] before initiating a lawsuit. Rather, 29 U.S.C. § 626(d) provides that, "No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission." In her Complaint, Plaintiff alleges that she has filed such a charge with both the EEOC and California's Department of Fair Employment and Housing, this the Court rejects the court's argument.

The Superior Court also argues that Plaintiff has failed to allege sufficient facts to support her age discrimination claim. However, as Plaintiff correctly notes in her Opposition, she has alleged that she is over 40 years of age, and that she suffered an adverse employment action based on her age. These allegations, while minimal, are sufficient to put Defendant on notice of Plaintiff's ADEA claim. See Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002). The Court therefore declines to dismiss Plaintiff's ADEA claim against the Superior Court.

## C. Plaintiff's State law claims

### 1. Fourth Cause of Action: Retaliation for Employee's Political Activity

In her Fourth Cause of [*33] Action, Plaintiff asserts that, "after she was refused membership in the recognized employee organization, Lake County Employees' Association, by the employees' union representatives appointed by the Defendant, employer . . . Plaintiff proceeded to organize her own non-profit organization, under 501(c)(3) to pay all agency shop fees required for continued employment under any new Collective Bargaining Agreement as yet unknown to Plaintiff." She further alleges that, between October 2002, and June 30, 2003, Mr. Jaynes "proposed policies and changes and engaged in labor negotiations that affected Plaintiff's terms and conditions of employment." Specifically, she alleges that, "Defendant by his conduct demonstrated that his new policy was to harass, discharge, and discriminate against terms and conditions of employment of any employee who engaged in protected activity in opposition." Thus, Plaintiff claims that "Defendants" violated Labor Code Sections 1101 and 1105.

### a) Legal Standard

Labor Code Section 1101 provides:

No employer shall make, adopt, or en-
force any rule, regulation, or policy:

(a) Forbidding or preventing employees
from engaging or participating in [*34]
politics or from becoming candidates for
public office.

(b) Controlling or directing, or tending to
control or direct the political activities or
affiliations of employees.

As used in Section 1101, "[t]he term political activity'
connotes that espousal of a candidate or a cause, and
some degree of action to promote the acceptance thereof
by other persons." *Mallard v. Boring*, 182 Cal. App. 2d
390, 394, 6 Cal. Rptr. 171 (Cal. Ct. App. 1960).

Similarly, Section 1102 states: "No employer shall
coerce or influence or attempt to coerce or influence his
employees through or by means of threat of discharge or
loss of employment to adopt or follow or refrain from
adopting or following any particular course or line of
political action or political activity." To enforce these
provisions, Section 1105 provides: "Nothing in this chap-
ter shall prevent the injured employee from recovering
damages from his employer for injury suffered through a
violation of this chapter."

### b) Defendants Superior Court and Mr. Jaynes

Unlike the other Defendants, there is no dispute that
the Superior Court was Plaintiff's employer. Thus, it is
subject to Sections 1101 and 1105. In its Motion, [*35]
the Superior Court argues that Plaintiff's retaliation claim
fails because Plaintiff has not alleged that she engaged in
any political conduct that would be protected under Sec-
tion 1101, or that the Superior Court engaged in any
conduct somehow preventing her from, or interfering
with her right to, participate in politics. Reviewing Plain-
tiff's Complaint, she has alleged that after she began to
organize her own non-profit organization, she was har-
assed, discriminated against, and, ultimately, discharged.
However, as the Superior Court notes, such activity does
not constitute "political activity" under Section 1101
because it does not advocate a particular view or encour-
age support for a particular candidate. *See Smedley v.
Capps, Staples, Ward Hastings & Dodson*, 820 F. Supp.
1227, 1230 n.3 (N.D. Cal. 1993) (noting that "the courts
have traditionally interpreted [Section 1101] as being
intended to defend employees engaged in traditional po-
litical activity from reprisal by their employer"); *Lock-
heed Aircraft Corp. v. Superior Court*, 28 Cal. 2d 481,
171 P.2d 21, 25 (1946) (holding that Section 1101 con-
cerned activities related to or connected with the orderly

conduct [*36] of government and the peaceful organiza-
tion, regulation, and administration of the government).
Accordingly, the Court agrees with the Superior Court
that Plaintiff has failed to state a cause of action for re-
taliation. The Court therefore dismisses Plaintiff's retalia-
tion claim as to all Defendants.

### 2. Fifth Cause of Action: Intentional Misrepre-sentation by Making Promises Without Intent to Per-form

In her Fifth Cause of Action, Plaintiff asserts that
from April 27 to May 25, 2004, "Defendants" promised
her that they would reinstate her employment, with the
same title, status, salary, benefits, and entitlements. Spe-
cifically, Plaintiff alleges that "this promise was implied
in the form of a benefits packet sent by the Defendants
via certified mail to Plaintiff's home on May 5, 2004,"
which Plaintiff accepted "by her act of completing the
benefit packet and personally returning it to the Defen-
dant(s), employer, on May 11, 2004." Plaintiff alleges
that at the time Defendants made the promise, they
lacked the intent to perform, and that she "was unaware
of Defendants' intention not to perform their promise
during the time that she relied upon them." According to
Plaintiff, she [*37] later discovered that at the time De-
fendants made the promises, Defendants "had already
raided' Plaintiff's office in an attempt to obtain material
to fire Plaintiff upon return." Thus, when she returned to
work on May 25, 2004, she "was immediately escorted
out of the building on an alleged performance based ad-
verse action under new policies created in her absence
and placed on admin-leave."

### a) The County

The County moves to dismiss Plaintiff's intentional
misrepresentation claim against it on the ground that
Plaintiff has not alleged that the County was a party to
any employment contract or promise regarding rein-
statement to her position with the Superior Court. The
Court agrees. Plaintiff has not alleged that the County
made any promise that Plaintiff could return to work as a
Superior Court employee. Further, because the County
does not have such authority, this is not an allegation that
Plaintiff may cure by further pleading. Accordingly, the
Court will dismiss Plaintiff's intentional misrepresenta-
tion claim against the County with prejudice.

### b) WPR and Ms. Armanino

WPR and Ms. Armanino move to dismiss Plaintiff's
intentional misrepresentation claim against them [*38]
because they were not parties to any agreement between
Plaintiff and her employer regarding her reinstatement
after she was terminated. Specifically, WPR argues that,
"[i]t is clear from the face of the Complaint. . . that WPR
is *not* Plaintiff's employer, but rather a Contract Service

Provider' for the Superior Court." Thus, it argues that Plaintiff's claim fails. The Court agrees. Accordingly, the Court will dismiss this claim against WPR.

Ms. Armanino argues that Plaintiffs intentional misrepresentation claim against her fails because officials of a public entity are immune from such claims under California Government Code

Section 820.2. This Section provides:

> [A] public employee is not liable for any injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

As Superior Court Manager, Ms. Armanino argues that she is a public employee under Section 820.2, and is therefore entitled to governmental immunity for personnel decisions that are entrusted to her judgment. The Court agrees. To the extent that Plaintiff is claiming that Ms. Armanino [*39] misrepresented that Plaintiff would be reinstated to her position, such acts constituted a discretionary personnel action within the scope of Ms. Armanino's authority. Accordingly, she is protected from suit under Section 820.2. The Court will therefore dismiss Plaintiff's intentional misrepresentation claim against Ms. Armanino.

#### c) The Superior Court and Mr. Jaynes

The Superior Court and Mr. Jaynes urge the Court to dismiss Plaintiff's intentional misrepresentation claim against because it fails as a matter of law. Specifically, like Ms. Armanino, Mr. Jaynes argues that he is entitled to governmental immunity from Plaintiff's intentional misrepresentation claim. The Court agrees. Accordingly, it will dismiss Plaintiff's intentional misrepresentation claim against Mr. Jaynes.

In its Motion, Defendants Superior Court and Jaynes also argue that, as the public entity that Mr. Jaynes served, the Superior Court is "protected by the governmental immunity afforded under Section 820.2." The Court agrees. *See Sanborn v. Chronicle Publishing Co.*, 134 Cal. Rptr. 402, 18 Cal. 3d 406, 414, 556 P.2d 764 (Cal 1976); *Widdows v. Koch*, 263 Cal App. 2d 228, 238, 69 Cal. Rptr. 464 (Cal. Ct. App. 1968). Accordingly, the Court [*40] therefore grants the Superior Court's request to dismiss Plaintiff's intentional misrepresentation claim against it.

### 3. Sixth Cause of Action: Breach of Contract and Seventh Cause of Action: Breach of Covenant of Good Faith an Fair Dealing

In her Sixth Cause of Action, Plaintiff alleges that she and "Defendant" entered into an employment contract "that was oral, written, and implied-in-fact," and which lasted through her nine and a half years of employment. According to Plaintiff, "[t]he basic terms of the agreement were that [her] employment would be secure for as long as the company's personnel manual and policies disseminated to [her] were followed, that any complaint of harassment or retaliation would be investigated and resolved promptly and fairly, that [she] would not be terminated or forced to quit without good cause, and Plaintiff having been hired on the State Personnel Local Agency Merit System would earn merit raise increases, longevity raise, retirement, and fringe benefits." She alleges that she accepted employment and performed according to the terms of the agreement, until Defendants prevented her further performance. Specifically, she alleges that "[b]eginning [*41] in about July 2003 and through October 2004, Defendants . . . breached the . . . employment agreement by failing to investigate and resolve Plaintiff's complaint of workplace harassment, hostile work environment, disparate treatment, and retaliation fairly and promptly." Additionally, she charges that "[o]n July 30, 2004, Defendants breached the . . . employment agreement by discharging Plaintiff without good cause and despite her continued satisfactory performance[.]"

Relatedly, in her Seventh Cause of Action, Plaintiff asserts a claim for breach of covenant of good faith and fair dealing. She alleges that Defendants "had the legal duty to act fairly and in good faith towards Plaintiff in connection with the employment agreement and the [TCEPGA]." (*Id.* at P 90.) According to Plaintiff, "[s]ometime before June 30, 2004 and through July 30, 2004, Defendants . . . breached these duties imposed by law in connection with the employment agreement and the TCEPGA by failing to investigate and promptly resolve Plaintiff's complaint of workplace harassment, hostile work environment, disparate treatment, relation, and violation of the governing statutes within the TCEPGA by further [*42] retaliation of discharging Plaintiff with a dishonest and bad faith motive."

Defendants argue that Plaintiff's contract-based claims fail because public employment in California is not contractual in nature. n16 Thus, they argue that a public employee cannot state a claim against an employer for breach of an alleged employment contract or of the covenant of good faith and fair dealing. The Court agrees.

n16 As indicated above, the County joined in the other Defendants' arguments. Additionally, the County moves to dismiss Plaintiff's breach of contract claim on the ground that Plaintiff has not alleged that the County was a party to any employment agreement. The Court agrees. Because the alleged employment agreement was between Plaintiff and the Superior Court, the County could not be held liable for any breach of a contract to which it did not subscribe.

In California, "public employment is not held by contract but by statute and that, insofar as the duration of such employment is concerned, no employee has [*43] a vested contractual right to continue in employment beyond the time or contrary to the terms and conditions fixed by law." *Miller v. State of Cal.*, 18 Cal. 3d 808, 135 Cal. Rptr. 386, 389, 557 P.2d 970 (1977). Accordingly, "[the California] Supreme Court has made it clear that civil service employees cannot state a cause of action for breach of contract or breach of the implied covenant of good faith and fair dealing." univ. of *Kim v. Regents of University of California*, 80 Cal. App. 4th 160, 95 Cal. Rptr. 2d 10, 12 (Cal. Ct. App. 2000). Plaintiff's claims for breach of contract and breach of the covenant of good faith and fair dealing therefore fail as a matter of law. The Court thus dismisses these claims against all Defendants without leave to amend. n17

N17 In her Oppositions, Plaintiff indicates that she will amend her claims for breach of contract and breach of covenant of good faith and fair dealing "to correctly allege facts sufficient to state a claim related to a [b]ilateral contract for reciprocal services of Plaintiff's dual employment with Defendant, County of Lake. Plaintiff will further amend to allege her employment with employer, Lake County Superior Court [and] C.E.O., was held by statute at all relevant times, entitling Plaintiff t Constitutional protection and guarantees, and that Plaintiff suffered deprivation under the color of authority in violation of those rights." As indicated above, to the extent that Plaintiff seeks to assert contract-based claims based on the existence of an employment agreement, her claims are not cognizable under California law. Thus, because her breach of contract and breach of covenant of good faith claims fail as a matter of law, no amendment will cure these claims. Further, to the extent that Plaintiff seeks to amend her Complaint, she is advised that any amendment must comply with the procedures set forth in Federal Rule of Civil Procedure 15(a).

[*44]

## 4. Eighth Cause of Action: Defamation

In her Eighth Cause of Action Plaintiff alleges that Defendants "negligently, reckless, and intentionally caused excessive and unsolicited internal and external publications of defamation, of and concerning Plaintiff, to third persons and to the community." According to Plaintiff, "[t]hese false and defamatory statements included expressed and implied accusations that Plaintiff violated company policies; that she was such a poor performer, that she deserved disciplinary [sic] or had done a serious act of misconduct calling for her immediate removal; that she was incompetent; and was dishonest."

Each of the Defendants has moved to dismiss Plaintiff's defamation claim on various theories. Reviewing Plaintiff's Complaint, she repeatedly alleges that "Defendants" engaged in certain conduct. To date, Plaintiff has named five separate defendants. Because she has failed to specify which Defendants made the purportedly defamatory statements, the Court is unable to assess the validity of Defendants' challenges. More importantly, although a defamation claim does not require Plaintiff to meet any heightened pleading requirement, it also does [*45] not excuse Plaintiff from complying with the minimal notice pleading standard set forth in Federal Rule of Civil Procedure 8(a). Here, it is impossible to determine which of the five Defendants Plaintiff is claiming made defamatory statements, when the statements were made, the form of the defamatory statements, or to whom the Defendant(s) made the statements. Indeed, in her Complaint Plaintiff acknowledges that she does not know when the purportedly defamatory publications were made, and fails to identify to whom they were published. Thus, the Court finds that Plaintiff's conclusory allegations fail to comply with the pleading standard of Rule 8(a) and fail to put Defendants on notice of what conduct Plaintiff claims gives rise to her defamation claim. The Court will therefore dismiss Plaintiff's defamation claim with leave to amend. n18

n18 Should Plaintiff seek to amend her defamation claim, she must identify which of the Defendants made the allegedly defamatory statements. Merely alleging that "Defendants and Does 1 - 50, and each of them," will not suffice. Further, in order to sustain a viable defamation claim, Plaintiff must initially allege, and later prove, that the purported defamatory statement was published *to a third party*. See *Shively v. Bozanich*, 31 Cal. 4th 1230, 7 Cal. Rptr. 3d 576, 583, 80 P.3d 676 (Cal. 2003). Unless such publication occurred, Plaintiff cannot plead a claim for defamation.

[*46]

### 5. Ninth Cause of Action: Discharge in Violation of Public Policy

In her Ninth Cause of Action, Plaintiff alleges that "[b]y terminating Plaintiff as described in the preceding causes of action, Defendants and Does 1-50, [have] terminated Plaintiff in violation of the public policies of the United States and the State of California, as those policies are designed to prevent retaliation against, and discrimination against, employees[.]"

#### a) WPR and Ms. Armanino

WPR and Ms. Armanino move to dismiss Plaintiff's claim for discharge in violation of policy because: (1) it is barred by PERB's exclusive jurisdiction (except to the extent Plaintiff claims that her termination was based on age discrimination); (2) it is precluded as to WPR and Ms. Armanino because neither one was Plaintiff's employer; and (3) individual and non-employer defendants cannot be liable on a claim for wrongful termination. The Court finds the last argument dispositive. Under California law, "[o]nly an employer can be liable for tortious discharge, and fellow employees cannot be held accountable for tortious discharge on a conspiracy theory." *Jacobs v. Universal Development Corp.*, 53 Cal. App. 4th 692, 704, 53 Cal. App. 4th 120, 62 Cal. Rptr. 2d 446 (1997). [*47] Accordingly, because neither WPR nor Ms. Armanino were Plaintiff's employer, the Court grants their Motion to Dismiss with respect to Plaintiff's claim for discharge in violation of public policy.

#### b) The County

The County has also moved to dismiss Plaintiff's claim for discharge in violation of public policy on the ground that, because the County was not Plaintiff's employer, it cannot be held liable under this theory. Because the Court cannot discern based on Plaintiff's Complaint if and when the County employed Plaintiff, it will deny the County's Motion to Dismiss Plaintiff's Ninth Cause of Action against it without prejudice.

#### c) The Superior Court and Mr. Jaynes

Similarly, Mr. Jaynes urges the Court to dismiss Plaintiff's discharge in violation of public policy claim against him because he was not Plaintiff's employer. Because it is undisputed that Mr. Jaynes is not Plaintiff's employer, the Court grants his request to dismiss Plaintiff's Ninth Cause of Action against him. *See id.*

In their Motion, Defendants Superior Court and Mr. Jaynes also argue that, because Plaintiff has failed to establish a violation of any of the public policies she cites as underlying [*48] her claim, her claim for discharge in violation of public policy fails as a mater of law. The Court disagrees. Because Plaintiff has alleged a viable claim under the ADEA, dismissal of her wrongful discharge in violation of public policy claim is premature at this juncture. The Court therefore denies the Superior Court's Motion with respect to Plaintiff's wrongful discharge claim.

### 6. Tenth Cause of Action: Intentional Infliction of Emotional Distress

In her Tenth Cause of Action, Plaintiff asserts a claim for intentional infliction of emotional distress ("IIED"). She alleges that "Defendants and Does 1-50 as described throughout this Complaint, in particular, their discriminatory actions, were extreme and outrageous and beyond the bounds of common decency." As result of Defendants' conduct, Plaintiff alleges that she has sustained and continues to suffer emotional distress.

#### a) Legal Standard

Under California law, to state a cause of action for intentional infliction of emotional distress, a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) [*49] the plaintiffs suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *See Braunling v. Countrywide Home Loans, Inc.*, 220 F.3d 1154, 1158 (9th Cir. 2000); *Trerice v. Blue Cross of Cal.*, 209 Cal. App.3d 878, 883, 257 Cal. Rptr. 338 (1989). To be "outrageous," conduct must be so extreme as to exceed all bounds of that usually tolerated in a civilized society. *Id.* "Conduct which exhibits mere rudeness and insensitivity does not rise to the level required for a showing of intentional infliction of emotional distress." *Braunling*, 220 F.3d at 1158.

#### b) The County

In its Motion, the County argues that the Court should dismiss Plaintiff's IIED claim against it because Plaintiff has failed to allege extreme or outrageous conduct by the County. Specifically, the County argues that, "all that the County did was tell [P]laintiff that she could not file a grievance with the County -- presumably because a new procedure and system was being implemented to handle such complaints. This was not outrageous' as a matter of law." Further, the County argues that Plaintiff [*50] was never injured by the County's acts. It points out that Plaintiff alleges that she filed an appeal and prevailed. Thus, the County contends that even if it was mistaken in telling Plaintiff that she could not file a grievance, there was no harm as a result of that mistake. The Court, however, disagrees. Plaintiff has alleged that the County denied her request to process a grievance and that it failed to prevent her from being

discriminated against in her role as Courthouse Safety Officer. At the pleading stage, the Court cannot say that the County's actions do not rise to a level sufficient to sustain an IIED claim. The Court therefore denies the County's Motion with respect to Plaintiff's IIED claim without prejudice to the County re-alleging its challenge based on a full evidentiary record.

### c) WPR and Ms. Armanino

Defendants WPR and Ms. Armanino argue that Plaintiff's IIED claim fails as a matter of law, and is therefore subject to dismissal. Particularly, they argue the IIED claim: (1) is barred by PERB's exclusive jurisdiction; (2) is precluded as to both Defendants because neither Defendants is Plaintiff's employer; (3) is barred as to WPR because the only conduct attributed [*51] to WPR is absolutely privileged under California Civil Code Section 47(b); and (4) is barred because Plaintiff's exclusive remedy for this claim is under worker's compensation law.

As to Defendant's first argument, the Court fails to see how Plaintiff's tort claim for IIED falls within the scope of claims relating to the wages, hours, or terms and conditions of Plaintiff's employment, or otherwise constitutes a violation of the TCEPGA. Accordingly, the Court finds that PERB does not have exclusive jurisdiction over it. Second, the fact that neither WPR or Ms. Armanino was Plaintiff's employer does not preclude Plaintiff from asserting an IIED claim against them. Particularly, the basis of Plaintiff's IIED claim appears to extend beyond the act of her termination.

The Court also rejects Defendants' argument that Plaintiff's exclusive remedy is workers' compensation law. To the contrary, "a *plaintiff can recover for infliction of emotional distress if he or she has a tort cause of action for wrongful termination in violation of public policy or wrongful termination in violation of an express statute because [in such cases], emotional distress damages are [*52] simply a component of compensatory damages." *Phillips v. Gemini Moving Specialists*, 63 Cal. App. 4th 563, 74 Cal.Rptr.2d 29, 38 (Cal Ct. App. 1998). Here, Plaintiff has stated a viable wrongful termination claim, which may support her IIED claim against the Superior Court.

However, because Plaintiff has failed to plead sufficient facts identifying what conduct Defendant WPR engaged in that amount to extreme or outrageous conduct, the Court will grant WPR's Motion to Dismiss Plaintiff's IIED claim against it. n19 As to Ms. Armanino, however, because Plaintiff still has stated a viable claim against Ms. Armnanino in her personal capacity, the facts supporting such claim may also support an IIED claim against her, as well. Accordingly, the Court denies

without prejudice Ms. Armanino's request to dismiss Plaintiff's IIED claim against her.

> n19 If Plaintiff seeks to assert an IIED claim against WPR in her Amended Complaint, Plaintiff must identify what conduct by WPR gives rise to an IIED claim.

### d) The Superior Court [*53] and Mr. Jaynes

The Superior Court and Mr. Jaynes also argue that the Court should dismiss Plaintiff's IIED claim because: (1) it is within PERB's exclusive jurisdiction; (2) because Defendant Jaynes is not Plaintiff's employer; and (3) because Plaintiff's exclusive remedy is under workers' compensation law. For the reasons discuss above, the Court rejects each of these arguments.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS IN PART and DENIES IN PART** the Defendants' Motions to Dismiss as follows:

With respect to the County of Lake's Motion to Dismiss (Doc. # 17), the Court **DENIES** its request to dismiss Plaintiff's Section 1983 claim, discharge in violation of public policy claim, and intentional infliction of emotional distress claim. The Court **GRANTS** the County's request to dismiss all other claims.

With Respect to Defendant WPR's Motion to Dismiss (Doc. # 11), the Court **GRANTS** its request to dismiss all of Plaintiff's claims against it.

As to Defendant Armanino, the Court **GRANTS** her Motion (Doc. # 11) with respect to Plaintiff's Section 1986 claim; ADEA claim; retaliation claim; intentional misrepresentation claim; breach [*54] of contract claim; breach of covenant of good faith and fair dealing claim; defamation claim; and claim for discharge in violation of public policy. It **DENIES** Defendant Armanino's Motion with respect to Plaintiff's Section 1983 claim in her personal capacity and Plaintiff's intentional infliction of emotional distress claim.

As to Defendant Jaynes the Court **GRANTS** his Motion to Dismiss (Doc. # 20) Plaintiff's Section 1986 claim; ADEA claim; retaliation claim; intentional misrepresentation claim; breach of contract claim; breach of covenant of good faith and fair dealing claim; defamation claim; and claim for discharge in violation of public policy. It DENIES Defendant Jaynes's Motion with respect to Plaintiff's Section 1983 claim in his personal capacity and Plaintiff's intentional infliction of emotional distress claim.

2005 U.S. Dist. LEXIS 40378, *

As to Defendant Superior Court the Court GRANTS its Motion to Dismiss (Doc. # 20) Plaintiff's Section 1983 claim; Section 1986 claim; breach of contract claim; breach of covenant of good faith claim; retaliation claim; and defamation claim. It DENIES the Superior Court's Motion to Dismiss with respect to Plaintiff's ADEA claim; discharge in violation [*55] of public policy claim, and intentional infliction of emotional distress claim.

Further, Plaintiff is granted leave to amend with respect to her Section 1986 claim, her defamation claim, and her IIED claim against WPR to cure the deficiencies outlined in this Order. Plaintiff shall file any amended complaint within 20 days of the filing date of this Order.

**IT IS SO ORDERED**.

Dated: 12/12/2005

MARTIN J. JENKINS

UNITED STATES DISTRICT JUDGE

**10**

LEXSEE 1998 US DIST LEXIS 5365

**ANTHONY PERNA and ANNA PERNA v. NICHOLAS BARBIERI and QUICK & REILLY, INC.**

**CIVIL ACTION No. 97-5943**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1998 U.S. Dist. LEXIS 5365**

**April 16, 1998, Decided**
**April 16, 1998, Filed, Entered**

**SUBSEQUENT HISTORY:** [*1] Motion for Reconsideration Denied June 25, 1998, Reported at: 1998 U.S. Dist. LEXIS 9387.

**DISPOSITION:** The pro se petition of plaintiffs Anthony Perna and Anna Perna to vacate the NASD arbitration award of June 30, 1997 against plaintiffs and in favor of defendants Nicholas Barbieri and Quick & Reilly, Inc. is denied.

**COUNSEL:** ANTHONY PERNA, PLAINTIFF, Pro se, PHILADELPHIA, PA USA.

For NICHOLAS BARBIERI, QUICK & REILLY INC., DEFENDANTS: ELIZABETH H. FAY, PHILADELPHIA, PA USA.

**JUDGES:** Edmund V. Ludwig, J.

**OPINION BY:** Edmund V. Ludwig

**OPINION**

**MEMORANDUM**

Ludwig, J.

April 16, 1998

This memorandum accompanies an order denying plaintiffs' *pro se* petition to vacate a National Association of Securities Dealers arbitration award entered against them on June 30, 1997. [1]

1 Plaintiffs, who were represented at the arbitration, are now representing themselves.

[*2] **Background**

On September 12, 1981, plaintiffs Anthony Perna and Anna Perna opened a customer's account with defendant Quick & Reilly, Inc. and proceeded to deal with its employee representative, defendant Nicholas Barbieri. On June 27, 1996, plaintiffs filed a claim in NASD arbitration against defendants, [2] asserting that because of Barbieri's failure to execute an order according to instructions in a letter written by plaintiff Anthony Perna dated October 28, 1995, they lost approximately $ 37,000. [3]

2 An amended claim was filed on May 7, 1997.

3 The underlying dispute concerns whether or not defendants failed to execute a certain transaction requested by plaintiffs, which is alleged to have resulted in a series of losses. Defendants argue that the award was proper and supported by the facts. *See* defendants' motion and exhibits, which include the statement of plaintiffs' claim to the panel, defendants' reply brief, and a copy of the arbitrators' decision and award.

This action is governed [*3] by the Federal Arbitration Act, 9 U.S.C. § 10. [4] Section 10(a) sets forth four grounds for vacating an arbitration award that is subject to the Act:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

(5) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

9 U.S.C. § 10(a).

4 The Act includes contractual arbitrations, such as the one held in this case pursuant to the customer agreement between plaintiffs and the securities dealer defendant Quick & Reilly. 9 U.S.C. § 2 ("A written provision...in a contract...to settle by arbitration...shall be valid, irrevocable, and enforceable...").

[*4] Our Court of Appeals has made clear that the applicable standard of review of an arbitration award is "fairness of the proceeding as a whole." *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.,* 397 F.2d 594, 600 (3d Cir.), *cert. denied,* 393 U.S. 954, 89 S. Ct. 378, 21 L. Ed. 2d 365 (1968). If the arbitration proceeding in its entirety was fair, the award will not be set aside because of incidental errors. *Id.* Grounds for vacating an award have been construed narrowly.

The reason is that the parties chose to resolve outside the traditional court system any disputes that might arise between them. Part of their agreement was that an arbitration decision would be "final and binding" and not subject to the usual right of appeal that accompanies cases that originate in court. As expressed in the Act, Congress intended to authorize the vacating of a contractual arbitration award only where the arbitration was proven to be a mockery or sham or to have been conducted illegally or by corrupt arbitrators. *See Newark Stereotypers' Union,* 397 F.2d at 598-99. Strict enforcement has been the rule. As stated by the Court, the Act "establishes a federal policy favoring [*5] arbitration, requiring that we rigorously enforce agreements to arbitrate." *Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 226, 107 S. Ct. 2332, 2337, 96 L. Ed. 2d 185 (1987) (citations omitted).

The law that applies to a petition to vacate an arbitration award under the Act has been summarized as follows:

[Arbitration awards are] presumed to be valid and arbitration proceedings need not meet procedural requirements; awards are not reviewable for errors or misinterpretations of fact or law, and arbitrators are not required to give reasons for their decisions; only those grounds specified in § 10 may be considered as a possi-

ble basis for vacating, and the burden of establishing such grounds is on the party seeking to upset the award.

Margaret Shulenberger, *Construction and Application of § 10(a-d) of United States Arbitration Act of 1947, Providing Grounds for Vacating Arbitration Awards,* 20 A.L.R. 295, *50 (1974 & supp. 1996).

In plaintiffs' petition, the bases asserted for vacating the arbitration award entered against them are "undue means," "partiality," and "arbitrators exceeded their powers." Each will be considered separately.

I - Undue [*6] Means

In order to show "corruption, fraud or undue means," a plaintiff must show an occurrence that so infected the arbitration process that the result was "immoral if not illegal." *A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1403 (9th Cir. 1992), *cert. denied,* 506 U.S. 1050, 113 S. Ct. 970, 122 L. Ed. 2d 126 (1993). A procedural irregularity must be fundamental. *See Teamsters Local 312 v. Matlack, Inc.,* 118 F.3d 985, 996 (3d Cir. 1997) (award should be vacated where arbitrator entered decision without notice and in violation of representation that there would be further opportunity to be heard).

Here, the irregularities alleged consist in part of defendants' late responses to discovery requests including missed deadlines. [5] *See* petition to vacate, 10-12. Such violations are not fundamental unless they taint the outcome of the proceeding, which has not been shown to have occurred in this case.

5 Defendants' position is that no violations occurred. *See* defendants' motion to dismiss, 4-5 (permission obtained to extend deadlines).

[*7] It is also alleged, as "undue means," that the NASD's tape recording of the hearing itself was of such a poor quality as to frustrate plaintiffs' effort to review the proceeding. *See* plaintiffs' letter to Judge Ludwig of January 17, 1998 at 2-3. [6] Plaintiffs have not demonstrated, however, how or in what manner this difficulty could amount to "undue means." Plaintiffs attended the arbitration hearing, and there is no specific claim or instance asserted by them of "undue means" as understood in the law.

6 Because plaintiff are *pro se,* their letters, although not a part of the record or a proper method of presenting argument, will be considered in order to set forth plaintiffs' position.

II - Partiality

Plaintiffs also charge the arbitrators with "evident partiality" under 9 U.S.C. § 10(a)(2). Essentially, they

point to two aspects of the hearing. First, the arbitrators asked a substantially larger number of questions of plaintiffs than of defendants or defendants' witnesses. *See* plaintiffs' [*8] petition at 10 ("Obviously [the arbitrator] gave the impression that my testimony had to be re-strengthened and Mr. Barbieri's evasive and non-documented testimony was just fine.").

Second, a corporate officer of Quick & Reilly was permitted to attend the arbitration hearing and to communicate with defendants' attorneys. Accordingly, plaintiffs conclude that the officer had a prior relationship with the chairperson of the arbitration panel. *See* plaintiffs' letter to Judge Ludwig of January 21, 1998 at 2. [7]

> 7  Defendants deny any prior relationship. *See* letter of plaintiffs to defendants' attorney, January 24, 1998 (attaching as an exhibit letter from defendants' attorney denying any acquaintance).

Neither of these contentions is supportable. Arbitrators, who sit in a judicial capacity, are permitted to ask questions in an effort to clarify a party's position. Moreover, a corporation acts through its officers and employees, and a representative of a corporate party is always allowed to be present during [*9] a hearing or other legal proceeding and to consult with counsel. [8]

> 8  The law requires that a substantial personal relationship between an arbitrator and a party must be disclosed. *See Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150, 89 S. Ct. 337, 340, 21 L. Ed. 2d 301 (1968). There is no evidence that such a relationship existed in this arbitration - and the failure to reveal such a relationship would be at the party's and the arbitrator's peril.

III - Arbitrators Exceeded Their Powers

In plaintiffs' view, the arbitration award was completely against the evidence. *See* plaintiffs' petition at 15. Plaintiffs' argument is that the arbitrators ignored the evidence and thereby exceeded their powers - which under 9 U.S.C. § 10(a)(4) is a ground for vacating an award.

However, as to evidentiary matters, the issue on a petition to vacate is not the sufficiency of the evidence but whether plaintiffs had a fair opportunity to be heard. *See Newark Stereotypers' Union*, [*10] 397 F.2d at 599 ("The statute cannot be read ... to intend that every failure to receive relevant evidence constitutes misconduct which will require the vacation of an arbitrator's award."). In other words, while it may be difficult for plaintiffs to understand or accept, the question is not whether the arbitration decision was right or wrong or even totally misguided. That is not what the Act means when it refers to arbitrators who "exceeded their powers." Again - it is a matter of whether plaintiffs were permitted to put on their case and to present their version of the facts. Here, plaintiffs do not urge that they were denied that opportunity - other than the arbitrators' refusal to consider a "case summary" submitted after the hearing. Whether or not such contention is accurate or inaccurate, a "case summary" is not evidence and does not constitute an essential part of the right to be heard.

In a similar way, plaintiffs' repeated requests for a judicial reexamination of the evidence unfortunately reflects a misunderstanding of the arbitration law under the federal Act. The court's function is to preserve and enforce the arbitration decision unless there is proof that - aside [*11] from the evidence presented - the decision was arrived at illegally or irregularly. What plaintiffs in this case are requesting is that the Court consider whether the arbitrators, under the evidence, reached the wrong result. This Court, under the applicable Act of Congress, has no power to do. Under the law, even if the Court were to disagree completely with the arbitrators' decision, it may not set aside the decision unless there is a specific statutory ground for doing so. These grounds do not include the correctness of the decision.

Edmund V. Ludwig, J.

ORDER

AND NOW, this 16th day of April, 1998, the *pro se* petition of plaintiffs Anthony Perna and Anna Perna to vacate the NASD arbitration award of June 30, 1997 against plaintiffs and in favor of defendants Nicholas Barbieri and Quick & Reilly, Inc. is denied. A memorandum is entered with this order.

Edmund V. Ludwig, J.

# 11

FOCUS - 17 of 85 DOCUMENTS

**TONIA R. RANDELL, Plaintiff, v. LEVI STRAUSS & CO. and CINDY MOORE, Defendants.**

No. C 05-1047 CW

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

2006 U.S. Dist. LEXIS 32177

**May 12, 2006, Decided**
**May 12, 2006, Filed**

**COUNSEL:** [*1] For Tonia R. Randell, Plaintiff: Curtis Gilbert Oler, Esq., Law Offices of Curtis G. Oler, San Francisco, CA.

For Levi Strauss & Co., Cindy Moore, Defendants: Danielle Ochs-Tillotson, Attorney at Law, Oakland, CA; Michael W. Foster, Foster and Associates, Oakland, CA.

**JUDGES:** CLAUDIA WILKEN, United States District Judge.

**OPINION BY:** CLAUDIA WILKEN

**OPINION:**

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Levi Strauss & Co. and Cindy Moore move for summary judgment. Plaintiff Tonia Randell opposes this motion. The matter was heard on March 24, 2006. Having considered all of the papers filed by the parties, the evidence cited therein and oral argument on the motion, the Court grants Defendants' motion.

BACKGROUND

In May, 1990, Defendant Levi Strauss hired Plaintiff, an African-American woman. Previously, Plaintiff had been working at a job where she was paid approximately half of what she would be paid starting at Levi Strauss. Before Plaintiff was hired, she signed her employment application, which, directly above her signature, stated:

I understand and agree that if I become employed by Levi Strauss & Co. . . . my employment may be terminated by myself or LS & Co. [*2] at any time with or without cause and with or without notice. I further agree and understand that only the President or Executive Vice President may enter into any employment agreement contrary to the above and then only if such employment agreement is in writing.

After accepting employment, Plaintiff signed an Acknowledgment and Agreement of Employment Relationship, which stated:

I acknowledge and agree that it is the policy of Levi Strauss . . . that unless there is a written employment agreement to the contrary signed by the employee and the President, Executive Vice-President or a Senior Vice-President of Levi Strauss Associates, Inc., each employee including myself is an employee-at-will. I further acknowledge and agree that as an employee-at-will either I or the Company can terminate my employment at any time for any reason with or without cause. I also acknowledge and agree that only the President, Executive Vice-President or a Senior Vice-President of Levi Strauss Associates, Inc. has the authority to enter into an employment agreement that changes my status as an employee-at-will and that no such employment agreement will be binding on the Company unless it [*3] is written and signed by an authorized officer and the employee. n1

Case 3:07-cv-02753-SC    Document 26    Filed 08/24/2007    Page 29 of 44

Page 2
2006 U.S. Dist. LEXIS 32177, *

n1 In addition, in April, 2003 Plaintiff signed a Statement of Commitment, which stated:

> I acknowledge that my working relationship with LS&CO. is "at will," meaning either party can terminate the relationship at any time, for any or no reason. This relationship cannot be modified except in a written agreement signed by the Senior Vice President of Human Resources. By agreeing to comply with LS&CO.'s Worldwide Code of Business Conduct, I understand and agree that there is no contract of employment created.

Although she signed documents stating that she was an at-will employee, Plaintiff states that she was informed that as long as she performed all of her duties satisfactorily, she would remain employed at Levi Strauss. Specifically Bonita Richardson, her hiring manager, told her that "Levi Strauss was a good company to work with, it was fair, it was a place that if I chose to I could retire from." Plaintiff states that she [*4] relied on Ms. Richardson's representation in accepting a job at Levi Strauss, and that because of those statements she did not read the documents that she signed. After she started working at Levi Strauss, Ms. Richardson would tell her that she was lucky to work at Levi Strauss and that she had a career with the company. In addition, Ms. Richardson told Plaintiff that she wanted her to move up in the company.

In 1995, Defendant Moore interviewed, and hired, Plaintiff for a position in Levi Strauss' Quality Assurance Department. During the interview, Defendant Moore told Plaintiff that she had a job with Levi Strauss as long as she did her job, and that the Company was "like a family," "a comfortable work environment," and "a place to grow."

After being hired for this position, Plaintiff first came under Defendant Moore's supervision. Plaintiff claims that she was the only African-American person in her department and that Defendant Moore began exhibiting hostility and animosity toward her. Plaintiff claims that such treatment was not related to her work performance.

In 1996 or 1997, Plaintiff and a co-worker complained to human resources representative Rudy Collin that Defendant [*5] Moore was excluding Plaintiff and

her co-workers, and giving preferential treatment to a newly hired temporary employee, a Caucasian female. Although Plaintiff claims that she made it clear that she felt Defendant Moore's actions were racially motivated, Mr. Collin states that at no point did Plaintiff or her co-worker suggest that Defendant Moore's actions were motivated by discrimination; nor did he draw that conclusion himself. Mr. Collin notes that, as an African-American, he is "sensitive, both professionally and personally, to claims of discrimination."

In 1999, Plaintiff was transferred to a different department with a new supervisor. But in 2002, Plaintiff was transferred back to Defendant Moore's department. Plaintiff states that after learning she was being transferred back, she complained to Christy Silva, a human resources representative, that Defendant Moore would find a way to fire her and that, because she was the only Black person in the Department, Defendant Moore would take every opportunity to single her out and express her negative and hostile feelings toward Plaintiff. Ms. Silva, who is still an employee at Levi Strauss, states that, although she does not recall [*6] the details of their conversation, at no point during that meeting did Plaintiff state, or even suggest, that Defendant Moore was discriminating against her.

In 2002, Defendant Moore gave Plaintiff an unfavorable evaluation. All of Defendant Moore's previous evaluations of Plaintiff had been positive, and in 2003 Defendant Moore gave Plaintiff another positive evaluation, resulting in a raise. In November, 2003, Plaintiff received a summons for jury duty by the San Francisco Superior Court. Levi Strauss offers its non-exempt employees paid time off for jury duty as part of its Time Off with Pay Program (TOPP). In January, 2004, Plaintiff informed her co-worker Rodel Ramos, the TOPP coordinator, that she had been summoned for jury duty. He advised her to follow the instructions on the summons. She did.

On Friday evening, January 23, 2004, Plaintiff dialed the telephone number provided by the summons and was instructed that she was required to report for jury duty on the morning of January 26, 2004. On that Monday morning, Plaintiff left a message at work that she would be reporting for jury duty. Plaintiff reported to the jury assembly room and was informed she was on telephone standby. [*7] Instead of returning to work, Plaintiff went home. On her time card for Monday, however, Plaintiff reported nine hours of paid time off for jury duty. Monday evening, Plaintiff called the telephone number on the summons and was informed she was on telephone standby for Tuesday, January 27, 2004. On Tuesday, Plaintiff went to work and worked a full day. Tuesday evening, Plaintiff again called the telephone number on the summons and was instructed to report to

the jury room on Wednesday, January 28, 2004. On Wednesday, Plaintiff went to the jury assembly room. She was excused to leave and informed that she was on telephone standby. Plaintiff left, picked up lunch and went to work. On her time card for Wednesday, she reported five hours off for jury duty. Plaintiff was not instructed to report for jury duty on Thursday or Friday, and she went to work, working full days.

Upon receiving Plaintiff's TOPP time report without any proof of jury duty, Mr. Ramos contacted the San Francisco Court for proof of jury duty. He received a letter, stating, in part,

> Tonia Randell was not required to appear for jury service during the week of January 26, 2004. She was on telephone standby the [*8] entire week and not required to report in for jury service. . . . I have checked our records for Jan. 26th and Jan. 28th and I do not see this juror's name on any of our lists. She would be on a list if she checked in.

Mr. Ramos reported this information to Defendant Moore, who then contacted human resources representative Grace Downey. Ms. Downey advised Defendant Moore that misreporting TOPP time was a violation of Company policy, which could result in termination. According to Defendant Moore, after she consulted with Ms. Downey, she informed Plaintiff that unless she could provide some evidence that she was on jury duty, as reflected in her TOPP report, she would be terminated for violating Company policy; Plaintiff left work that day and never returned. According to Plaintiff, however, Defendant Moore came into her office on February 20, 2004 and stated that she was fired for filing a false TOPP report.

Levi Strauss terminated Plaintiff's employment. Defendants state Plaintiff was fired for falsely reporting jury duty time off, a violation of Company policy. Plaintiff contends that she was impermissibly fired based on her race, color and national origin.

### LEGAL STANDARD [*9]

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the nonmoving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome [*10] of the case. The substantive law will identify which facts are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the non-moving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Id.

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990); Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). [*11] If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the

non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

## DISCUSSION

### I. Breach of Contract

Defendants argue that Plaintiff's breach of contract claim is barred as a matter of law because Plaintiff had an express at-will employment relationship with [*12] Levi Strauss. Plaintiff responds that she has presented credible evidence of an implied employment contract with Levi Strauss and thus summary judgment must be denied.

California Labor Code § 2922 provides that "an employment, having no specified term, may be terminated at the will of either party on notice to the other." The "at-will" presumption provided in section 2922, however, may be overcome by an implied agreement not to terminate without good cause. **Foley** v. Interactive Data Corp., 47 Cal. 3d 654, 680, 254 Cal. Rptr. 211, 765 P.2d 373 (1988). The **Foley** court cited several factors that may be considered in determining whether such an implied agreement exists, including "'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged.'" Id. (quoting **Pugh** v. See's Candies, 116 Cal. App. 3d 311, 326-27, 171 Cal. Rptr. 917 (1981), overruled on other grounds Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 100 Cal. Rptr. 2d 352, 8 P.3d 1089 (2000)). An important consideration is what the parties actually and [*13] mutually understood, based on express words and on conduct. Guz, 24 Cal. 4th at 337. Although a statement in a written personnel policy that employment is at-will creates a presumption that employment is at-will, it does not by itself preclude a plaintiff from rebutting that presumption. But if there is an express, written at-will employment contract signed by the employee, that presumption cannot be overcome. Id. at 339-40.

Here, Plaintiff thrice signed agreements stating that she was an at-will employee: before she was hired, after she accepted employment and less than a year before she was terminated. When asked if the Statement of Commitment she signed in April, 2003, confirms that as of 2003 her employment continued to be at-will, Plaintiff responded, "Based on the document today, yes."

Nonetheless, Plaintiff argues there was a breach of contract because she was informed that as long as she performed all her duties satisfactorily, she would remain employed and have a career at Levi Strauss. Specifically, Plaintiff was told by the hiring manager that "Levi Strauss was a good company to work with, it was fair, it was a place that if I chose to [*14] I could retire from," and that there were good career opportunities at Levi Strauss. Such evidence, however, is insufficient to prove an implied employment agreement. As explained in Tomlinson v. Qualcomm, Inc., 97 Cal. App. 4th 934, 944, 118 Cal. Rptr. 2d 822 (2002), a case Plaintiff cites, "Although the California courts will under some circumstances imply an agreement contrary to the statutorily presumed at-will status, the courts will not imply an agreement if doing so necessarily varies the terms of an express at-will employment agreement signed by the employee." Nor is Plaintiff's statement that she never read or understood any of the three agreements she signed regarding at-will employment sufficient to create a dispute of material fact, and she provides no authority to suggest otherwise. California courts have long ago found that failure to read a contract before signing is not in itself a reason to refuse its enforcement. See, e.g., Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 20 Cal. App. 3d 668, 671, 97 Cal. Rptr. 811 (1971).

Summary judgment for Defendants is granted on the breach of contract claim.

### II. Breach of Implied Covenant of Good Faith and Fair Dealing [*15]

Defendants argue that Plaintiff cannot establish a breach of the implied covenant of good faith and fair dealing because there is no employment contract. Plaintiff acknowledges that the viability of her implied covenant claim is contingent upon the viability of her breach of contract claim. Because Plaintiff cannot establish the existence of an implied contract to terminate only for just cause, she cannot state a cause of action for breach of the implied covenant of good faith and fair dealing on the ground that she was terminated without good cause. See Gould v. Maryland Sound Indus., Inc., 31 Cal. App. 4th 1137, 1153, 37 Cal. Rptr. 2d 718 (1995).

Summary judgment for Defendants is granted on the claim for breach of the implied covenant of good faith and fear dealing.

### III. Fraud and Deceit

Plaintiff asserts that she was defrauded because, before she accepted employment, she was informed that, as long she competently performed her job, Levi Strauss would treat her fairly and discharge her only for good cause. Plaintiff claims that she relied on those representa-

tions. Defendants argue that Plaintiff's fraud and deceit claim fails because Defendants made no actionable representation [*16] or promise, and Plaintiff was not justified in relying on the representations and/or promises Plaintiff purports were made.

Actionable fraud requires an intentional misrepresentation of past or existing fact; predictions or statements as to future events are deemed opinions, and are not actionable fraud. Borba v. Thomas, 70 Cal. App. 3d 144, 152, 138 Cal. Rptr. 565 (1977). As noted above, Plaintiff states that she was told that "Levi Strauss was a good company to work with, it was fair, it was a place that if I chose to I could retire from." Plaintiff stated that Defendant Moore told her that she had a position with Levi Strauss as long as she did her job, and that the company was "like a family," "a comfortable work environment," and "a place to grow." These are opinions about Levi Strauss and Plaintiff's future with Levi Strauss. And a promise of future conduct is actionable as fraud only if made without the present intent to perform. See Magpali v. Farmers Group, Inc., 48 Cal. App. 4th 471, 481, 55 Cal. Rptr. 2d 225 (1996). During her deposition Plaintiff stated that she believed Defendant Moore and Ms. Richardson were sincere at the time they made the promises.

In addition, actionable [*17] fraud requires justifiable reliance. Slivinsky v. Watkins-Johnson Co., 221 Cal. App. 3d 799, 807, 270 Cal. Rptr. 585 (1990). Citing Slivinsky, Defendants contend that, even if Plaintiff can establish a misrepresentation or false promise, she cannot, as a matter of law, establish that she justifiably relied upon the alleged misrepresentation or false promise. In Slivinsky, the court ruled that the plaintiff's alleged reliance on the defendant's oral promises of continuing employment was "simply not justifiable" because the representations contradicted the parties' agreement which provided that the employment was at-will. Id. As noted above, here, Plaintiff signed three agreements acknowledging that her employment was at-will.

In response, Plaintiff does not attempt to distinguish, or even address, any of the cases cited by Defendants. Nor does she cite any admissible evidence. Instead, she states that she "obviously justifiably relied" upon representations by her new employer as indicated by her acceptance of employment. She further states that, although she believed that the representations when made were sincere, she later learned that the representations were false as reflected [*18] by the actions against her by Defendants. But, as held in Slivinsky, if a "plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, [s]he will never reach a jury." Id. Here, Plaintiff produces no further evidence, and thus this claim will not reach a jury.

To avoid summary judgment, Plaintiff must establish through admissible evidence that there exists a genuine issue of material fact as to each of the elements of this claim. She does not. Summary judgment for Defendants is granted on the fraud and deceit claim.

IV. Discrimination

Plaintiff brings claims against Defendants for race, color and national origin discrimination in violation of California's Fair Employment and Housing Act (FEHA) and 42 U.S.C. § 1981. n2 Defendants argue that Plaintiff's discrimination claims fail because she cannot establish a prima facie case of discrimination and cannot rebut Defendants' legitimate, non-discriminatory reasons for terminating her. n3

n2 Plaintiff's discrimination claims are not analyzed separately. Analysis of an employment discrimination claim under § 1981 and FEHA follows the same legal principles as those applicable in a Title VII disparate treatment case. See Fonseca v. Sysco Food Servs., 374 F.3d 840, 850 (9th Cir. 2004); Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996). [*19]

n3 Defendants also argue that supervisory employees are not subject to individual liability for claims under FEHA. See, e.g., Reno v. Baird, 18 Cal. 4th 640, 663, 76 Cal. Rptr. 2d 499, 957 P.2d 1333 (1998). Plaintiff offers no opposition on this issue, and the Court grants summary judgment to Defendant Moore on the FEHA claims.

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), the Supreme Court established a burden-shifting framework for evaluating the sufficiency of a plaintiff's evidence in employment discrimination suits. Within this framework, plaintiffs may establish a prima facie case of discrimination by reference to circumstantial evidence: plaintiffs must show that they are members of a protected class; that they were qualified for the position they held or sought; that they were subjected to an adverse employment decision; and that they were replaced by someone who was not a member of the protected class or that the circumstances of the decision otherwise raised an inference of discrimination. [*20] St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed.

2d 407 (1993) (citing McDonnell Douglas and Burdine). Once plaintiffs establish a prima facie case, a presumption of discriminatory intent arises. Id. To overcome this presumption, the defendant must come forward with a legitimate, non-discriminatory reason for the employment decision. Id. at 506-07. If the defendant provides that explanation, the presumption disappears. See id. at 511; Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994).

In response to the defendant's offer of a non-discriminatory reason, plaintiffs must produce "specific, substantial evidence of pretext." Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983). To survive summary judgment, plaintiffs must introduce evidence sufficient to raise a genuine issue of material fact as to whether the reason the employer articulated is a pretext for discrimination. Plaintiffs may rely on the same evidence used to establish a prima facie case or put forth additional evidence. See Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000); [*21] Wallis, 26 F.3d at 892. The Ninth Circuit has instructed that "in deciding whether an issue of fact has been created about the credibility of the employer's nondiscriminatory reasons, the district court must look at the evidence supporting the prima facie case, as well as the other evidence offered by the plaintiff to rebut the employer's offered reasons. And, in those cases where the prima facie case consists of no more than the minimum necessary to create a presumption of discrimination under McDonnell Douglas, plaintiff has failed to create a triable issue of fact." Wallis, 26 F.3d at 890. To avoid summary judgment, plaintiffs "must tender a genuine issue of material fact as to pretext." Id. (quoting Steckl, 703 F.2d at 393); see also Lindahl v. Air France, 930 F.2d 1434, 1438 (9th Cir. 1991)(in determining whether the proffered reason is pretext, "the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact"). The factfinder's disbelief of the defendant's proffered reason, along with the elements of the prima facie case, may "suffice to show intentional [*22] discrimination." Hicks, 509 U.S. at 511.

Here, there is no dispute that Plaintiff is a member of a protected class, and that Defendants terminated her. Plaintiff presents evidence that she was performing competently in the position she held at the time she was terminated. Although Plaintiff received an unsatisfactory work performance evaluation in 2002, she received a positive work evaluation and raise in 2003.

Defendants contend that Plaintiff produces no evidence of circumstances suggesting a discriminatory motive. But their reliance on Bradley v. Harcourt, Brace and Co., 104 F.3d 267 (9th Cir. 1996), is misplaced. Bradley held that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and

both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." 104 F.3d at 270-71. Defendants omit Bradley's requirement that both the hiring and the firing occur within a short period of time. Here, Defendant Moore hired Plaintiff for a position in Quality Assurance Department in 1995. Plaintiff was terminated almost a decade later. [*23]

Plaintiff produces circumstantial evidence of discrimination: she states that she was the only African-American in her department; that she was treated less favorably than other employees in the department; and Defendant Moore singled Plaintiff out and expressed hostile feelings toward her that were not based on her work performance. n4

> n4 Defendants contend that this evidence contradicts what Plaintiff stated in her deposition. It does not. In her deposition, Plaintiff stated that Defendant Moore never criticized her work or criticized her in coaching sessions. Defendants do not point to testimony by Plaintiff that Defendant Moore never criticized her based on non-work related issues.

Regardless of whether Plaintiff presents a prima facie case of discrimination, Defendants have produced evidence that they had a legitimate, non-discriminatory reason for firing Plaintiff. Defendants state that Plaintiff was fired because she violated company policy by falsely reporting fourteen hours of time off for jury [*24] duty. As Defendants note, it is undisputed that the San Francisco Superior Court sent a letter to Defendants stating that Plaintiff was not required to appear for jury service during the week and that Levi Strauss policy states that falsification of time cards is a serious offense that may lead to immediate termination. In her deposition, Plaintiff admitted that she marked on her time sheet that she was out for jury duty for nine hours on Monday and five hours on Wednesday, even though she was not.

Plaintiff submits no evidence to show that Defendants' alleged legitimate, non-discriminatory reason for firing her is pretext. She states that it was a common practice at Levi Strauss not to return to work after reporting for jury duty and that no other employee was required to return to work after reporting for jury duty. According to Plaintiff, when Defendant Moore was summoned for jury duty she disappeared from work, even though she was on standby. But Plaintiff was terminated for falsely reporting time off for jury duty on her time card, not for failing to return to work after reporting for jury duty. Plaintiff provides no competent evidence that Defendant Moore or any other employee [*25] took

paid time off for jury duty when they were not on jury duty.

Summary judgment for Defendants is granted on the claims for discrimination in violation of FEHA and section 1981.

## V. Retaliation

Plaintiff alleges that, in addition to being fired for discriminatory reasons, she was fired in retaliation for reporting discrimination. Defendants argue that this FEHA retaliation claim fails because she cannot show that she was engaged in protected activity that was causally connected to her termination and, as noted above, Plaintiff was terminated for a legitimate, non-retaliatory reason.

To establish a prima facie case of retaliation, Plaintiff must show that she engaged in protected activity, that she was thereafter subjected to an adverse employment action by her employer and that there was a causal link between the two. Morgan v. Regents of Univ. of Cal., 88 Cal. App. 4th 52, 69, 105 Cal. Rptr. 2d 652 (2000). As Morgan explains, the causal link may be established by an inference derived from circumstantial evidence, such as the defendant's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory [*26] employment decision. Id. "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." Id. (quoting Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982)).

Here, as Defendants note, Plaintiff provides no evidence to show the required causal link. She does not address the necessary connection between reporting Defendant Moore's allegedly discriminatory behavior to human resources, the protected activity, and being terminated. She points to no evidence showing that Defendant Moore was aware of Plaintiff's complaints of discrimination. Plaintiff alleges that, after she was transferred from Defendant Moore's department, she told Ms. Amanda Cattermole, her new supervisor, who she later discovered was Defendant Moore's close friend, about her "awful experiences with Moore." But Plaintiff does not establish how she knew that this supervisor was a close friend and thus likely told Defendant Moore about her comments; nor does Plaintiff state that she told the supervisor that she had reported Defendant Moore's discriminatory conduct to human resources. Unlike Plaintiff, Defendants do provide evidence [*27] that Defendant Moore and Ms. Downey were not aware that Plaintiff engaged in protected activity. In the absence of evidence that Defendant Moore and Ms. Downey were aware of Plaintiff's complaints of discrimination, the causal link necessary for a claim of retaliation cannot be established. See id. at 73.

In addition, Plaintiff does not address the fact that the last discrimination complaint she claims she made occurred sometime in 2002, after she learned she was being sent back to Defendant Moore's department, approximately two years before she was fired. Even assuming that Defendant Moore did know about protected activity, the time that elapsed between Plaintiff's last complaint to human resources and her termination is too long to support an inference of causation. As the Supreme Court found, "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (inner citation and quotations omitted) (no [*28] causal relationship found when adverse action was taken twenty months after protected activity); see also Manatt v. Bank of Am., NA, 339 F.3d 792, 802 (9th Cir. 2003) ("While courts may infer causation based on the proximity in time between the protected action and the allegedly retaliatory employment decision, such an inference is not possible in this case because approximately nine months lapsed between the date of Manatt's complaint and the Bank's alleged adverse decisions.") (inner citation and quotations omitted). Furthermore, between Plaintiff's complaint and her termination, she received a positive evaluation by Defendant Moore, resulting in a raise, which undermines any inference that subsequent acts were motivated by retaliatory animus. Manatt, 339 F.3d at 802.

Because there is no evidence of a causal link between Plaintiff's protected activity and her termination, summary judgment for Defendants is granted on the FEHA retaliation claim.

## VI. Intentional Infliction of Emotional Distress

Defendants argue that Plaintiff's claim for intentional infliction of emotional distress fails because Defendants' alleged conduct was neither extreme [*29] or outrageous and Plaintiff's claim is barred by the California Workers' Compensation Act.

The Ninth Circuit has explained that, under the California law of intentional infliction of emotional distress, "Summary judgment is proper if a claim cannot 'reasonably be regarded as so extreme and outrageous as to permit recovery.'" Schneider v. TRW, Inc., 938 F.2d 986, 992 (9th Cir. 1991) (quoting Trerice v. Blue Cross, 209 Cal. App. 3d 878, 883, 257 Cal. Rptr. 338 (1989)). To be considered outrageous, the conduct "must be so extreme as to exceed all bounds of that usually tolerated in a civilized society." Id. Mere insulting language, rudeness and insensitivity do not constitute outrageous conduct. Id.

As Defendants note, although Plaintiff contends that she was subjected to a "reign of terror," the specific facts presented at her deposition, and even in her declaration, do not support that contention. In her deposition, Plaintiff complained that Defendant Moore sent her emails rather than speaking to her directly, left other employees phone messages concerning her schedule while not leaving Plaintiff the same messages; and asked other employees to convey information [*30] to Plaintiff rather than convey the information herself. Plaintiff acknowledged, however, that Defendant Moore never became physically aggressive with Plaintiff or yelled at her. In her declaration, Plaintiff asserts that Defendant Moore continuously and routinely expressed hostility, animosity and contempt toward Plaintiff, took every opportunity to single Plaintiff out and express her negative feelings toward Plaintiff, issued Plaintiff an unsatisfactory performance rating in 2002 and treated a recently employed Caucasian female with few skills more favorably than she treated Plaintiff. Plaintiff recalls an incident at a co-worker's birthday party when Defendant Moore ridiculed her, causing Plaintiff to become upset and leave the celebration.

Plaintiff's statement in her opposition that Defendant Moore's conduct was shameful, arrogant, extreme, outrageous and inhumane is not sufficient to create a material dispute of fact. As Defendants note, Plaintiff fails to specify which facts she contends constitute the outrageous behavior that makes up her claim. And there is no evidence in the record from which a trier of fact could reasonably find that Defendant Moore intentionally inflicted [*31] emotional distress. See Celotex, 477 U.S. at 324. Defendant Moore's conduct, as alleged by Plaintiff,

is not the conduct of a model supervisor. But it is not so extreme as to go beyond all possible bounds of decency, nor does it qualify as the kind of outrageous conduct necessary to support an action for intentional infliction of emotional distress.

Because Plaintiff fails to satisfy the elements of a claim for intentional infliction of emotion distress, the Court will not address Defendants' argument that Plaintiff's claim is also precluded by the exclusivity provisions of California's Workers' Compensation Act. Summary judgment for Defendants is granted on the intentional infliction of emotional distress claim.

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment (Docket No. 17). n5 Judgment shall enter accordingly. Defendants shall recover their costs from Plaintiff.

> n5 To the extent that the Court relied upon evidence to which there is an objection, the parties' objections are overruled. To the extent that the Court did not rely on such evidence, the parties' objections are overruled as moot.

[*32]

IT IS SO ORDERED.

Dated: May 12, 2006

CLAUDIA WILKEN

United States District Judge

**12**

LEXSEE 2006 US DIST LEXIS 80922

**THE EDWARD MELLON TRUST, by and through Trustee, M. RICHARD MEL-LON, Plaintiff/Counter-Defendant, v. UBS PAINEWEBBER, INC. and GARY LYON OTTO, Defendants/Counter-Claimants.**

No. 2:06-cv-0184

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**2006 U.S. Dist. LEXIS 80922**

**November 6, 2006, Decided**
**November 6, 2006, Filed**

**COUNSEL:** [*1] For IN RE: THE EDWARD MEL-LON TRUST, Plaintiff: Arnold Y. Steinberg, Pittsburgh, PA.

For UBS PAINEWEBBER, INC., GARY LYON OTTO, Individually and as an Employee and Agent thereof, Defendants: David C. Franceski, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, PA US; William T. Mandia, Jonathan F. Bloom, Stradley, Ronon, Stevens & Young, Philadelphia, PA.

For UBS PAINEWEBBER, INC., GARY LYON OTTO, Individually and as an Employee and Agent thereof, Counter Claimants: David C. Franceski, Jr., Stradley, Ronon, Stevens & Young, Philadelphia, PA US; William T. Mandia, Jonathan F. Bloom, Stradley, Ronon, Stevens & Young, Philadelphia, PA.

**JUDGES:** Thomas M. Hardiman, United States District Judge.

**OPINION BY:** Thomas M. Hardiman

**OPINION**

**MEMORANDUM OPINION**

**I. Introduction**

M. Richard Mellon (Mellon), the trustee of Plaintiff The Edward Mellon Trust (the Trust), filed this action on behalf of the Trust seeking to vacate a securities arbitra-tion award (Award) entered in favor of Defendants UBS Painewebber, Inc. (UBS) and its broker, Gary Lynn Otto (Otto), after an arbitration conducted under the auspices of the National Association of Securities Dealers, Inc. (NASD). Defendants [*2] have counterclaimed, seeking confirmation of the Award. Additionally, Defendants have filed a Motion for Judgment on the Pleadings, reit-erating their request for confirmation of the Award and seeking sanctions against Mellon.

After careful consideration of the pleadings and the record, the Court will deny Mellon's Motion to Vacate the Award, and will grant Defendants' Counterclaim to Confirm the Award. The Court also will deny Defen-dants' request for sanctions, and deny Defendants' Rule 12(c) motion.

**II. Procedural History**

Mellon initiated this action by filing a document captioned "Complaint in the Form of Motion to Vacate Arbitration Award" (Motion or Mot.) along with a sup-porting memorandum and exhibits on February 13, 2006. On April 27, 2006, Defendants filed their Answer to the Complaint and Counterclaim (Counterclaim) to Confirm Arbitration Award. On that same date, Defendants filed a Motion for Judgment on the Pleadings and a Memoran-dum in Support (Memo.), including exhibits. [1] On May 18, 2006, Mellon filed his "Brief in Opposition re: Mo-tion for Judgment on the Pleadings" (Opposition or Opp.). On May 30, 2006, Defendants filed their Reply Brief to Mellon's Opposition [*3] (Reply).

1 Possibly because Mellon captioned his initial pleading "Complaint in the Form of Motion to Vacate," Defendants responded to that pleading as though it were *both* a complaint (by filing the Rule 12(c) motion) *and* a motion to vacate (by filing the counterclaim for confirmation of the Award).

**III. Factual Background**

In 1998, Edward Mellon established the Trust. At that time, the Trust's sole trustees were Edward Mellon and David Pollock, an attorney in Pittsburgh. Pursuant to the Trust agreement, any income from the Trust would be paid to Edward during his lifetime, and the trustees were empowered to make all investment decisions for the Trust. Shortly thereafter, Edward opened an account with Defendant UBS (Account), with Defendant Otto as the registered representative. All decisionmaking authority for the Account rested with the trustees.

In March and April 1998, Edward Mellon transferred securities valued at approximately $ 8 million into the Account. Approximately one-quarter [*4] of the Account's assets -- i.e., $ 2 million -- was comprised of shares of DQE, Inc., the holding company for Duquesne Light Company (DQE). Aside from dividend reinvestments, Edward made only a few trades in the Account between 1998 and 2001. One of these trades was a purchase of additional DQE shares in February 2000 -- against Otto's advice -- with cash which had accumulated in the Account.

By early 2000, Edward Mellon's total assets -- including a $ 12 million account at Mellon Bank and another $ 1 million in mutual funds -- totaled more than $ 22 million. UBS did not, however, encourage Edward to retain or increase his holdings in DQE. In fact, on several occasions, Otto and a Mellon Bank trust officer independently recommended that Edward divest himself of some of his holdings in DQE. Each time, however, Edward declined to follow this advice, and retained his shares of DQE in the Trust.

In November 2000, the Trust agreement was amended to replace David Pollock with two new trustees: Richard Mellon, who was Edward's only child, and the Northern Trust Bank of Florida (Northern Trust). Significantly, neither Edward nor the new trustees informed Defendants of this amendment [*5] to the Trust agreement. In February 2001, Richard and Northern Trust wrote to UBS requesting that the Account holdings be transferred to Northern Trust. Because UBS had not received documentation showing that Richard and Northern Trust had any power to make this request, however, UBS did not make the transfer until March 2001, when it received proof that Richard and Northern Trust were indeed new trustees of the Account.

By its terms, the Trust terminated in November 2002, when Edward Mellon died. On April 15, 2003, Richard Mellon commenced the arbitration by filing a Statement of Claim against UBS and Otto with the NASD. In the Statement, Mellon contended that Defendants were liable for damages caused by: (1) the continued accumulation of DQE shares in the account; (2) Defendants' failure to sell DQE when its price spiked in early 2000; and (3) Defendants' refusal to transfer the Account assets to Northern Trust until March 2001. Defendants submitted to the NASD arbitration.

Over a five-day span in the summer of 2005 -- specifically, on June 27, 28, and 29, and on September 9 and 10, 2005 -- a total of nine hearing sessions were held as scheduled before a three-arbitrator NASD panel [*6] (Panel). The NASD panelists were Larry A. Feldman, William R. Gruver, and Beth Rackley Hesselson. On August 11, 2005, Mellon raised for the first time the issue of Arbitrator Hesselson's alleged bias in a letter to the NASD. After the NASD promised to investigate, Mellon filed a Motion to Recuse with the Panel on August 22, 2005. Arbitrator Hesselson refused to recuse herself on September 1, 2005. When Mellon again took the issue up with the NASD, the NASD ratified Arbitrator Hesselson's decision, refusing to disqualify her before the final two hearings were held on September 9 and 10, 2005.

On November 15, 2005, the Panel unanimously entered an award against Mellon and in favor of UBS and Otto. More specifically, the Panel denied Mellon's claims in their entirety, denied his request for punitive damages, and recommended the expungement of all reference to the arbitration from Otto's registration records, which were maintained by the NASD Central Registration Depository (CRD). [2] The Panel also denied all requests for attorneys' fees, directed the parties to bear their own costs, and ordered the parties to pay equal shares of the NASD's fees, which totaled $ 13,200.

> 2    The terms of the Award provide that Defendant "Otto must obtain confirmation from a court of competent jurisdiction before the CRD will execute the expungement directive." (See Mot., Exh. 1, at 3).

## [*7] IV. Standard of Review

Judicial review of an arbitration award is governed by the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq. Generally speaking, the FAA limits the Court's role to determining "whether the parties received a fair and honest hearing on a matter within the arbitrator's authority." See Sun Ship, Inc. v. Matson Navigation Co., 785 F.2d 59, 62 (3d Cir. 1986). Section 9 of the FAA addresses the confirmation of an award and provides, in pertinent part:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the ar-

bitration may apply to the court so speci-
fied for an order confirming the award,
and thereupon the court must grant such
an order unless the award is vacated,
modified, or corrected as prescribed in
sections 10 and 11 of this title. If no court
is specified in the agreement of the par-
ties, then such application may be made to
the United States court in and for the dis-
trict within which such award was made.

[*8]  *See* 9 U.S.C. § 9. Where "an award that is ques-
tionable nevertheless falls within the broad discretion
granted to arbitrators, it *must be confirmed.*" *See Major
League Umpires Ass'n v. American League of Profes-
sional Baseball Clubs*, 357 F.3d 272, 289 (3d Cir. 2004)
(emphasis added).

When parties do not dispute that the arbitration itself
involved a matter within the arbitrators' authority, as is
true in the case at bar, a district court's power to vacate
an arbitration award is quite limited. Pursuant to Section
10 of the FAA, an award may be vacated:

> (1) Where the award was procured by
> corruption, fraud, or undue means.
>
> (2) Where there was evident partiality
> or corruption in the arbitrators, or either
> of them.
>
> (3) Where the arbitrators were guilty
> of misconduct in refusing to postpone the
> hearing, upon sufficient cause shown, or
> in refusing to hear evidence pertinent and
> material to the controversy; or of any
> other misbehavior by which the rights of
> any party have been prejudiced.
>
> (4) Where the arbitrators exceeded
> their power, or so imperfectly executed
> them that a mutual, final, and definite
> award upon the subject matter [*9] sub-
> mitted was not made. . . .

*See* 9 U.S.C. § 10(a). In addition to these statutory
grounds, two common-law grounds permit the *vacatur* of
an arbitration award. First, a court may vacate an award
if it reveals a manifest disregard of the law. *See Tanoma
Mining Co. Inc. v. Local Union No. 1269, United Mine
Workers of Am.*, 896 F.2d 745, 749 (3d Cir. 1990). Sec-
ond, *vacatur* is permitted where an award is "completely
irrational." *See Mutual Fire, Marine & Inland Ins. Co. v.
Norad Reinsurance Co. Ltd.*, 868 F.2d 52, 56 (3d Cir.
1989) (citation omitted).

As the foregoing indicates, a court's role in review-
ing an arbitrator's award under the FAA is limited. *See
United Transp. Union Local 1589 v. Suburban Transit
Corp.*, 51 F.3d 376, 379 (3d Cir. 1995); *see also Mutual
Fire*, 868 F.2d at 56. As long as there is some basis for
the arbitrators' decision, no matter how "slender" that
basis may be, the award must be confirmed. *See Tanoma
Mining*, 896 F.2d at 748. "All that is required is some
support in the record." *Id.* Under these standards, a re-
viewing court should decline [*10] to sustain an award
"only in the rarest case." *See Newark Morning Ledger
Co. v. Newark Typographical Union*, 797 F.2d 162, 165
(3d Cir. 1986). Unless a ground for vacating the Award
exists, it should be confirmed. *See Bender v. Smith Barney,
Harris Upham & Co., Inc.*, 901 F. Supp. 863, 868-69 (D.
N.J. 1994) (confirming a NASD award where grounds
for *vacatur* did not exist).

## V. Jurisdiction

Mellon invokes federal question jurisdiction pursu-
ant to the Arbitration Act, 9 U.S.C. § 1, citing *Kaplan v.
First Options of Chicago, Inc.*, 19 F.3d 1503 (3d Cir.
1994), *aff'd*, 514 U.S. 938, 115 S. Ct. 1920, 131 L. Ed.
2d 985 (1995). He also avers that the Securities Ex-
change Act of 1934, 15 U.S.C. § 78aa, provides an inde-
pendent basis of federal question jurisdiction. Finally,
Mellon asserts diversity jurisdiction pursuant to 28
U.S.C. § 1332. (*See* Mot. at 2-3).

Although Defendants have not challenged Mellon's
assertion of these bases of subject matter jurisdiction,
"federal courts have the duty . . . where the issue of ju-
risdiction is not raised by any party, to inquire into their
[*11] jurisdiction to act and to deny relief where juris-
diction is lacking." *Pharmadyne Laboratories, Inc. v.
Kennedy*, 596 F.2d 568, 570 n.3 (3d Cir. 1979) (citations
omitted). Because the pleadings demonstrate that diver-
sity exists, the Court accepts jurisdiction on that basis.
*See* 28 U.S.C. § 1332.

## VI. Analysis

Mellon raises three substantive arguments on the
merits in support of his request to vacate the Award.
First, he claims that the Award was "irrational" in light
of the evidence presented at the hearings. (*See* Mot. at
13-20). Second, he argues that the Panel improperly re-
fused to hear the testimony of a second expert witness,
whose testimony Mellon offered for the first time on
rebuttal. (*See* Mot. at 20-23). Finally, Mellon argues that
he was prejudiced by the alleged partiality of Arbitrator
Hesselson. (*See* Mot. at 23-34). Defendants counter all of
these arguments, insisting that they are entitled to judg-
ment as a matter of law pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure and seek confirmation

of the Award in their Counterclaim. (*See* Memo. at 7; *see* [*12] *also* Counterclaim at 12).

Before reaching these substantive arguments, however, the Court must address a procedural issue that Mellon raises. Specifically, Mellon complains that "[t]he transcript of the Arbitration Hearing is only partially available, as the recording device, provided by the NASD to make this record, did not operate properly," a contention that Defendants do not appear to dispute. (*See* Mot. at 11-13; *see also* Memo. at 6 n.6). Although arbitration proceedings are not required to be transcribed by law, *see Dennis v. Wachovia Sec. LLC,* 429 F. Supp. 2d 281, 285 (D. Mass. 2006), Mellon points out that Rule 10326 of the NASD Code of Arbitration Procedure required it to keep a record of the proceedings. [3] (*See* Mot. at 12).

> 3   That rule provides, in pertinent part, that "[a] verbatim record by stenographic reporter or a tape recording of all arbitration hearings shall be kept." *See* NASD Code of Arbitration Proc., Rule 10326(a).

Notwithstanding the NASD [*13] rule requiring that the proceedings be recorded, the Court rejects the assertion that the incomplete transcript is a ground for *vacatur* of the Award, if indeed that is what Mellon is asserting. Although Mellon insists that this transcription failure "harm[ed]" him, *see* Motion at 12, he does not explain *how*. In these circumstances, the incomplete transcription of the arbitration is not a ground for *vacatur* of the Award. [4] Indeed, it is difficult to imagine how Mellon could be prejudiced where, as here, the parties do not contest each other's characterizations of the evidence adduced at the hearing. (*Compare* Memo. at 12 (noting that Mellon had provided "his own recitation of what he purports to be 'examples' of the facts" without disputing any of his factual contentions specifically) *with* Opp. at 3-6 (failing to contest any portion of Defendants' summary of the facts supporting the Award).) Nevertheless, to eliminate any prejudice that could possibly exist for either party, the Court will accept as true *both* Mellon's and UBS's summaries of the evidence introduced at the arbitration.

> 4   *See Grosso v. Salomon Smith Barney, Inc.,* 2003 U.S. Dist. LEXIS 20208, No. 03-MC-115, 2003 WL 22657305, at *7 (E.D. Pa. Oct. 24, 2003) (declining to overturn an arbitration award on the ground that the loss of some of the transcripts had violated NASD Rule 10326, where the appellant noted the loss and claimed prejudice "[w]ithout identifying any evidence or testimony submitted during the time period in issue"), *aff'd* 115 Fed. Appx. 600 (3rd Cir. 2004); *see also*

*Perna v. Barbieri,* 1998 U.S. Dist. LEXIS 5365, No. CIV. 97-5943, 1998 WL 181818, at *2 (E.D. Pa. Apr. 16, 1998), *aff'd,* 176 F.3d 472 (3d Cir. 1999) (rejecting the argument that a NASD tape recording was of such poor quality as to frustrate plaintiff's efforts to review proceedings, where the aggrieved party did not demonstrate prejudice).

[*14] Having resolved Mellon's procedural challenge, the Court will consider each of his substantive attacks on the Award *seriatim.* As will be explained more fully below, the Court concludes that Mellon has demonstrated no legal basis for upsetting the Award. Accordingly, the Court will deny his request to vacate the Award and will, instead, confirm it. [5]

> 5
>
> A motion for judgment on the pleadings pursuant to Rule 12(c) is evaluated under the same standard as a motion to dismiss pursuant to Rule 12(b). *See Regalbuto v. City of Philadelphia,* 937 F. Supp. 374, 376-77 (E.D. Pa. 1995), *aff'd,* 91 F.3d 125 (3d Cir. 1996). Like Rule 12(b)(6), Rule 12(c) requires the Court to "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff." *Turbe v. Gov't of the Virgin Is.,* 938 F.2d 427, 428 (3d Cir. 1991) (citing *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1394- 95 (3d Cir. 1991)). Under either rule, a complaint may be dismissed for failure to state a claim where it appears beyond any doubt that no relief could be granted under any set of facts which could be proved consistent with the allegations. *See Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). Because the Court will confirm the Award, Defendants' Rule 12(c) motion will be denied as moot.

[*15] *A. The Award Is Not Irrational*

Mellon argues that the Award is "irrational" in light of several "examples" of evidence adduced at the hearing. (*See* Mot. at 13). Defendants contend that the Court is not entitled to "review selective portions of testimony, evidence, and argument presented to the Panel to determine if the Panel reached the correct result." (Memo. at 12). In light of the applicable standard of review, the Court agrees with Defendants.

An award will be deemed irrational and set aside if there is *no* evidence to support it. *See NF&M Corporation v. United Steelworkers of America,* 524 F.2d 756, 760 (3d Cir. 1975); *H.K. Porter Co., Inc. v. United Saw, File & Steel Products Workers of America,* 333 F.2d 596

(3d Cir. 1964). Put another way, an award is not irrational as long as there is *any* evidence to support it. *See Kane Gas Light and Heating Co. v. International Broth. of Firemen and Oilers, Local 112,* 687 F.2d 673, 679 n.8 (3d Cir. 1982) (declining to overturn an award where "we cannot say that there was no evidence supporting the arbitrator's conclusion"); *see also Conn v. United States Steel,* 667 F. Supp. 204, 206 (E.D. Pa. 1987) [*16] (explaining that, as long as there is some evidence in the record to support an arbitrator's findings, those findings are not irrational).

The unforgiving operation of this legal standard cannot be overstated. The *vacatur* of an award is allowed only if there is "absolutely no support at all in the record justifying the arbitrator's determinations." *See United Transp. Union Local 1589 v. Suburban Transit Corp.,* 51 F.3d 376, 379 (3d Cir. 1995) (citation omitted); *see also Mutual Fire,* 868 F.2d at 56 (explaining that only if the terms of the award are "completely irrational" will it be subject to judicial revision or *vacatur); Daugherty v. Washington Square Securities, Inc.,* 271 F. Supp.2d 681, 694 (W.D. Pa. 2003) (same). As should be obvious from the foregoing, a court may not overrule an arbitrator "simply because it disagrees" with the arbitrator's interpretation of the law. *See United Transp. Union Local 1589,* 51 F.3d at 379. Even where the support is "slender," as long as the record reveals "some basis for the arbitrator's conclusion . . . the inquiry is over." *Tanoma Mining,* 896 F.2d at 748. [*17]

Against the backdrop of this difficult standard, Mellon cites selected "examples" of the evidence adduced at the hearing for the proposition that the Award was "irrational." (*See* Mot. at 13-20). Succinctly, he argues that the evidence at the arbitration demonstrated that, despite the fact that Edward Mellon's mental condition began to deteriorate toward the end of his life, Defendant Otto did not inquire into his competency and continued to buy DQE holdings for the Trust, while UBS did not inquire of Otto why Edward continued to purchase shares of DQE and delayed the transfer of the Trust corpus to Northern Trust. (*See* Mot. at 13-20). Even accepting all of Mellon's contentions about the content of the record developed at the arbitration, the Court concludes that he has not met his burden of showing that the Panel behaved irrationally in ruling as it did.

After reviewing as much of the record as survived the technical difficulties at the NASD hearing, and in light of the representations the parties have made about the other evidence introduced at the arbitration, the Court is confident that at least some evidence supported the Award: and again, the presence of *any* evidence [*18] is conclusive for the purposes of this review. *See United Transp. Union Local 1589,* 51 F.3d at 379; *see also Tanoma Mining,* 896 F.2d at 748; *Kane Gas Light,* 687

F.2d at 679 n.8. Specifically, Defendants aver that the record contained evidence that Edward Mellon was a savvy investor who, despite Otto's repeated recommendations that he divest himself of some of his stock in DQE, continued to buy DQE shares and made Richard Mellon a trustee without informing Defendants he had done so. (*See* Memo. at 5-6). Although most of the transcript is missing, Mellon does not dispute Defendants' summarization of the evidence supporting the Award. (*See generally* Opposition). The evidence that Defendants cite permitted the Panel to find that any losses to the Trust were caused by Edward's deliberate actions and inactions, and not by any breach of duty on Defendants' part. Accordingly, Mellon has not demonstrated that the Panel's result was irrational, and "the inquiry is over." *See Tanoma Mining,* 896 F.2d at 748.

In light of Defendants' uncontradicted characterization of the record that the Panel relied upon in reaching its [*19] result, Mellon's showing of "irrationality" is nothing more than a summary of evidence which could have supported a different outcome. (*See* Mot. at 13-20). Significantly, although Mellon ultimately argues that the Panel "acted in a manifest disregard of the law, *and of the facts," (see* Mot. at 32 (emphasis added)), he does not identify any law that, in his view, the Award disregards. (*See* Memo. at 12; *see also* Mot. at 13-20). Instead, he confines his attack on the Award to the contention that it disregards "the facts," *i.e.,* that it is "irrational [. . .] when taken from the standpoint of the evidence adduced at the hearing." (*See* Mot. at 13). Putting aside the problem this approach presents -- for it is exactly the opposite of the standard that the Court applies [6] -- and although Mellon does not explain how he thinks his list of facts shows the Award to be "irrational," one of two possibilities exists: either he believes the Panel ascribed *insufficient weight* to the evidence he offered, or that Defendants offered *insufficient evidence* to support the Award.

> 6    As another district court in our Circuit recently has observed, "the court's function is to preserve and enforce the arbitration decision unless there is proof that -- *aside from the evidence presented* -- the decision was arrived at illegally or irregularly." *See Perna,* 1998 U.S. Dist. LEXIS 5365, 1998 WL 181818 at *3 (emphasis added).

[*20]  Even assuming for the sake of argument that Mellon is right on both counts, the Court could not vacate the Award. Federal courts "do not sit to hear claims *of factual or legal error* by an arbitrator as an appellate court does in reviewing decisions of lower courts." *See Tanoma Mining,* 896 F.2d at 747 (emphasis added); *see also Wilko v. Swan,* 346 U.S. 427, 436-37, 74 S. Ct. 182, 98 L. Ed. 168 (1953). Thus, a court may not reweigh the

evidence under the guise of determining whether the Panel's decision was irrational. *See Mutual Fire,* 868 F.2d at 56. Nor does a review for "irrationality" permit an inquiry into the sufficiency of the evidence supporting a decision. *See Kaplan,* 19 F.3d at 1520 (distinguishing between "manifest disregard" review and a review of the sufficiency of the evidence), *see also Coltec Industries, Inc. v. Elliott Turbocharger Group, Inc.,* 1999 U.S. Dist. LEXIS 13684, Nos. CIV. A. 99-1400, 99-MC-36, 1999 WL 695870, at *5 (E.D. Pa. Sept. 9, 1999) (explaining that the court is "precluded" from reviewing "the sufficiency of the evidence in support of the arbitrator's findings and legal conclusions in the award and reach[ing] a different [*21] result" under the guise of performing a review for "manifest disregard").

In the end, Mellon "has done nothing more than allege facts which would allow [the Court] to disagree with the arbitrator['s] decision." *See McLaughlin, Piven, Vogel, Inc. v. Gross,* 699 F. Supp. 55, 58 (E.D. Pa. 1988). But findings of fact and the inferences to be drawn therefrom are the exclusive province of the arbitrator. *See Exxon Shipping Co. v. Exxon Seaman's Union,* 73 F.3d 1287, 1297 (3d Cir. 1996) (citation omitted). As such, and because there is no dispute that there was at least some evidence to support the Panel's decision, Mellon has not shown that the Award was irrational. *See id.* "The fact that this Court might not have made the same findings as the [Panel] or might not have evaluated the evidence as [it] did is not a sufficient basis to overturn an arbitration award as long as the arbitrator[s] stayed within the confines of the agreement." *See Equitable Gas Co. v. United Steelworkers of America, AFL-CIO-CLC,* 676 F. Supp. 648, 652 (W.D. Pa. 1987). Mellon argues that *a rational Panel could have* seen things his way, but he does [*22] not show that *only an irrational Panel would have* seen things any other way. Since the latter -- and not the former -- is what Mellon must show, the Court rejects his common-law challenge to the Award.

### B. The Panel's Refusal to Hear the Testimony of a Rebuttal Expert

Mellon next argues that the Award should be vacated because the Panel refused to permit him to present expert testimony from Mr. Peter Elish to rebut the testimony presented by Defendants' expert. (*See* Mot. at 20-23). Defendants disagree, and contend that the Panel properly excluded the testimony of Mr. Elish, which would have served only to revisit and rehabilitate the damaging testimony given by one Mr. Miles: an expert whose testimony Mellon presented in its case-in-chief. [7] (*See* Memo. at 14-15 and n.10). After reviewing the pleadings and the record, the Court agrees with Defendants.

7  Because the testimony of Mr. Miles did not survive the technical glitch that resulted in the inaudibility of most of the hearing cassettes, and because the parties have not given the Court any more specific information about the identity of this witness, the Court will refer to him throughout this Memorandum Opinion as "Mr. Miles."

[*23]  An award may be vacated if the arbitrator "refus[es] to hear evidence pertinent and material to the controversy." *See* 9 U.S.C. § 10(a)(3). The NASD Code of Arbitration gives the arbitrators wide discretion to determine which evidence is "pertinent" or "material." Specifically, Section 10323 states that "[t]he arbitrators shall determine the materiality and relevance of any evidence proffered and shall not be bound by rules governing the admissibility of evidence." *See* NASD Code of Arbitration Proc. Rule 10323 (quoted in *Maiocco v. Greenway Capital Corp.,* 1998 U.S. Dist. LEXIS 836, No. CIV-A 97-MC-0053, 1998 WL 48557, at *7 (E.D. Pa. Feb. 2, 1998)).

Consistent with this discretion, "[i]n an arbitration case a court cannot act as a legal screen to comb the record for technical errors in the receipt or rejection of evidence by arbitrators, who in most cases are laymen." *Newark Stereotypers' Union v. Newark Morning Ledger Co.,* 397 F.2d 594, 599 (3d Cir. 1968). Thus, *vacatur* is appropriate under Section 10(a)(3) only when the arbitrators' refusal to hear testimony "so affects the rights of a party that it may be said that he was deprived of [*24] a fair hearing." *Hasbro, Inc. v. Amron,* 419 F. Supp.2d 678, 687 (E.D. Pa. 2006) (quoting *Newark Stereotypers' Union No. 18,* 397 F.2d at 599). In the final analysis, the aggrieved party must show that the arbitrators' refusal to hear his evidence prejudiced him. *See* 9 U.S.C. § 10(a)(3).

Here, the record reflects that the Panel considered Mellon's request to permit Mr. Elish to testify in rebuttal. (*See* Mot., Exh. 2 at 29-38). After hearing the offer of proof as to Mr. Elish's proposed testimony, Defendants argued that Mellon was offering Mr. Elish to "put on the same points he addressed under direct examination [of Miles]," and urged the Panel not to give Mellon "a second bite at the apple by having put on Mr. Miles[,] who was an absolute disgrace of a witness, and come back with someone who they [sic] perhaps have since found to be more credible, at least on paper." (*See* Mot., Exh. 2 at 39-40). After taking a recess to have a "long discussion" amongst themselves about the matter, the arbitrators denied the request on the ground that none of the proposed testimony was proper for rebuttal. (*See* Mot., Exh. [*25] 2 at 40-42).

In these circumstances, the Court cannot conclude that the Panel's decision to exclude the proffered rebuttal

testimony was even erroneous, let alone that it denied Mellon a fair hearing. *See Hasbro,* 419 F. Supp.2d at 687. The NASD rules permit exclusion of evidence which appeared to be cumulative of other evidence already in the record. *See* NASD Code of Arbitration Proc. Rule 10323; *see also Scott v. Prudential Securities, Inc.,* 141 F.3d 1007, 1017 (11th Cir. 1998) ("An arbitrator need not consider all the evidence the parties seek to introduce but may reject evidence that is cumulative or irrelevant."). Significantly, Mellon made no effort at the hearing to refute Defendants' contention that this testimony was, in fact, cumulative of that offered by Mr. Miles, the expert Mellon offered in his case-in-chief. (*See* Mot., Exh. 2 at 31-38). Indeed, although Mellon's briefing in this Court recapitulates his offer of proof as to the relevancy of Mr. Elish's proposed testimony, even now he makes no effort to refute Defendants' contention that this testimony would have been superfluous in light of what Mr. Miles already had testified. [*26] (*See* Mot. at 20-21).

In sum, Mellon makes no effort to show that the proffered rebuttal testimony of Mr. Elish was anything but what Defendants claim it is: an improper and cumulative attempt to rehabilitate the testimony of Mr. Miles, the expert who testified in Mellon's own case-in-chief. Because the Panel had discretion to exclude such testimony, and because Mellon has not explained how the Panel's decision to exclude this cumulative evidence prejudiced him, *see* 9 U.S.C. § 10(a)(3), the Court finds that the Panel's decision to exclude this proposed testimony does not justify *vacatur* of the Award.

### C. Alleged Bias of One of the Three Panel Arbitrators

In his final argument, Mellon claims that, because of her alleged "bias" and "attention problems" on the last day of the arbitration, Arbitrator Hesselson's failure to recuse herself entitles him to a *vacatur* of the Award. (*See* Mot. at 23-34). Defendants argue that Mellon has not met his burden of demonstrating evident partiality. (*See* Memo. at 16-19). The Court concludes that Mellon cannot show that Arbitrator Hesselson was biased or inattentive, or that her participation in the arbitration [*27] prejudiced him.

The party challenging the arbitration decision has the burden of showing "evident partiality." *See* 9 U.S.C. § 10(a)(2); *see also Commonwealth Coatings Corp. v. Cont'l Cas. Co.,* 393 U.S. 145, 147, 89 S. Ct. 337, 21 L. Ed. 2d 301 (quoting 9 U.S.C. § 10). What constitutes "evident partiality" remains somewhat nebulous. Although there is some debate whether "evident partiality" must be shown by proof of "actual bias," or merely an "appearance of bias," *see Crow Constr. Co. v. Jeffrey M. Brown Assoc., Inc.,* 264 F. Supp.2d 217, 220-24 (E.D. Pa. 2003), the Third Circuit arguably adopted an "actual

bias" standard when it stated in *Kaplan* that, "[i]n order to show 'evident partiality,' the challenging party must show [that] a reasonable person would have to conclude that the arbitrator was partial to the other party in the arbitration." *See Kaplan,* 19 F.3d 1503, 1523 n.30 (citation and internal quotation marks omitted). *Kaplan* further observed that "'[e]vident partiality' is strong language and requires proof of circumstances powerfully suggestive of bias." *Id.* Even applying the more generous [*28] "appearance of bias" standard, and even assuming *arguendo* that Mellon's allegations enjoyed full evidentiary support, they would not justify vacating the Award, however.

Mellon has not alleged that any of the arbitrators had a pecuniary interest or any other personal stake in the outcome of the case. Instead, Mellon's claim of bias focuses on two points, both of which are directed solely at Arbitrator Hesselson. First, Mellon complains about derogatory comments that Arbitrator Hesselson supposedly made about his counsel during a prior arbitration in a different matter; second, he alleges that Arbitrator Hesselson displayed an unspecified "attention problem" during the last day of Mellon's arbitration. (*See* Mot. at 24-28). As a threshold matter, the Court observes that Mellon offers no evidence -- other than his *ipse dixit* -- that Arbitrator Hesselson either made derogatory comments about his counsel at a separate arbitration, or that she was inattentive during Mellon's arbitration. (*See* Mot. at 24-30).

But even if Mellon could provide some evidence that Arbitrator Hesselson made these comments about his counsel, "[a]crimony or negative feelings between the arbitrators [*29] and a party's attorneys do not indicate an appearance of bias, much less the evident partiality required to vacate an award." *See LLT Int'l Inc. v. MCI Telecomms. Corp.,* 18 F. Supp.2d 349, 354 (S.D.N.Y. 1998) (citation and internal quotation marks omitted). This principle is reinforced by the fact that Arbitrator Hesselson is not alleged to have been biased against *Mellon* (as opposed to his counsel), or *this* arbitration (as opposed to an entirely separate arbitration). Thus, supposing Mellon could prove that Arbitrator Hesselson "made disparaging remarks about how [Mellon's counsel] was conducting his interrogations of witnesses" during an entirely separate arbitration, (*see* Motion at 24), that evidence would not even create the appearance of bias -- let alone persuade the Court that any alleged prior strife between Arbitrator Hesselson and Mellon's counsel affected this arbitration.

Likewise unavailing is Mellon's contention that Arbitrator Hesselson displayed an "attention problem" during the final day of the arbitration, (*see* Motion at 27-28), which allegation appears to fall under the category of "other misbehavior" rather than "evident [*30] partial-

ity." *See* 9 U.S.C. § 10(a)(3). Even if there were some evidentiary support for this allegation, the Court could not vacate the Award on that basis. *See Forsythe Intern., S.A. v. Gibbs Oil Co.,* 915 F.2d 1017, 1021-23 (5th Cir. 1990) (upholding an arbitrator's decision despite clear evidence of arbitrator inattention and refusal by the panel to hear certain evidence); *see also Velasco v. Beth Israel Medical Center,* 279 F. Supp.2d 333, 337 (S.D.N.Y. 2003) (holding that a party's allegation that the arbitrator was "not paying attention to the arbitration proceeding," even if true, would not establish bias).

These conclusions are reinforced by the apparent harmlessness of any alleged bias or misconduct by Arbitrator Hesselson. Significantly, Mellon does not contend that either of the other two arbitrators was biased against him; indeed, he admits that he had "no objection to the remainder of the Panel" hearing the matter. (*See* Mot. at 25-26). This concession, when considered in light of the unanimity of the Panel's ultimate decision, means that Arbitrator Hesselson was -- even if biased or inattentive -- entirely immaterial [*31] to the result. *See Lummus Global Amazonas S.A. v. Aguaytia Energy del Peru S.R. Ltda.,* 256 F. Supp.2d 594, 628 (S.D. Tex. 2002) (finding that the alleged bias of one arbitrator on a unanimous three-arbitrator panel was not prejudicial where the plaintiff "has not alleged any wrongdoing by the other two members of the panel.").

In light of the foregoing, the Court concludes that Mellon has not demonstrated partiality under either the "actual bias" standard articulated in *Kaplan,* or the more generous "appearance of bias" standard adopted in other circuits. Thus, the Court concludes that the alleged bias of Arbitrator Hesselson does not warrant *vacatur* of the Award. *See* 9 U.S.C. § 10(a)(2) and (3).

## VII. Conclusion

For all the foregoing reasons, Plaintiff Mellon has not carried his heavy burden of showing that the arbitration award should be vacated. Accordingly, the Court will deny Plaintiff's Motion to Vacate, grant Defendants' Counterclaim, and confirm the Award. [8]

8

To the extent that Defendants' Motion for Judgment on the Pleadings seeks the same relief as their Counterclaim, the Court's confirmation of the Award moots the Rule 12(c) motion. *See Grosso,* 2003 U.S. Dist. LEXIS 20208, 2003 WL 22657305, at *9 (confirming an arbitration award and denying all other motions as moot). Defendants' request for sanctions, which appears in their Rule 12(c) motion but not in the Counterclaim, will be denied. *See Virgin Islands Housing Authority v. Coastal General Const. Services Corp.,* 27 F.3d 911, 917, 30 V.I. 417 (3d Cir. 1994) (declining to sanction a party who challenged an arbitration award in district court).

[*32] An appropriate Order follows.

Thomas M. Hardiman

United States District Judge

Dated: November 6, 2006

## ORDER

AND NOW this 6<th> day of November, 2006 upon consideration of Plaintiff's Complaint in the Form of Motion to Vacate Arbitration Award (Doc. No. 2) and Defendants' Answer to Complaint and Counterclaim to Confirm Arbitration Award (Doc. No. 7), it is hereby

ORDERED that Plaintiff's Motion is DENIED, Defendants' Counterclaim is GRANTED, and the NASD arbitration award entered in favor of Defendants is CONFIRMED. It is further

ORDERED that Defendants' request for sanctions is DENIED and Defendants' Motion for Judgment on the Pleadings (Doc. No. 8) is DENIED AS MOOT. It is further

ORDERED that Plaintiff's Complaint is DISMISSED, and the Clerk is directed to mark this case CLOSED.

BY THE COURT:

Thomas M. Hardiman

United States District Judge